## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| Linda DeVooght, Tressa Sinha, Jennifer Piper, Donna Tripi, Suzanne Chaffin, and Cheryl Osowski, | Case: |
| Plaintiffs, | Hon. _____ United States District Judge |
| v. | |
| City of Warren, | |
| Defendant. | |

## VERIFIED COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT, INJUNCTIVE RELIEF AND JURY DEMAND

Plaintiffs Linda DeVooght, Tressa Sinha, Jennifer Piper, Donna Tripi, Suzanne Chaffin, and Cheryl Osowski, by their attorneys Pitt McGehee Palmer & Rivers, are women dispatchers employed by the City of Warren Police Department. They bring this lawsuit against their employer, the City of Warren, alleging violations of their 14th Amendment Equal Protection rights and their rights under the Elliott-Larsen Civil Rights Act because they are subjected to unlawfully adverse conditions of employment that have now placed them in dire and immediate danger because of the COVID-19 global pandemic and public health emergency.

Specifically, Plaintiffs are required to conduct pat-down and, on occasion, strip searches of women arrestees at considerable risk to their health and safety;

1

whereas, similarly situated male dispatchers have no such work demand. Plaintiffs have been ordered to conduct these dangerous activities without adequate protective gear and thus are regularly exposed to the risk of the deadly COVID-19 virus; whereas, their male counterparts are never expected to take on such risks.

Plaintiffs' claims of discrimination on the basis of sex in violation of Title VII are pending before the EEOC, and this Complaint will be amended once the EEOC has conducted its responsibilities under Title VII.

## JURISDICTION, PARTIES AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions; 28 U.S.C. § 1343(a)(3) and (4), which authorize federal courts to hear civil rights cases; and 28 U.S.C. § 2201, the Declaratory Judgment Act.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1367 over the state-law claims under the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq* ("ELCRA") arising from the same core operative facts as the federal questions.

3. Plaintiff Linda DeVooght is a 48-year-old woman who resides in Sterling Heights, County of Macomb, Michigan.

4. Plaintiff Tressa Sinha is a 35-year-old woman who resides in Troy, County of Oakland, Michigan.

2

5.     Plaintiff Jennifer Piper is a 46-year-old woman who resides in Warren, County of Macomb, Michigan.

6.     Plaintiff Donna Tripi is a 46-year-old woman who resides in Sterling Heights, County of Macomb, Michigan.

7.     Plaintiff Suzanne Chaffin is a 38-year-old woman who resides in Sterling Heights, County of Macomb, Michigan.

8.     Plaintiff Cheryl Osowski is a 48-year-old woman who resides in Chesterfield, County of Macomb, Michigan.

9.     Defendant City of Warren is an incorporated municipality under Michigan's Home Rule Cities Act and located in Macomb County, Michigan.

10.    Venue is proper in this Court as Defendant is located in the Eastern District of Michigan.

## Statement of Facts

11.    The City of Warren Police Department employs 22 dispatchers, 17 of whom are women.

12.    The dispatchers employed by the City of Warren Police Department are paid according to two collective bargaining agreements—one for the dispatchers and one for the supervisors—and these agreements make no distinction in pay between male and female dispatchers.

13.    Plaintiff Linda DeVooght began working as a dispatcher for Defendant City of Warren's Police Department on or about April 6, 1999. She was promoted to a Supervisor of Dispatch on or about February 20, 2015.

14.    Plaintiff Tressa Sinha began working as a dispatcher for Defendant City of Warren's Police Department on or about May 27, 2015.

15.    Plaintiff Jennifer Piper began working a dispatcher for Defendant City of Warren's Police Department on or about January 24, 2005.

16.    Plaintiff Donna Tripi began working as a dispatcher for Defendant City of Warren's Police Department on or about July 29, 1996.

17.    Plaintiff Suzanne Chaffin began working as a dispatcher for Defendant City of Warren's Police Department on or about December 13, 2010.

18.    Plaintiff Cheryl Osowski began working as a dispatcher for Defendant City of Warren's Police Department on or about November 19, 1991.

**A.    The City of Warren Police Department Maintains a Long-Standing Policy that Requires Women Dispatchers to Conduct Custodial Searches of Prisoners; whereas, Male Dispatchers Have No Such Requirement**

19.    On October 4, 2017, the City of Warren Police Department issued General Order No. 17-10 for Arrest Procedures and the "handling, booking, and processing of prisoners taken into custody."

