## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Linda DeVooght, Tressa Sinha,
Jennifer Piper, and Dawn McLean,

     Plaintiffs,

v.

City of Warren,

     Defendant.

Case: 20-cv-10812

Hon. George Caram Steeh
United States District Judge

Hon. David R. Grand
United States Magistrate Judge

## PLAINTIFFS' STIPULATED SECOND AMENDED
## VERIFIED COMPLAINT FOR DAMAGES, DECLARATORY
## JUDGMENT, INJUNCTIVE RELIEF AND JURY DEMAND

1.　　Plaintiffs Linda DeVooght, Tressa Sinha, Jennifer Piper, and Dawn McLean are women dispatchers employed by the City of Warren Police Department. They originally brought this lawsuit against their employer, the City of Warren alleging violations of their 14th Amendment Equal Protection rights and their rights under the Elliott-Larsen Civil Rights Act. Plaintiffs have been subjected to unlawfully adverse conditions of employment because of their sex, and now Plaintiffs add to their Complaint charges under Title VII of the 1964 Civil Rights Act.

2.　　Plaintiffs, who are civilian employees, are required to conduct pat-down searches of women arrestees, which is universally understood to be a

1

responsibility properly left to trained sworn police officers; whereas, similarly situated male dispatchers have no such work demand. Defendants, the City of Warren and its Police Commissioner, require Plaintiffs and their fellow women dispatchers, but not their similarly situated male dispatchers, to conduct these inherently unsafe searches of arrestees instead of assigning the task to one of the City's on-duty female police officers who have been properly trained to conduct the searches, or requesting the assistance of a female office from a neighboring jurisdiction.

## JURISDICTION, PARTIES AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions; 28 U.S.C. § 1343(a)(3) and (4), which authorize federal courts to hear civil rights cases; and 28 U.S.C. § 2201, the Declaratory Judgment Act.

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1367 over the state-law claims under the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq* ("ELCRA") arising from the same core operative facts as the federal questions.

5.      Plaintiff Linda DeVooght is a 48-year-old woman who resides in Sterling Heights, County of Macomb, Michigan.

6.      Plaintiff Tressa Sinha is a 35-year-old woman who resides in Troy, County of Oakland, Michigan.

7.    Plaintiff Jennifer Piper is a 46-year-old woman who resides in Warren, County of Macomb, Michigan.

8.    Plaintiff Dawn Mclean is a 48-year-old woman who resides in Warren, County of Macomb, Michigan.

9.    Defendant City of Warren is an incorporated municipality under Michigan's Home Rule Cities Act and located in Macomb County, Michigan.

10.    On October 15, 2020, Plaintiffs received their Notices of Right to Sue from the EEOC on their charges of discrimination in violation of Title VII of the 1964 Civil Rights Act:

     a.  DeVooght, Charge Number 471-2020-02481

     b.  Sinha, Charge Number 471-2020-02484

     c.  Piper, Charge Number 471-2020-02483

     d.  McLean, Charge Number 471-2020-02604

11.    Venue is proper in this Court as Defendant City is located in the Eastern District of Michigan, all parties live and work in the Eastern District of Michigan, and all the events alleged herein occurred in the Eastern District of Michigan.

## Statement of Facts

12.    The City of Warren Police Department employs approximately 20 dispatchers, 4 of whom are men and the rest of whom are women.

13.     The dispatchers employed by the City of Warren Police Department are paid according to two collective bargaining agreements—one for the dispatchers and one for the supervisors—and these agreements make no distinction in pay between male and female dispatchers or dispatch supervisors.

14.     Plaintiff Linda DeVooght began working as a dispatcher for Defendant City of Warren's Police Department on or about April 6, 1999. She was promoted to a Supervisor of Dispatch on or about February 20, 2015.

15.     In September of 2020, Ms. DeVooght accepted a settlement agreement negotiated through the unions with Defendants to accept a demotion to dispatcher and an unpaid suspension.

16.     On October 7, 2020, the City issued a personnel order reinstating DeVooght to the position of dispatcher.

17.     On October 9, 2020, Ms. DeVooght resumed employment with the City of Warren as a dispatcher.

18.     Plaintiff Tressa Sinha began working as a dispatcher for Defendant City of Warren's Police Department on or about May 27, 2015.

