UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA DeVOOGHT, TRESSA
SINHA, JENNIFER PIPER
and DAWN McLEAN,

               Plaintiffs,

                               Case No. 20-CV-10812

vs.

                               HON. GEORGE CARAM STEEH

CITY OF WARREN,

               Defendant.

_____/

OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT [ECF No. 26] AND DENYING DEFENDANT'S
MOTION TO DISMISS OR FOR SUMMARY JUDGMENT [ECF No. 27] \

      Plaintiffs Tressa Sinha, Jennifer Piper and Dawn McLean work as

dispatchers and Linda DeVooght works as a dispatch supervisor for

defendant City of Warren's Police Department.  Plaintiffs each allege that

they are discriminated against based on their gender by defendant's policy

and practice of requiring female dispatchers to perform searches on

arrestees, while male dispatchers are never required to perform such

searches.  In their Amended Complaint, plaintiffs assert that defendant's

policy and practice violates their rights under the Equal Protection Clause

as provided for by 42 U.S.C. § 1983 (Count I), as well as their rights under

Michigan law as guaranteed by the Elliott-Larsen Civil Rights Act

("ELCRA"), M.C.L. § 37.2101 *et seq.* (Count II).

The matter is before the court on plaintiffs' motion for partial summary

judgment [ECF No. 26] in which plaintiffs seek a declaratory judgment that

defendant's policy is unconstitutional and violates the ELCRA.  Also before

the court is defendant's motion to dismiss or for summary judgment [ECF

No. 27] wherein defendant seeks dismissal of plaintiff's lawsuit.  Oral

argument was held on November 12, 2020.  For the reasons stated below,

plaintiffs' motion for partial summary judgment is DENIED and defendant's

motion to dismiss or for summary judgment is DENIED.

## **FACTUAL BACKGROUND[1]**

Defendant City of Warren employs 20 people as dispatchers and

dispatch supervisors – 16 women and four men.  Three of the plaintiffs are

women employed as emergency dispatchers, and one plaintiff, Linda

DeVooght, is a woman employed as a dispatch supervisor.  The City's

main police station houses the dispatch center where plaintiffs work, as

well as a jail.

---

[1] The parties submitted a joint statement of facts for purposes of the pending cross-
motions for summary judgment [ECF No. 25].  The Court draws the following recitation
of the facts from that document as well as from exhibits attached to the parties' briefs.

The City's General Order 19-04 governs arrest procedures for prisoners taken into custody by the Warren Police.  The Order provides that an available male officer shall conduct the search of a male prisoner arrested by a female officer (19-04, III.G.9).  By contrast, when a female prisoner is arrested by a male officer, an available female officer who is on duty and in the station shall be called upon to conduct the search prior to calling upon a female dispatcher to perform the search (19-04, III.G.10). The search is to be conducted by a female dispatcher when there are no female officers on duty and in the building at the time of booking (19-04, III.G.14.a.).  There is no provision for male dispatchers to ever search a prisoner.  The City's policies have required female dispatchers to conduct prisoner searches since the mid-1970's.

The job description for dispatchers was last revised in 2003.  Earlier versions of the dispatcher's duties listed "processing" arrested persons, but the revised version provides that dispatchers "[a]ssist[] in the searching/processing of arrested persons in the station, as necessary, at the direction of a supervisor."  Job duties for the position of Dispatcher Supervisor include: "Performs general dispatch duties."  The collective bargaining agreement ("CBA") governing the terms of employment for the dispatchers does not mention prisoner searches.

Plaintiffs contend that the City's General Order discriminates against female dispatchers on the basis of gender, creating two separate and unequal workplaces for its dispatcher employees.  On an average day, approximately 9.1 prisoners are brought into the jail with an average of 2.4 being female.  City records reveal the number of searches of female prisoners conducted by female dispatchers has increased from about a quarter to over a third of all such searches over the last few years:

2017 - 194 out of 725 searches, or 26.8% of searches,

2018 – 253 out of 978, or 25.9% of searches,

2019 – 300 out of 806, or 37.2% of searches,

January to March, 2020 – 69 of 156, or 44.2% of searches.