20.    According to Section G, "Prisoner Searches," of this 2017 General Order:

4

      a.    "the arresting/transporting officers will conduct an initial search for weapons and contraband."

      b.    "If a male prisoner is arrested by a female officer, an available male officer who is on duty and in the station when the arrest is made shall be called upon to conduct the search."

      c.    "If a female prisoner is arrested by a male officer, an available officer who is on duty and in the station when the arrest is made shall be called upon to conduct the search prior to calling upon a dispatcher to perform the search."

21.    This General Order further directs that "A female dispatcher will conduct the search of a female prisoner in the detention facility when: 1) a female is arrested by a male officer; and 2) there are no female officers on duty and in the station at the time of booking."

22.    This General Order further directs that when only 3 dispatchers are on duty "or if the Watch Commander deems it necessary, an officer will be assigned by the Watch Commander to assist in Dispatch until the search is completed."

23.    There is no provision for male dispatchers to ever search a prisoner.

24.    This policy of ordering female dispatchers to perform body searches of female prisoners has been in effect, with some minor variations, since at least 2002.

25.     An earlier version of this General Order, which was in effect from May 17, 2011 until October 4, 2017, ordered that "When a female officer is not available to conduct a search of a female prisoner, a female Dispatcher will be called upon to conduct the search."

26.     The version of the General Order for Prisoner Processing that became effective on August 4, 2005, directs that "when a female officer is not available to conduct a search of a female prisoner, a female Dispatcher will be called upon to conduct the search."

27.     The City of Warren Police Department General Order No. 02-01 regarding the General Description of Duties for Dispatchers became effective on April 30, 2002 and remains in effect today.

28.     This General Order regarding the Duties for Dispatchers does not mention prisoner searches.

29.     Similarly, the General Order describing the duties of Dispatch Supervisors, which became effective on October 9, 2002 and remains in effect today, makes no mention of prisoner searches as a responsibility of any dispatcher.

30.     The collective bargaining agreements relevant to Dispatchers and Dispatch Supervisors similarly make no mention of prisoner searches as a responsibility of any dispatcher.

6

**B.      Plaintiffs and the Other Female Dispatchers Regularly and Frequently Conduct Custodial Searches of Female Arrestees who are Being Detained at the Warren Jail**

31.     On numerous occasions in any given week—averaging four to five times in a week—it becomes necessary for a female dispatcher to leave her duties and perform a custodial search of a prisoner.

32.     Even though the applicable orders direct a female officer who is on duty and in the station to conduct the search, as a practice and policy of the department and its commanding officers, female officers are not ordered to perform these searches, even when they are on duty and in the station.

33.     Rather, it is nearly always the case that when a male officer brings in a female prisoner, a female dispatcher is ordered to report to the intake area and conduct the search.

34.     Of its nearly 200 sworn officers, Defendant City of Warren's Police Department employs 13 female police officers.

35.     One of these female officers is assigned during the days from Monday to Friday at the station and yet she has rarely if ever been ordered to conduct the full custodial search of a female arrestee brought in by a male officer.

**C.     Custodial Searches Involve Extensive Physical Contact with the Prisoner's Body, Clothing, and Personal Effects; However, the City of Warren has Failed to Properly Train or Protect the Female Dispatchers it Orders to Conduct these Searches**

36.     The General Order No. 17-10 on Arrest Procedures defines the full custodial search that must be conducted of a prisoner being arrested as requiring the person conducting the search to remove and inventory all personal property, check the prisoner's garments, remove all medications, contraband, and potential weapons, and remove and inspect all headwear such as wigs, toupees, weaves, or barrettes.

37.     When a female dispatcher is performing the search, the arresting/assisting officer is required by the General Order No. 17-10 to "stand by in close proximity in the booking area until the search has been completed and the prisoner has been turned over to detention personnel."

38.     In practice, the arresting/assisting officer will commonly leave the proximity of the female dispatcher and the prisoner she has been ordered to search.

39.     Indeed, on March 12, 2020, Plaintiff Suzanne Chaffin was ordered to conduct a custodial search on a female prisoner who was arrested on a two-felony warrant—assault and concealing a dangerous weapon—yet the male arresting/assisting officer left Chaffin alone with this prisoner for at least two minutes during the search.

8

40.     Sworn police officers receive extensive training to perform all parts of their job requirements, including how to safely conduct a custodial search of a prisoner, disarm prisoners, and remove contraband.