19.     Plaintiff Jennifer Piper began working a dispatcher for Defendant City of Warren's Police Department on or about January 24, 2005.

20.     Plaintiff Dawn McLean began working as a dispatcher for Defendant City of Warren's Police Department in or about May 1997.

**A. The City of Warren Police Department Maintains a Long-Standing Policy that Requires Women Dispatchers to Conduct Custodial Searches of Prisoners; whereas, Male Dispatchers Have No Such Requirement**

21.    On October 4, 2017, the City of Warren Police Department issued General Order No. 17-10 for Arrest Procedures and the "handling, booking, and processing of prisoners taken into custody."

22.    According to Section G, "Prisoner Searches," of this 2017 General Order:

> a.    "the arresting/transporting officers will conduct an initial search for weapons and contraband."
>
> b.    "If a male prisoner is arrested by a female officer, an available male officer who is on duty and in the station when the arrest is made shall be called upon to conduct the search."
>
> c.    "If a female prisoner is arrested by a male officer, an available officer who is on duty and in the station when the arrest is made shall be called upon to conduct the search prior to calling upon a dispatcher to perform the search."

23.    This General Order further directs that "A female dispatcher will conduct the search of a female prisoner in the detention facility when: 1) a female is arrested by a male officer; and 2) there are no female officers on duty and in the station at the time of booking."

24.    This General Order further directs that when only 3 dispatchers are on duty "or if the Watch Commander deems it necessary, an officer will be assigned by the Watch Commander to assist in Dispatch until the search is completed."

25.    There is no provision for male dispatchers to ever search a prisoner.

26.    This written policy of ordering female dispatchers to perform body searches of female prisoners has been in effect since 2011.

27.    Earlier versions of the prisoner search policy have, with only a few short exceptions, also spelled out that only female dispatchers would be called upon to perform prisoner searches.

28.    On April 4, 2020, in response to initial negotiations regarding Plaintiffs' filing of their initial Complaint and a since-withdrawn Motion for Preliminary Injunction and Temporary Restraining Order (Dkt. 2), Defendants issued General Order 20-03, which altered the policy's language to require a dispatcher to conduct a prisoner search when a same-sex patrol officer is unavailable.

29.    There is no known instance dating back at least three decades and including since the revised directive issued on April 4, 2020, of a male dispatcher conducting a prisoner search.

30.    The City of Warren Police Department General Order regarding the General Description of Duties for Dispatchers was last revised in August of 2003.

31.     This General Order regarding the Duties for Dispatchers mentions as the last of a long list of duties that a dispatcher "assists in the searching/processing of arrested persons in the station, as necessary, at the direction of a supervisor."

32.     The General Order describing the duties of Dispatch Supervisors, which became effective on October 9, 2002 and remains in effect today, makes no mention of prisoner searches as a responsibility, but does indicate that he or she performs general dispatch duties.

33.     The collective bargaining agreements relevant to Dispatchers and Dispatch Supervisors make no mention of prisoner searches as a responsibility of any dispatcher.

**B. Defendants Maintain a Policy and Practice that Requires Plaintiffs and the Other Female Dispatchers, but Never Male Dispatchers, to Regularly Conduct Custodial Searches of Female Arrestees**

34.     On numerous occasions in any given week—averaging four to five times in a week—Defendants order a female dispatcher to leave her duties and perform a custodial search of a prisoner.

35.     Even though the applicable orders direct a female officer who is on duty and in the station to conduct the search, as a practice and policy of the department and its commanding officers, female officers are not ordered to perform these searches, even when they are on duty and in the station.

36.     Rather, it is nearly always the case that when a male officer brings in a female prisoner, a female dispatcher is ordered to report to the intake area and conduct the search.

37.     Of its nearly 200 sworn officers, Defendant City of Warren's Police Department employs 14 female police officers, which is only 7%.

38.     The average across the United States of women as a percentage of a police force is over 12%, and in comparable Michigan police departments, women comprise over 10% of the sworn officers.

39.     One of the Warren PD female officers is assigned during the days from Monday to Friday at the station and yet she is rarely ordered to conduct the full custodial search of a female arrestee brought in by a male officer.