The duty to conduct a prisoner search exposes the dispatcher to significant dangers.  Plaintiffs describe instances in which dispatchers were required to conduct searches without officer backup, searched a subject with a knife, struggled with prisoners who are intoxicated and verbally and physically aggressive, searched arrestees with open wounds and sores, or who were high on drugs.  Some dispatches came into contact with an arrestee's blood or urine, and some performed strip searches alone without assistance from an officer.

Sworn police officers undergo extensive training on how to conduct a custodial search, disarm a prisoner, manage a chain of evidence and remove dangerous articles.  Plaintiffs argue the City of Warren has failed to provide training to the civilian female dispatchers that is comparable to the training police officers receive.  For example, dispatchers do not receive training in self-defense or in the use of force to subdue a prisoner.  Nor have they had training to search, disarm, or remove contraband from a prisoner.  The training provided at initial hiring for dispatchers lasts approximately 15 minutes. (Sinha Decl. ¶ 9.)  Ms. DeVooght recalls a video, shown approximately once a year, demonstrating custodial searches of prisoners.  (DeVooght Decl. ¶ 10.)  Ms. Piper and Ms. McLean's only training in their 15 years and 23 years of employment was a single demonstration provided by a dispatcher.  (Piper Decl. ¶ 8; McLean Decl. ¶ 9.)

Plaintiffs argue that in addition to the discriminatory policy of being required to perform searches based on their gender, the City also discriminates by failing to provide additional compensation or benefits to female dispatchers to reflect the work required of them but not of male dispatchers.

There is a history of complaints by dispatchers to the union regarding the requirement to conduct searches.  In 1993, dispatchers, all of whom were female at the time, received a pay increase after a grievance prompted the union to negotiate on their behalf.  Defendant does not dispute that today there is no pay differential based on gender despite the difference in duties as it relates to conducting prisoner searches.

There are various unexpected ways in which plaintiffs are treated differently than their male counterparts due to the requirement that they conduct prisoner searches.  Plaintiff Piper underwent knee surgery and took a medical leave of absence in the summer and fall of 2019.  She attempted to return to work once she was cleared to perform sedentary duty.  However, defendant refused to allow Ms. Piper to return to work until she could perform the physical demands of completing a prisoner search.  Ms. Piper was not paid until she was able to perform prisoner searches due to the terms of defendant's General Order.  By contrast, a male dispatcher who underwent hernia surgery around the same time, was able to resume work as a dispatcher having only been cleared for sedentary work.

Plaintiffs also maintain that although the General Order requires that a female officer on duty and in the station be called upon to conduct a prisoner search, in practice this policy is not always followed.  Plaintiffs

document 22 occasions from June 2019 through June 2020 where a female dispatcher was required to conduct a prisoner search even though a female officer was available [ECF No. 26-7].

According to the Department of Justice, in 2013 the number of female police officers in municipal police departments averaged 12%.  At the Warren Police Department, approximately 7% of the police force is made up of female sworn officers of various ranks (approximately 14 of 200 officers are female).

Plaintiffs' expert witness, Brandon del Poso, reviewed the Warren Police Department's policy regarding searches of female prisoners and offered his opinion.  In his report, del Poso states that best practices in policing and maintaining a jail at a police station dictate that safe searches of arrested individuals be conducted as follows: 1) direct a sworn officer of the sex requested by the prisoner to conduct the search; or 2) direct a sworn officer who matches the apparent sex of the prisoner; or 3) if no such officer is available, summon a sworn officer from a neighboring jurisdiction who matches the prisoner's apparent sex or requested sex to conduct the search (del Poso Expert Report at pp. 865-7).

In order to encourage female officers to work full-time in the Warren Jail, WPD offers a shift premium.  This results in at least one female officer

in the Warren Jail on every shift.  However, there are times when the officer is not physically present in the jail, such as if she is called to active duty or is on sick or vacation leave.  At oral argument, counsel described these instances as "exceptionally rare."