41.     However, the City of Warren's Police Department has failed to provide any training in five years for the female dispatchers to conduct a custodial search of a prisoner, disarm prisoners, or remove contraband from a prisoner.

42.     Approximately once a year, the City of Warren's Police Department has its female dispatchers watch a training video regarding custodial searches of prisoners.

43.     Watching a training video is woefully inadequate training for conducting a search that can expose the person conducting the search to infectious diseases such as COVID-19, potential weapons the prisoner is holding that evaded the original pat-down, highly toxic narcotics the prisoner may yet have concealed on her person, as well as lice, scabies, fleas and other pests that may have infested a prisoner.

44.     This training video even demonstrates a male officer conducting the custodial search of a female prisoner.

45.     Male dispatchers, unlike their female counterparts, are never asked or ordered to perform custodial searches of prisoners; therefore, the male dispatchers

are never subjected to the risks associated with conducting custodial searches of prisoners.

     **D.**    **Since March 10, 2020, when the First COVID-19 Case in Michigan was Confirmed, Female Dispatchers have been Ordered to Continue to Conduct Custodial Searches of Prisoners**

46.    On March 10, 2020, the first COVID-19 case in Michigan was confirmed and Governor Whitmer declared a State of Emergency directing that steps be taken to prevent the spread of the disease.

47.    Since March 10, 2020, Plaintiffs and their fellow Female Dispatchers have been ordered to conduct custodial searches of female prisoners on no fewer than 12 separate occasions.

48.    The United States Centers for Disease Control and Prevention ("CDC") has issued guidance regarding the measures to be taken at workplaces to avoid and protect against transmission of COVID-19. Among the recommendations provided for law enforcement personnel is maintain a distance of 6 feet from individuals whenever possible.[1]

---

[1] "What Law Enforcement Personnel Need to Know About Coronavirus Disease 2019 (COVID-19)," CDC, available at https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-law-enforcement.html (Last visited 3-23-2020).

10

49.    Additionally, the CDC has proscribed the following as minimally acceptable Personal Protective Equipment to Wear when one must be within 6 feet of another individual to perform operational duties[2]:

    a.    A single pair of disposable examination gloves,

    b.    Disposable isolation gown or single-use/disposable coveralls,

    c.    Any NIOSH-approved particulate respirator (i.e., N-95 or higher-level respirator); Facemasks are an acceptable alternative until the supply chain is restored, and

    d.    Eye protection (i.e., goggles or disposable face shield that fully covers the front and sides of the face)

50.    While disposable gloves and face masks have been made available to Plaintiff and their fellow Female Dispatchers, at no time has Defendant provided isolation gowns or eye protection to them.

51.    Indeed, on March 22, 2020, Plaintiff Cheryl Osowski expressed her grave concerns about performing a custodial search without such protective equipment because she lives with three family members who are in high-risk categories for COVID-19 exposure—diabetes, cancer treatment, and asthma.

52.    The Watch Commander told Osowski that all she needed was the mask and the gloves. He denied her a protective gown and eye protection.

_____

[2] *Id.*

53.     Osowski was required to perform the custodial search on this female prisoner notwithstanding her concerns and the lack of proper protective equipment, and the fact that a female officer was due to come on duty at the station in 15 minutes.

54.     Police officers are provided with eye protection and protective gowns to perform custodial searches.

55.     Male Dispatchers are never expected to perform custodial searches of prisoners.

56.     It appears nowhere in the Dispatcher job description that any Dispatcher would be expected to perform custodial searches of prisoners.

57.     Nonetheless, when Plaintiff Jennifer Piper took a medical leave in the fall of 2019, the City of Warren required her to demonstrate that she was physically able to conduct custodial searches or prisoners before she was cleared to return to work.

58.     No male dispatcher has ever had to demonstrate that he was physically able to conduct custodial searches in order to be cleared to return to work.

**E.     In Addition to the Immediate Concerns of COVID-19 Exposures, Custodial Searches of Prisoners Expose Female Dispatchers to Other Dangerous and Odious Conditions**

59.     Plaintiffs and their fellow Female Dispatchers have been ordered to conduct searches in which they must touch and handle women who:

        a.      are extremely intoxicated;

  b.  are belligerent and make direct threats to the female dispatchers;

  c.  have urinated, vomited, and/or defecated on themselves;

  d.  are known or believed to be infected with highly contagious diseases;

  e.  show obvious signs of lice, bed bugs, flea, and/or scabies infestation; and/or

  f.  may have sharp objects such as drug paraphernalia and/or weapons.