40.     Plaintiffs and their female colleagues in dispatch have regularly been called upon to conduct a prisoner search even though a female sworn officer is either available in the station or could be readily summoned from the road to perform the search.

41.     Searching a prisoner or arrestee is inherently dangerous work that requires the specialized training of a sworn police officer.

42.     The Warren Police Department's policy indicates that women dispatchers should wear bullet-proof vests when conducting prisoner searches.

43.   This policy of prescribing bullet-proof vests serves as Defendants' admission that conducting prisoner searches is inherently dangerous work not suitable for civilians.

44.   Acceptable practices for searching arrestees include:

   a.  Having a sworn officer of the sex requested by the prisoner conduct the search;

   b.  Having a sworn officer of the sex that matches the apparent sex of the prisoner conduct the search;

   c.  Summoning from a neighboring jurisdiction a sworn officer of the sex matching the apparent or requested sex of the prisoner to conduct the search;

   d.  Having a sworn officer of any sex conduct the search in a situation that can be monitored through security cameras.

45.   It is not considered an acceptable policing practice to allow civilians who are not trained or sworn officers to search a prisoner or arrestee.

46.   Defendant City of Warren has in the past dispatched its own female officers to a neighboring jurisdiction to search a female arrestee.

47.   Defendant City of Warren borders the City of Detroit, which employees approximately 500 female police officers who could be summoned to assist with a search when no female officer is on duty in Warren.

9

48.     The City of Warren is compact in geographical scope so that a   female officer on duty anywhere in the city could be summoned to the jail to perform a search in less than twenty minutes.

## C. Female and Male Dispatchers are Held to Different Qualifications for Employment

49.     Defendants require that female dispatchers be physically able to perform prisoner searches, but do not hold male dispatchers to the same physical job requirements.

50.     When Plaintiff Jennifer Piper took a medical leave in the fall of 2019, Defendants would not clear her to return to work until she could demonstrate that she was physically able to conduct custodial searches of prisoners.

51.     No male dispatcher has ever had to demonstrate that he was physically able to conduct custodial searches to be cleared to return to work.

52.     Indeed, a male dispatcher during the same time took time off work for hernia surgery, but was allowed to return to his job, which for him was considered light duty, even though he was not physically able to conduct custodial searches.

## D. Custodial Searches Involve Extensive Physical Contact with the Prisoner's Body, Clothing, and Personal Effects; However, the City of Warren has Failed to Properly Train or Protect the Female Dispatchers it Orders to Conduct these Searches

53.     The City's General Order No. 17-10 on Arrest Procedures defines the full custodial search that must be conducted of a prisoner being arrested as requiring

the person conducting the search to remove and inventory all personal property, check the prisoner's garments, remove all medications, contraband, and potential weapons, and remove and inspect all headwear such as wigs, toupees, weaves, or barrettes.

54.     When a female dispatcher is performing the search, the arresting/assisting officer is required by the General Order No. 17-10 to "stand by in close proximity in the booking area until the search has been completed and the prisoner has been turned over to detention personnel."

55.     In practice, the arresting/assisting officer will commonly leave the proximity of the female dispatcher and the prisoner she has been ordered to search.

56.     Indeed, on March 12, 2020, one female dispatcher was ordered to conduct a custodial search on a female prisoner who was arrested on a two-felony warrant—assault and concealing a dangerous weapon—yet the male arresting/assisting officer left this dispatcher alone with this prisoner for at least two minutes during the search.

57.     Sworn police officers receive extensive training to safely conduct a custodial search of a prisoner, disarm prisoners, and remove contraband.

58.     However, the City of Warren's Police Department has failed to provide adequate training in five years for the female dispatchers to conduct a custodial search of a prisoner, disarm prisoners, or remove contraband from a prisoner.

59.     One video Defendants have used to provide "training" to Plaintiffs and other female dispatchers on conducting searches even demonstrates a male officer conducting the custodial search of a female prisoner.

60.     Watching a training video is woefully inadequate training for conducting a search that can expose the person conducting the search to infectious diseases such as COVID-19, potential weapons the prisoner is holding that evaded the original pat-down, highly toxic narcotics the prisoner may yet have concealed on her person, as well as lice, scabies, fleas and other pests that may have infested a prisoner.