When plaintiffs filed this case on March 27, 2020, they sought preliminary injunctive relief after expressing concerns regarding the lack of personal protection equipment ("PPE") necessary to conduct arrestee searches during the coronavirus pandemic.  PPE was made available and distributed to all personnel, including dispatchers.  In lieu of a preliminary injunction hearing the parties entered a Stipulated Interim Agreement.  Pursuant to the Stipulation, General Order 20-03 was issued, which amended the current dispatcher search policy to include gender-neutral language.  The manner in which the policy is implemented has not changed.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) allows the Court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted.  Under the Supreme Court's articulation of the Rule 12(b)(6) standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007), the Court must construe the complaint in favor of the plaintiff,

accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims. Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.,* 650 F.3d 1046, 1051 (6th Cir. 2011) (*citing Twombly*, 550 U.S. at 555).

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Tolan v.* Cotton, 572

U.S. 650, 660 (2014); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## **ANALYSIS**

### I. **Equal Protection Clause**

Individuals have a right, protected by the Equal Protection Clause of the Fourteenth Amendment, to be free from discrimination on the basis of sex in public employment.  *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576–77 (6th Cir. 2004) (citing *Davis v. Passman*, 442 U.S. 228, 234–35 (1979).  Individuals may bring Equal Protection claims under 42 U.S.C.

- 10 -

§1983 asserting unlawful discrimination in the terms and conditions of their employment against public employers. *See, e.g., Smith*, 378 F.3d at 577; *Weberg v. Franks*, 229 F.3d 514 (6th Cir. 2000). The City's decision to impose different duties on male and female dispatchers is codified in its General Orders, which are the official policy, practice, and custom of the City; therefore, municipal liability is established. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986).

In this case, the challenged policy, as well as its application, requires female dispatchers, and never their male counterparts, to perform the potentially dangerous work of searching prisoners. For purposes of stating a claim of unlawful discrimination, "[t]he direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both. If a plaintiff can produce direct evidence of discrimination[,] then the *McDonnell Douglas–Burdine* paradigm is of no consequence." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348-49 (6th Cir. 1997)). A facially discriminatory policy serves as direct evidence of discrimination. *Heike v Guevara*, 519 F. App'x 911, 919 (6th Cir. 2013) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). By treating female dispatchers differently based on their gender, the policy at issue is indeed facially discriminatory.

The burden then shifts to defendant to establish a justification for the policy that satisfies the heightened standard for gender-based classifications:

> the reviewing court must determine whether the proffered justification is "exceedingly persuasive." The burden of justification is demanding and it rests entirely on the State. The State must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.

*United States v. Virginia*, 518 U.S. 515, 532-33 (1996) (citation and quotation marks omitted).  It is not necessary to demonstrate "malevolent motive" for a policy to be in violation of the Constitution.  *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991).

While plaintiffs bring their intentional discrimination claim under § 1983, courts evaluate such claims of disparate treatment by a state employer the same as if brought under Title VII.  *See Grano v. Dept. of Dev.,* 637 F.2d 1073, 1082 (6th Cir.1980).  Under this analysis, overt discrimination is permissible if the disparate treatment is based on a bona fide occupation qualification ("BFOQ").  *Reed v. Cty. of Casey*, 184 F.3d 597, 599 (6th Cir. 1999).  The BFOQ exception to Title VII was "meant to be an extremely narrow exception to the general prohibition of discrimination . . . ."  *Dothard v. Rawlinson,* 433 U.S. 321, 334 (1977).  The

Supreme Court has framed the exception in various ways.  For example,

"'discrimination based on sex is valid only when the *essence* of the

business operation would be undermined by not hiring members of one sex

exclusively.'"  *Id*. (quoting *Diaz v. Pan Am. World Airways,* 442 F.2d 385,

388 (5th Cir.) (rejecting the contention that sex was a BFOQ for airline flight

attendants because the airline's proposed justification - to provide a

"pleasing environment" for passengers - was merely tangential to the

airline's primary objective of providing safe transportation)).  Courts have

also held that "an employer could rely on the BFOQ exception only by

proving 'that he had reasonable cause to believe, that is, a factual basis for

believing, that all or substantially all women would be unable to perform

safely and efficiently the duties of the job involved.'" *Id.* (citation omitted).