60. Plaintiffs and their fellow Female Dispatchers have been ordered to conduct strip searches of women who are believed to be:

  a.  concealing weapons in the folds and cavities of their bodies;

  b.  concealing highly toxic controlled substances in the folds and cavities of their bodies;

  c.  are known or believed to be infected with highly contagious diseases;

  d.  show obvious signs of lice, bed bugs, flea, and/or scabies infestation.

61. Plaintiffs and their fellow Female Dispatchers have been ordered to conduct searches of women who are obviously ill.

62.     Plaintiffs and other Female Dispatchers have been exposed directly to the body fluids of women prisoners during these searches.

63.     Plaintiffs and other Female Dispatchers have been left alone with multiple female prisoners during the custodial search or left with only an inexperienced rookie officer while the female dispatcher conducted the search.

64.     Plaintiffs and other Female Dispatchers have even been left alone to search prisoners who were arrested on violent felony charges.

**F.    Plaintiffs Have Been Required to Search Prisoners even when Female Officers were on Duty and in the Station**

65.     The General Order governing custodial searches of prisoners requires that a female officer present in the station and on duty conduct the search, and that a female dispatcher only be ordered to conduct the search when that is not the case.

66.     However, on numerous occasions Plaintiffs and their fellow female dispatchers have been ordered to conduct the custodial search of female prisoners even though there were female officers on duty in the station. For example:

    a.     On June 24, 2019, a female prisoner was brought in by a male officer. A female officer was on duty and in the station at the time but she rejected the page to conduct the search. Instead, Plaintiff Linda DeVooght was ordered to conduct the search.

    b.     On October 4, 2019, a female prisoner was brought in by a male officer. At the time, two female officers were on duty at the

station; however, they did not respond to their commanding officer's page. Instead, Plaintiff Cheryl Osowski was ordered to report to the booking area and conduct the search.

c.    On October 28, 2019, a female prisoner was brought in by a male officer. At the time, two female officers were on duty and at the station, but their commanding officers were not. As a result, Plaintiff Donna Tripi was ordered to conduct the search.

d.    On February 26, 2020, a female prisoner was brought in by a male officer. At the time, a female officer was on duty and in the station, but Dispatch was informed that this officer was "unavailable" without any additional clarification. Instead, Plaintiff Donna Tripi was ordered to search the prisoner.

e.    On February 27, 2020, a female prisoner was brought in by a male officer. At the time, a female officer was on duty in the building and Plaintiff Donna Tripi actually saw this officer by the elevator when Tripi responded to the order to report to the booking area and conduct the custodial search.

f.    On March 13, 2020, a female prisoner was brought in by a male officer. At the time, a female officer was in the station and on

duty. Nonetheless, Plaintiff Jennifer Piper was ordered to conduct the search of the prisoner.

g. On March 16, 2020, a female prisoner was brought in by a male officer. At the time, a female officer was on duty and in the station; however, the watch commander informed dispatch that this officer was "unavailable" with no further elaboration. Instead, Plaintiff Tressa Sinha was ordered to conduct the search of the prisoner.

## G. When Female Dispatchers are Ordered to Report to Booking and Conduct a Search, Dispatch is Left Understaffed

67. The General Order governing prisoner processing indicates that to prevent understaffing of the dispatch unit, a male officer will provide relief for the female dispatcher when she is ordered to conduct a custodial search of a prisoner.

68. However, the male officers sent to relieve female dispatchers do not have training to perform the functions of the dispatch, leaving the dispatch unit short of staff.

69. On June 13, 2019, a female dispatcher was ordered to conduct a custodial search. While she was conducting the search, the male police officer sent to cover this dispatcher's duties talked with colleagues nearby instead of answering the phones at dispatch.

16

70.     On October 19, 2019, when a female dispatcher was ordered to report to booking and conduct a search, the male officer who replaced her at dispatch sat at a computer that was not logged in and worked on his own paperwork instead of answering the phones at dispatch.

**H.     Plaintiffs Face Immediate and Ongoing Threats to their Physical Health Because of Defendant's Unlawful Policy**

71.     The policy and practice of the City of Warren's Police Department on its face imposes conditions and terms of employment on the women who work as dispatchers and dispatch supervisors that are far more dangerous and odious than the terms and conditions of employment enjoyed by the male dispatchers.

72.     Because of this facially discriminatory policy and practice, Plaintiffs have endured the risk and danger of exposure to infectious diseases, including notably COVID-19, solely because of their sex.