61.     Male dispatchers, unlike their female counterparts, are never asked or ordered to perform custodial searches of prisoners; therefore, the male dispatchers are never subjected to the risks associated with conducting custodial searches of prisoners.

**E.      On March 10, 2020, when the First COVID-19 Case in Michigan was Confirmed, Defendants Ordered Female Dispatchers to Continue to Conduct Custodial Searches of Prisoners**

62.     On March 10, 2020, the first COVID-19 case in Michigan was confirmed and Governor Whitmer declared a State of Emergency directing that steps be taken to prevent the spread of the disease.

63.     After March 10, 2020, Defendants continued to order Plaintiffs and their fellow Female Dispatchers to conduct custodial searches of female prisoners.

64.     The United States Centers for Disease Control and Prevention ("CDC")
has issued guidance regarding the measures to be taken at workplaces to avoid and
protect against transmission of COVID-19. Among the recommendations provided
for law enforcement personnel is maintain a distance of at least 6 feet from
individuals whenever possible.[1]

65.     Additionally, the CDC has advised the following as minimally
acceptable Personal Protective Equipment to Wear when one must be within 6 feet
of another individual to perform operational duties[2]:

a.      A single pair of disposable examination gloves,

b.      Disposable isolation gown or single-use/disposable coveralls,

c.      Any NIOSH-approved particulate respirator (i.e., N-95 or
higher-level respirator); Facemasks are an acceptable alternative
until the supply chain is restored, and

d.      Eye protection (i.e., goggles or disposable face shield that fully
covers the front and sides of the face)

---

[1] "What Law Enforcement Personnel Need to Know About Coronavirus Disease 2019 (COVID-19)," CDC, available at https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-law-enforcement.html (Last visited 3-23-2020).
[2] *Id.*

66.     While disposable gloves and face masks have been made available to Plaintiff and their fellow Female Dispatchers, Defendants initially failed to provide isolation gowns or eye protection to them.

67.     Indeed, on March 22, 2020, a female dispatcher, who has since withdrawn her claims against Defendant, expressed her concerns about performing a custodial search without such protective equipment because she lives with three family members who are in high-risk categories for COVID-19 exposure—diabetes, cancer treatment, and asthma.

68.     The Watch Commander told this dispatcher that all she needed was the mask and the gloves. He denied her a protective gown and eye protection.

69.     This dispatcher was required to perform the custodial search on this female prisoner notwithstanding her concerns and the lack of proper protective equipment, and the fact that a female officer was due to come on duty at the station in 15 minutes.

70.     Male Dispatchers are never expected to perform custodial searches of prisoners.

## F.  Custodial Searches of Prisoners Expose Female Dispatchers to Other Dangerous and Odious Conditions

71.     Plaintiffs and their fellow Female Dispatchers have been ordered to conduct searches in which they must touch and handle women who:

      a.    are extremely intoxicated;

b.      are belligerent and make direct threats to the female dispatchers;

c.      have urinated, vomited, and/or defecated on themselves;

d.      are known or believed to be infected with highly contagious diseases;

e.      show obvious signs of lice, bed bugs, flea, and/or scabies infestation; and/or

f.      may have sharp objects such as drug paraphernalia and/or weapons.

72.    Plaintiffs and their fellow Female Dispatchers have been ordered to conduct strip searches of women who are believed to be:

a.      concealing weapons in the folds and cavities of their bodies;

b.      concealing highly toxic controlled substances in the folds and cavities of their bodies;

c.      are known or believed to be infected with highly contagious diseases;

d.      show obvious signs of lice, bed bugs, flea, and/or scabies infestation.

73.    Plaintiffs and their fellow Female Dispatchers have been ordered to conduct searches of women who are obviously ill.

74.    Plaintiffs and other Female Dispatchers have been exposed directly to the body fluids of women prisoners during these searches.

75.    Plaintiffs and other Female Dispatchers have been left alone with female prisoners during the custodial search or left with only an inexperienced rookie officer while the female dispatcher conducted the search.

76.    Plaintiffs and other Female Dispatchers have even been left alone to search prisoners who were arrested on violent felony charges.