Where the employer institutes a sex-based policy that is the result of

a "reasoned decision-making process," it may be entitled to a BFOQ

defense.  *See e.g., Everson v. Michigan Department of Corrections*, 391

F.3d 737 (6th Cir. 2004); *Reed*, 184 F.3d 597; *Strozier v. Warren Cty.,*

*Ohio*, No. 1:17-CV-817, 2020 WL 3867316 (S.D. Ohio July 9, 2020).

Accepted reasons supporting the decision to institute sex-based polices

have included preventing sexual abuse in prisons and protecting the

privacy rights of prisoners.  Reasons such as these justified excluding male

correction officers from positions in the housing units at female prisons, *Everson*, 391 F.3d at 753, and assigning female deputy jailers to undesirable shifts in order to supervise female prisoners, *Reed*, 184 F.3d at 599.

The Sixth Circuit has held, in order to assert a valid BFOQ defense, the employer bears the burden of showing that it: (1) had a "basis in fact" for its belief that gender discrimination is "reasonably necessary" to the normal operation of its business; (2) the job qualification relates to the essence, or to the central mission, of the employer; and (3) that no reasonable alternatives exist to discriminating based on sex.  *Everson*, 391 F.3d at 748-49.

## A.   Is Dispatcher's Gender "Reasonably Necessary" to Normal Operation of WPD?

Defendant must demonstrate that it has a "basis in fact" for its belief that requiring female dispatchers, but not male dispatchers, to conduct searches of female arrestees "is 'reasonably necessary' – not merely reasonable or convenient—to the normal operation of its business." *Everson*, 391 F.3d at 748 (citations omitted).

Both sides acknowledge that prisoners maintain certain privacy rights that mandate same-sex prisoner intake searches.  *See Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992) (Every incarcerated individual

- 14 -

"maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners.")  It is therefore the case that a female must perform a search on a female prisoner.  It can also be said that processing arrestees, which includes searching them at intake, is a task that falls within the normal business of WPD.

The BFOQ defense is routinely analyzed in the jail or prison setting. Both *Everson* and *Reed* are cases where the Sixth Circuit concluded that female gender was a BFOQ for correction officers in female correctional facilities as well as in jails where female prisoners are processed.  The Court also held that the "reasoned decisions of prison officials are entitled to deference and that the goals of security, safety, privacy, and rehabilitation can justify gender-based assignments in female correctional facilities."  *Everson*, 391 F.3d at 750.

As has been documented, female officers make up only 7% of WPD's police force.  Faced with a police force made up of very few female officers, and a requirement that female prisoners be searched by a female, WPD took measures to ensure that at least one female officer is on duty at the jail during all shifts.  In settling on the challenged policy, WPD struck a

balance by imposing the female prisoner intake search duty upon female dispatchers only when a female police officer is not available.  Defendant has shown that it has a basis in fact for its belief that requiring female dispatchers to conduct searches of female arrestees when a female police officer is not available is reasonably necessary to the normal operation of its business.

**B.    Does the Requirement that Female Dispatchers Search Female Arrestees Relate to the Essence of the WPD's Business?**

The Supreme Court has stressed that "in order to qualify as a BFOQ, a job qualification must relate to the essence, or to the central mission of the employer's business." *Johnson Controls,* 499 U.S. at 203 (internal citations and punctuation omitted).  The essence of the WPD's business can be summed up as ensuring the safety of the community through law enforcement.  The Warren Police Station houses both a jail and a dispatch center.

"The 'essential nature' of the [jail] is to lodge, keep, transport, feed and care for prisoners."  *Reed*, 184 F.3d at 599.  There is no dispute that it is necessary to conduct a prompt and thorough intake search of each prisoner, including female prisoners, coming into the Warren Jail to recover concealed drugs, weapons, contraband and other items that could be

dangerous, so that other prisoners and all WPD personnel remain safe and secure in the facility.  There is also no dispute that intake searches of female prisoners must be conducted by a female.