73.     Indeed, on March 23, 2020, the dispatch unit received a memo entitled "Friendly Reminders During the COVID-19 Pandemic" explicitly confirming that "Searches of female prisoners when an officer is not available remains status quo."

74.     Even before the COVID-19 Pandemic, Plaintiffs have regularly and frequently been subjected to belligerence and hostility by the female prisoners they have been ordered to search, and Plaintiffs suffer these indignities and stresses solely because of their sex.

75.    Plaintiff have also regularly and frequently been subjected to the risk of being exposed to noxious infestations like scabies, bed bugs, lice, and fleas, as well as the dangers of toxic drugs and weapons hidden on these female prisoners' bodies, and Plaintiffs have been forced to face these dangers solely because of their sex.

76.    Plaintiffs receive no remuneration nor compensation of any sort for the additional dangers, risks, and unpleasantness of being regularly and frequently ordered to conduct custodial searches solely because of their sex.

## I.    There Exist Other Reasonable Operational Procedures That Would Allow for the Processing of Female Prisoners without Violating Plaintiffs' Equal Protection Rights

77.    The City of Warren's Police Department has failed to consider or adopt alternative procedures that would allow for the processing of female prisoners without imposing on Plaintiffs and their fellow female dispatchers unfair, dangerous, and noxious terms and conditions of employment because of their sex.

78.    For instance, Plaintiffs have requested many times and been denied on each and every occasion that they be paid a form of "hazard compensation" for being ordered to conduct these dangerous and odious custodial searches of prisoners.

18

79.    It is also the case that while nationally, women comprise over 14 percent of all police officers[3], the City of Warren employs only 13 female police officers, which is approximately 7% of the police force. Therefore, the City of Warren has failed to adequately recruit and employ reasonable numbers of female officers. If the City of Warren had female police officers in numbers commensurate with the national averages, it would have twice the female officers it currently employs—at least 28.

80.    As alleged above, even when female officers are on duty and in the station, they do not report to the jail to conduct searches of female prisoners. Therefore, the City of Warren's Police Department has failed to rely upon its female officers, who are properly trained to handle prisoners and compensated commensurate to the risks and dangers they must face as sworn officers, to conduct custodial searches—an integral part of their own job descriptions while not a component of Plaintiffs' job descriptions.

81.    The City of Warren's Police Department has failed to organize its staffing schedules to ensure that a female officer is on duty and available to conduct female prisoner searches.

---

[3] Data USA, "Police Officers", available at
https://datausa.io/profile/soc/333050/#demographics (last visited March 24, 2020).

82.    For the immediate future, from today through the next month, at least one of the Plaintiffs is scheduled to work on each day; therefore, Plaintiffs face immediate and ongoing risks of exposure to COVID-19 if and when they are ordered to conduct a custodial search of a female prisoner.

### Count One: 42 U.S.C. § 1983, *Monell*-based Violation of Plaintiffs' Rights Under the Equal Protection Clause of the 14th Amendment

83.    Plaintiffs incorporate all the above allegations by reference here.

84.    42 U.S.C. § 1983 allows for a municipality to be sued when it enacts and promulgates a law or policy that violates the Constitution or Laws of the United States. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)

85.    The 14th Amendment of the United States Constitution forbids the denial of any person the equal protection of the laws.

86.    Included within the 14th Amendment is the guarantee that a government may not treat a group of persons less favorably because of their sex.

87.    As set forth above, the City of Warren, through its Police Department, has promulgated and enforced a General Order that treats Plaintiffs, a group of female dispatchers, less favorably in the terms and conditions of their employment with the City of Warren because of their sex.

88.    As set forth above, Plaintiffs now face imminent and real danger of exposure to COVID-19—a danger amplified far above the danger faced by the male dispatchers who are their co-workers—because of their sex.

20

89.     Pursuant to 42 U.S.C. §§ 1983, 1988 and other applicable laws, Plaintiffs seek the following relief:

a.      Issue a Temporary Restraining Order banning the policy and practice of requiring Plaintiffs and their fellow female dispatchers to conduct custodial searches of female prisoners:

b.      a declaratory judgment that Defendant's General Order, policy, and practice of requiring Plaintiffs and their fellow female dispatchers to conduct custodial searches of female prisoners violates Plaintiffs' Equal Protection rights guaranteed by the 14th Amendment;

c.      monetary damages to compensate Plaintiffs for the many years of extremely dangerous and odious terms and conditions of employment that have been imposed upon them unlawfully because of their sex;

d.      an award of Plaintiffs' attorney's fees and costs;

e.      other relief that the Court may deem appropriate.