## G. Plaintiffs Have Been Required to Search Prisoners even when Female Officers were on Duty and in the Station

77.    The General Order governing custodial searches of prisoners requires that a female officer present in the station and on duty conduct the search, and that a female dispatcher only be ordered to conduct the search when that is not the case.

78.    However, on numerous occasions Plaintiffs and their fellow female dispatchers have been ordered to conduct the custodial search of female prisoners even though there were female officers on duty in the station. For example:

      a.    On June 24, 2019, a female prisoner was brought in by a male officer. A female officer was on duty and in the station at the time but she rejected the page to conduct the search. Instead, Plaintiff Linda DeVooght was ordered to conduct the search.

      b.    On March 13, 2020, a female prisoner was brought in by a male officer. At the time, a female officer was in the station and on

duty. Nonetheless, Plaintiff Jennifer Piper was ordered to conduct the search of the prisoner.

c.    On March 16, 2020, a female prisoner was brought in by a male officer. At the time, a female officer was on duty and in the station; however, the watch commander informed dispatch that this officer was "unavailable" with no further elaboration. Instead, Plaintiff Tressa Sinha was ordered to conduct the search of the prisoner.

## H. When Female Dispatchers are Ordered to Report to Booking and Conduct a Search, Dispatch is Left Understaffed

79.    The General Order governing prisoner processing indicates that to prevent understaffing of the dispatch unit, a male officer will provide relief for the female dispatcher when she is ordered to conduct a custodial search of a prisoner.

80.    However, the male officers sent to relieve female dispatchers do not have training to perform the functions of the dispatch, leaving the dispatch unit short of staff.

81.    On June 13, 2019, a female dispatcher was ordered to conduct a custodial search. While she was conducting the search, the male police officer sent to cover this dispatcher's duties talked with colleagues nearby instead of answering the phones at dispatch.

82.    On October 19, 2019, when a female dispatcher was ordered to report to booking and conduct a search, the male officer who replaced her at dispatch sat at a computer that was not logged in and worked on his own paperwork instead of answering the phones at dispatch.

**I.  Plaintiffs Face Immediate and Ongoing Threats to their Physical Health Because of Defendant's Unlawful Policy**

83.    The policy and practice of the City of Warren's Police Department on its face imposes conditions and terms of employment on the women who work as dispatchers and dispatch supervisors that are far more dangerous and odious than the terms and conditions of employment enjoyed by the male dispatchers.

84.    Because of this facially discriminatory policy and practice, female dispatchers, but never their male counterparts, have endured the risk and danger of exposure to infectious diseases, including notably COVID-19, solely because of their sex.

85.    Even before the COVID-19 pandemic, Plaintiffs have regularly and frequently been subjected to belligerence and hostility by the female prisoners they have been ordered to search, and Plaintiffs suffer these indignities and stresses solely because of their sex.

86.    Plaintiffs have also regularly and frequently been subjected to the risk of being exposed to noxious infestations like scabies, bed bugs, lice, and fleas, as well as the dangers of toxic drugs and weapons hidden on these female prisoners'

18

bodies, and Plaintiffs have been forced to face these dangers solely because of their sex.

87.     Plaintiffs and the other female dispatchers receive no remuneration nor compensation of any sort for the additional dangers, risks, and unpleasantness of being regularly and frequently ordered to conduct custodial searches solely because of their sex.

**J.  There Exist Other Reasonable Operational Procedures That Would Allow for the Processing of Female Prisoners without Violating Plaintiffs' Equal Protection Rights**

88.     The City of Warren's Police Department has failed to consider or adopt alternative procedures that would allow for the processing of female prisoners without imposing on Plaintiffs and their fellow female dispatchers unfair, dangerous, and noxious terms and conditions of employment because of their sex.

89.     For instance, Plaintiffs have requested and been denied that they be paid a form of "hazard compensation" for being ordered to conduct these dangerous and odious custodial searches of prisoners.

90.     It is also the case that while nationally, women comprise nearly 15% of all police officers[3], the City of Warren employs only 14 female police officers, which is approximately 7% of the police force.

---

[3] Data USA, "Police Officers", available at
https://datausa.io/profile/soc/333050/#demographics (last visited March 24, 2020).