However, because the discriminatory policy involves dispatchers, and because the BFOQ defense is "an extremely narrow exception," *Dothard*, 433 U.S. at 334, perhaps the essence of defendant's business should also be viewed more narrowly.  If the focus is narrowed, the "essence or central mission" of the dispatch center is to receive calls, dispatch units to respond to emergencies, answer questions, verify information, and process and maintain records related to emergency response.  This is gleaned from the statement of duties in the WPD Dispatcher job description:

> Receives and transmits messages over a radio communication system.  Receives complaints and relays information or instruction from and to remote units.  Receives incoming telephone calls and makes independent judgment relative to the kind of action necessary.  Receives, types and sends LEIN messages and broadcasts to appropriate units.  Enters information into Computer Aided Dispatch consoles.

("Dispatcher" revised 08/03).  The job description also lists typical examples of work, the last of which provides: "[a]ssists in the searching/processing of arrested persons in the station, as necessary, at the direction of a supervisor."  While we know that female dispatchers at WPD are required to conduct prisoner searches, when viewed narrowly,

the "essence" of the dispatch center is a place that receives calls and connects people with appropriate emergency services.

Male dispatchers are not required to conduct searches because that is not central to the job of dispatcher or to the essence of the business of the dispatch center.  Nor is there evidence that defendant has a reasonable basis for believing that all male dispatchers would be unable to safely and efficiently perform the duties of dispatcher, such that the job can only be performed by females.  *See Dothard*, 433 U.S. at 334.  Indeed, defendant employs male dispatchers.

If the essence of its business is viewed broadly, encompassing all aspects of law enforcement, including prisoner care, defendant has a stronger argument that a dispatcher's gender relates to its mission.  But if the essence of its business is viewed more narrowly, focusing on the central mission of the dispatch center, then defendant has not shown that requiring female dispatchers to conduct intake searches of female prisoners relates to the essence of its business.  At this stage, the Court need not decide this point because even assuming the second element of the BFOQ defense has been met, defendant has not satisfied the third element of the defense.

**C. Does a Reasonable Alternative Exist to Requiring Female Dispatchers to Conduct Prisoner Searches?**

The Sixth Circuit requires employers asserting a BFOQ defense to establish that no reasonable alternatives exist to discrimination on the basis of sex.  *Everson*, 391 F.3d at 749 (citing *Reed,* 184 F.3d at 600).  Plaintiffs propose several alternatives to the current policy.  Defendant rejects each one as not being reasonable.

Defendant's position is that the number of female police officers at WPD is insufficient to ensure that one will always be readily available to search female prisoners when they arrive at intake.  Defendant explains that because WPD is one of the few local police departments with its own dispatch center in the state of Michigan, and given that dispatchers are located on-site 24 hours a day, 7 days a week, it has chosen to impose the search job duty upon its female dispatchers to ensure that female intake searches are timely done by trained personnel in accordance with prisoner privacy interests.

In support of its chosen solution, defendant points out that the policy has been narrowly drafted to provide that a female dispatcher is to be called upon only when a female police officer is not available.  General Order 2019-04; General Order 2020-03.  It also points to the fact that

dispatchers were given a raise almost forty years ago to compensate them for this additional job duty.

Plaintiffs' expert opines that a reasonable alternative is for WPD to have female police officers always search the female prisoners.  If WPD ensured that female officers are distributed across shifts, it would contribute to the "good order and efficiency of the department" (Expert Report, p. 7). Defendant points out it is already doing this by offering shift premiums to female officers who are willing to occupy a full-time position at the jail. However, the female officer on duty at the jail does not perform all of the searches at issue.  The statistics show that over a third of the searches, amounting to almost one per day, still fall to the female dispatchers.

Plaintiffs' next proposal is to hold female prisoners in a location separated from others until a female police officer becomes available. Defendant responds that this alternative has several flaws.  First is that female inmates may be left waiting for an indeterminate period of time which raises obvious safety concerns if the primary reason for conducting an arrestee search is to confiscate contraband.  Second, with only one holding cell and two detox cells, there is not always going to be an available place to hold a female arrestee who has not yet been searched.

Plaintiffs respond with their next alternative, which is that an on-duty female police officer could be called in from the field when a female arrestee is brought to the station.  Defendant's position on this alternative is that if female officers are subject to being called away from their other duties, they will become ineligible for prized assignments and will therefore not be able to fully participate in their chosen fields.  According to defendant, the logical consequence is that female officers will become limited-assignment employees while their male counterparts are able to conduct the full array of police work.