**Count Two: Violation of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.*, Disparate Treatment in the Terms and Conditions of Employment on the Basis of Sex**

90.     Plaintiffs incorporate all the above allegations by reference here.

21

91.     The ELCRA prohibits employers from discriminating in the terms and conditions of employment on the basis of sex. M.C.L. § 37.2202.

92.     Municipalities and governmental entities are covered employers under the ELCRA.

93.     As set forth above, the City of Warren, through its Police Department, has promulgated and enforced a General Order that treats Plaintiffs, a group of female dispatchers, less favorably in the terms and conditions of their employment with the City of Warren because of their sex.

94.     As set forth above, Plaintiffs now face imminent and real danger of exposure to COVID-19—a danger amplified far above the danger faced by the male dispatchers who are their co-workers—because of their sex.

95.     Pursuant to M.C.L. § 37.2801 and other applicable laws, Plaintiffs seek the following relief:

        a.    immediate injunctive relief banning the policy and practice of requiring Plaintiffs and their fellow female dispatchers to conduct custodial searches of female prisoners:

        b.    a declaratory judgment that Defendant's General Order, policy, and practice of requiring Plaintiffs and their fellow female dispatchers to conduct custodial searches of female prisoners violates Plaintiffs' rights under the ELCRA;

c.      monetary damages to compensate Plaintiffs for the many years

of extremely dangerous and odious terms and conditions of

employment that have been imposed upon them unlawfully

because of their sex;

d.      an award of Plaintiffs' attorney's fees and costs;

e.      other relief that the Court may deem appropriate.

**PITT McGEHEE PALMER & RIVERS**

By:  */s/ Robin B. Wagner*____
        Michael L. Pitt (P24429)
        Robin B. Wagner (P79408)
        Kevin M. Carlson (P67704)
        Attorneys for Plaintiffs
        117 W. Fourth Street, Suite 200
        Royal Oak, MI  48067
        248-398-9800
        248-268-7996 (fax)
        mpitt@pittlawpc.com
        rwagner@pittlawpc.com
        kcarlson@pittlawpc.com

Dated:  March 27, 2020

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of the facts and issues involved in this matter.

PITT McGEHEE PALMER & RIVERS

By: /s/ Robin B. Wagner
      Michael L. Pitt (P24429)
      Robin B. Wagner (P79408)
      Kevin M. Carlson (P67704)
      Attorneys for Plaintiffs
      117 W. Fourth Street, Suite 200
      Royal Oak, MI  48067
      248-398-9800
      248-268-7996 (fax)
      mpitt@pittlawpc.com
      rwagner@pittlawpc.com
      kcarlson@pittlawpc.com

Dated:  March 27, 2020

**SIGNATURE AND VERIFICATION OF COMPLAINT BY PLAINTIFF**

I declare under penalty of perjury that the facts stated in this Complaint are true and accurate to the best of my knowledge and information.

Signed: _Jennifer Piper_
Jennifer Piper

## SIGNATURE AND VERIFICATION OF COMPLAINT BY PLAINTIFF

I declare under penalty of perjury that the facts stated in this Complaint are true and accurate to the best of my knowledge and information.

Signed: _____

Tressa Marie Sinha

## SIGNATURE   AND   VERIFICATION   OF   COMPLAINT   BY PLAINTIFF

I declare under penalty of perjury that the facts stated in this Complaint are true and accurate to the best of my knowledge and information.

Signed: _Cheryl Osowski_____
Cheryl Osowski

27

**SIGNATURE AND VERIFICATION OF COMPLAINT BY PLAINTIFF**

I declare under penalty of perjury that the facts stated in this Complaint are true and accurate to the best of my knowledge and information.

Signed: _____

Linda DeVooght

## SIGNATURE   AND   VERIFICATION   OF   COMPLAINT   BY PLAINTIFF

I declare under penalty of perjury that the facts stated in this Complaint

are true and accurate to the best of my knowledge and information.

Signed: _____

Donna Tripi

## SIGNATURE AND VERIFICATION OF COMPLAINT BY PLAINTIFF

I declare under penalty of perjury that the facts stated in this Complaint are true and accurate to the best of my knowledge and information.

Signed: _____

Suzanne Chaffin