91.     The City of Warren has failed to adequately recruit and employ reasonable numbers of female officers.

92.     Even when female officers are on duty and in the station, Defendants fail to order them to report to the jail to conduct searches of female prisoners.

93.     Therefore, the City of Warren has failed to rely upon its female officers, who are properly trained to handle prisoners and compensated commensurate to the risks and dangers they must face as sworn officers, to conduct custodial searches— an integral part of their own job descriptions.

94.     The City of Warren's Police Department has failed to organize its staffing schedules to ensure that a female officer is on duty and available to conduct female prisoner searches.

95.     Defendants' failure to recruit and hire sufficient number of women to serve as sworn officers impedes their ability to staff the department so as to ensure that a female officer is on duty and available to conduct female prisoner searches.

### Count One: 42 U.S.C. § 1983, *Monell*-based Violation of Plaintiffs' Rights Under the Equal Protection Clause of the 14th Amendment

96.     Plaintiffs incorporate all the above allegations by reference here.

97.     42 U.S.C. § 1983 allows for a municipality to be sued when it enacts and promulgates a law or policy that violates the Constitution or Laws of the United States. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

98.   The 14th Amendment of the United States Constitution forbids the denial of any person the equal protection of the laws.

99.   Included within the 14th Amendment is the guarantee that a government may not treat a group of persons less favorably because of their sex.

100.   As set forth above, the City of Warren, through its Police Department, have promulgated and enforced a General Order that treats Plaintiffs, a group of female dispatchers, less favorably than the male dispatchers in the terms and conditions of their employment with the City of Warren because of their sex.

101.   Defendant has knowingly promulgated a policy and practice that violates the equal protection guarantee of the United States Constitution.

102.   Pursuant to 42 U.S.C. §§ 1983, 1988 and other applicable laws, Plaintiffs seek the following relief:

> a.   a declaratory judgment that Defendant's General Order, policy, and practice of requiring Plaintiffs and their fellow female dispatchers to conduct custodial searches of female prisoners violates Plaintiffs' Equal Protection rights guaranteed by the 14th Amendment;

> b.   monetary damages to compensate Plaintiffs for the many years of extremely dangerous and odious terms and conditions of

employment that have been imposed upon them unlawfully because of their sex;

c.    punitive damages reflecting the knowing and deliberate nature of Defendants' sustained promulgation of an unconstitutional policy and practice that violated Plaintiffs' equal protection rights;

d.    an award of Plaintiffs' attorney's fees and costs; and

e.    other relief that the Court may deem appropriate.

## Count Two: 42 U.S.C. § 2000e, Unlawful Employment Discrimination

103.   Plaintiffs incorporate all the above allegations by reference here.

104.   Title VII of the Civil Rights act of 1964 makes it unlawful *inter alia* "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

105.   Title VII further make it unlawful for an employer to "limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [her] status as an employee, because of . . . sex." 42 U.S.C. § 2000e-2(a)(2).

106.   As set forth above, the City of Warren, through its Police Department, has promulgated and enforced a General Order that treats Plaintiffs, a group of

female dispatchers, less favorably than the male dispatchers in the terms and conditions of their employment with the City of Warren because of their sex.

107.   Defendant has knowingly promulgated a policy and practice that violates the equal protection guarantee of the United States Constitution.

108.   Pursuant to 42 U.S.C. § 1981a and other applicable laws, Plaintiffs seek the following relief:

      a.    a declaratory judgment that Defendant's General Order, policy, and practice of requiring Plaintiffs and their fellow female dispatchers to conduct custodial searches of female prisoners violates Plaintiffs' Equal Protection rights guaranteed by the 14th Amendment;

      b.    monetary damages to compensate Plaintiffs for the many years of extremely dangerous and odious terms and conditions of employment that have been imposed upon them unlawfully because of their sex;

      c.    punitive damages reflecting the knowing and deliberate nature of Defendants' sustained promulgation of an unconstitutional policy and practice that violated Plaintiffs' equal protection rights;

      d.    an award of Plaintiffs' attorney's fees and costs; and

e.      other relief that the Court may deem appropriate.

**Count Three: Violation of the Elliott-Larsen Civil Rights Act, M.C.L. §
37.2101 *et seq*., Disparate Treatment in the Terms and Conditions of
Employment on the Basis of Sex**

109.   Plaintiffs incorporate all the above allegations by reference here.

110.   The ELCRA prohibits employers from discriminating in the terms and
conditions of employment on the basis of sex. M.C.L. § 37.2202.

111.   Municipalities and governmental entities are covered employers under
the ELCRA.

112.   As set forth above, Defendant City of Warren, through its Police
Department, has promulgated and enforced a General Order that treats Plaintiffs, a
group of female dispatchers, less favorably in the terms and conditions of their
employment with the City of Warren because of their sex.

113.   As set forth above, Plaintiffs face dangerous and odious work
conditions not imposed the male dispatchers who are their co-workers—because of
their sex.

114.   Pursuant to M.C.L. § 37.2801 and other applicable laws, Plaintiffs seek
the following relief:

a.      immediate injunctive relief banning the policy and practice of
requiring Plaintiffs and their fellow female dispatchers to
conduct custodial searches of female prisoners:

b.  a declaratory judgment that Defendant's General Order, policy, and practice of requiring Plaintiffs and their fellow female dispatchers to conduct custodial searches of female prisoners violates Plaintiffs' rights under the ELCRA;

c.  monetary damages to compensate Plaintiffs for the many years of extremely dangerous and odious terms and conditions of employment that have been imposed upon them unlawfully because of their sex;

d.  an award of Plaintiffs' attorney's fees and costs;

e.  other relief that the Court may deem appropriate.

**PITT McGEHEE PALMER**
**BONANNI & RIVERS**

By:  */s/ Robin B. Wagner*
Michael L. Pitt (P24429)
Robin B. Wagner (P79408)
Kevin M. Carlson (P67704)
Attorneys for Plaintiffs
117 W. Fourth Street, Suite 200
Royal Oak, MI  48067
248-398-9800
248-268-7996 (fax)
mpitt@pittlawpc.com
rwagner@pittlawpc.com
kcarlson@pittlawpc.com

Dated:  November __, 2020

25

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of the facts and issues involved in this matter.

**PITT McGEHEE PALMER**
**BONANNI & RIVERS**

By:  */s/ Robin B. Wagner*____
    Michael L. Pitt (P24429)
    Robin B. Wagner (P79408)
    Kevin M. Carlson (P67704)
    Attorneys for Plaintiffs
    117 W. Fourth Street, Suite 200
    Royal Oak, MI  48067
    248-398-9800
    248-268-7996 (fax)
    mpitt@pittlawpc.com
    rwagner@pittlawpc.com
    kcarlson@pittlawpc.com

Dated:  November __, 2020

**SIGNATURE AND VERIFICATION OF STIPULATED SECOND AMENDED COMPLAINT BY PLAINTIFF**

I declare under penalty of perjury that the facts stated in this Plaintiffs' Stipulated Second Amended Verified Complaint for Damages, Declaratory Judgment, Injunctive Relief and Jury Demand are true and accurate to the best of my knowledge and information.

Signed: _____
Linda DeVooght

## SIGNATURE AND VERIFICATION OF STIPULATED SECOND AMENDED COMPLAINT BY PLAINTIFF

I declare under penalty of perjury that the facts stated in this Plaintiffs' Stipulated Second Amended Verified Complaint for Damages, Declaratory Judgment, Injunctive Relief and Jury Demand are true and accurate to the best of my knowledge and information.

Signed: _____

Dawn McLean

**SIGNATURE AND VERIFICATION OF STIPULATED SECOND AMENDED COMPLAINT BY PLAINTIFF**

I declare under penalty of perjury that the facts stated in this Plaintiffs' Stipulated Second Amended Verified Complaint for Damages, Declaratory Judgment, Injunctive Relief and Jury Demand are true and accurate to the best of my knowledge and information.

Signed: _____

Jennifer Piper

## SIGNATURE AND VERIFICATION OF STIPULATED SECOND AMENDED COMPLAINT BY PLAINTIFF

I declare under penalty of perjury that the facts stated in this Plaintiffs'
Stipulated Second Amended Verified Complaint for Damages, Declaratory
Judgment, Injunctive Relief and Jury Demand are true and accurate to the best of my
knowledge and information.

Signed: _____

Tressa Marie Sinha