The final alternative offered by plaintiffs is that aid could be solicited from another jurisdiction when necessary.  Defendant dismisses this idea as unreasonable by simply saying it is something it cannot impose on its neighboring police departments.  But perhaps an agreement between two or more police departments would prove to be mutually beneficial.

It is defendant's burden to establish that no reasonable alternatives exist.  Defendant has not shown any significant effort to examine the alternatives put forth by plaintiff's expert witness.  Nor has defendant adequately explained how the measures undertaken to ensure that a female officer is assigned to the jail during all shifts have nevertheless resulted in female dispatchers doing more searches rather than fewer.  The

Court finds there is an issue of material fact whether there are any reasonable alternatives to the facially discriminatory policy adopted by defendant.

## II. ELCRA Claim

Claims brought under Michigan's ELCRA "involve the same analysis as Title VII claims." *McDaniels v. Plymouth-Canton Comm. Sch.*, 755 Fed. App'x 461, 469 n.3 (6th Cir. 2018) (citing *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 n.4 (6th Cir. 2003)); *see also Everson*, 391 F.3d 748 n.14 (discussing M.C.L. § 37.2208); *Reed*, 184 F.3d at 599. Therefore, pursuant to the Court's analysis above, having found genuine issues of material fact remain as to whether the BFOQ defense applies in this case, the parties' cross-motions for summary judgment on this count are also denied.

## III. <u>Failure to Exhaust Under CBA</u>

Plaintiffs McLean, Piper and Sinha are part of the Warren Police Officer's Association ("WPOA") and covered under the terms of the Collective Bargaining Agreement ("CBA"). Plaintiff DeVooght was promoted to the position of Dispatch Supervisor on February 20, 2015 and is part of the Warren Police Department Command Officer's Association ("WPCOA"), covered under the terms of the WPCOA CBA. The CBAs do

not mention prisoner searches by dispatchers.  Plaintiffs did not file a formal grievance with the WPOA or WPCOA prior to filing this action.

Defendant argues that exhaustion of internal appeals under the CBA is required before plaintiffs can bring their lawsuit in federal court. Defendant relies on *Clayton v. International Union, UAW*, 451 U.S. 679 (1981), where the Court held that exhaustion of internal appeals is required before an employee can sue the employer and the union under Section 301 of the Labor Management Relations Act.  In § 301 cases, the plaintiff alleges that the union breached its duty of fair representation, and the employer breached the CBA by terminating without just cause.  *Clayton* is expressly limited to § 301 claims, and it does not compel exhaustion of internal union remedies in a case alleging discrimination under state and federal statutes.  *Bolin v. General Motors, LLC*, 2019 WL 196885 (E.D. Mich. Jan. 13, 2019) (rejecting union exhaustion requirement in ADEA case).  Another case relied on by defendant involved the imposition of a drug screening requirement that was codified within and implemented through the CBA.  *Bailey v. Beaver Precision Products, Inc.*, 678 F. Supp. 684 (E.D. Mich. 1998).  Thus, the question of whether the drug screening requirement was discriminatory involved interpretation of the terms of the CBA itself.

Unlike *Bailey*, the discriminatory policy in this case is implemented through the City's General Orders and is not set forth as a term of the CBA. Plaintiffs have not sued the City for violating a CBA and have not asserted that their unions breached any duty of fair representation. Therefore, exhaustion of contractual remedies is not required.

<u>CONCLUSION</u>

The Court finds that plaintiffs have stated causes of action for which relief can be granted.   The Court further finds that there are issues of fact that preclude the granting of summary judgment.  Now, therefore,

IT IS HEREBY ORDERED that defendant's motion to dismiss or for summary judgment [ECF No. 27] is DENIED.

IT IS HEREBY FURTHER ORDERED that plaintiffs' motion for partial summary judgment [ECF No. 26] is DENIED.

IT IS HEREBY FURTHER OREDERED that the parties shall consult with each other and submit a proposed scheduling order to the case manager by Friday, December 4, 2020.

Dated:  November 16, 2020

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE