UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA DeVOOGHT,
JENNIFER PIPER
and DAWN McLEAN,

                Plaintiffs,

                                 Case No. 20-CV-10812

vs.

                                 HON. GEORGE CARAM STEEH

CITY OF WARREN,

                Defendant.

_____/

OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [ECF No. 57]

        Plaintiffs Linda DeVooght, Jennifer Piper and Dawn McLean work as

emergency dispatchers for defendant City of Warren's Police Department

("WPD"). Plaintiffs allege that they are discriminated against based on their

gender by defendant's policy and practice of requiring female dispatchers

to perform intake searches of female arrestees when a sworn female

officer is not available. Male dispatchers are never required to perform

such searches. In their Second Amended Complaint, plaintiffs assert that

defendant's policy violates their rights under the Fourteenth Amendment's

Equal Protection Clause, 42 U.S.C. § 1983 (Count I), Title VII (Count II),

and the Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 *et seq.*
(Count III).

Plaintiffs assert that by requiring them to search female arrestees,
while male dispatchers are not required to do so, defendant treats the
female dispatchers less favorably in their employment conditions because
of their gender. Unlike male dispatchers, female dispatchers are exposed
to the physical dangers associated with searching arrestees. As relief,
plaintiffs ask for a declaratory judgment that defendant's General Order,
policy and practice violates plaintiffs' rights under the Equal Protection
Clause, Title VII and ELCRA. Plaintiffs also seek money damages to
compensate them for years of unlawfully being exposed to dangerous
conditions in their employment. Finally, plaintiffs request punitive damages,
attorney fees and costs if they prevail.

The matter is before the court on defendant's motion for summary
judgment (ECF No. 57). The Court heard oral argument on defendant's
motion on February 2, 2022. For the reasons stated below, defendant's
motion for summary judgment is DENIED.

## **FACTUAL BACKGROUND**

Defendant City of Warren employs 20 people as dispatchers and
dispatch supervisors – 16 women and four men. The City's main police

station houses the dispatch center where plaintiffs work, as well as a jail.

Plaintiffs challenge the City's General Order 19-04 ("Order") governing

arrest procedures for prisoners taken into custody by the Warren Police.[1]

The Order provides that an available male officer shall conduct the search

of a male prisoner arrested by a female officer (19-04, III.G.9). By contrast,

when a female prisoner is arrested by a male officer, the Order provides

that an available female officer who is on duty and in the station shall be

called upon to conduct the search prior to calling upon a female dispatcher

to perform the search (19-04, III.G.10). The search is to be conducted by a

female dispatcher when there are no female officers on duty and in the

building at the time of booking (19-04, III.G.14.a). There is no provision for

male dispatchers to ever search a prisoner. The City's policies have

required female dispatchers to conduct prisoner searches since the mid-

1970's.

According to the Department of Justice, in 2013 the number of female

police officers in municipal police departments averaged 12%. However, at

WPD, approximately 7% of the police force is made up of female sworn

officers of various ranks (approximately 14 of 200 officers are female).

Faced with a police force made up of very few female officers, and a

---

[1] The current policy, General Order 2020-03, is written in facially gender-neutral terms. However, the manner in which the policy is implemented has not changed.

requirement that female prisoners be searched by a female, WPD took measures to ensure that at least one female officer is on duty at the jail during all shifts. In settling on the challenged policy, WPD believes it struck a balance by imposing the female prisoner intake search duty upon female dispatchers only when a female police officer is not available.

Plaintiffs contend that the City's General Order impermissibly discriminates against female dispatchers on the basis of sex, creating two separate and unequal workplaces for its dispatcher employees. On an average day, approximately 9.1 prisoners are brought into the jail with an average of 2.4 being female. City records reveal the number of searches of female prisoners conducted by female dispatchers has increased from about a quarter to over a third of all such searches over the last few years:

2017 - 194 out of 725 searches, or 26.8% of searches,

2018 – 253 out of 978, or 25.9% of searches,

2019 – 300 out of 806, or 37.2% of searches,

2020 (January to March) – 69 of 156, or 44.2% of searches.

In comparison, there are no known instances of a male dispatcher ever performing a prisoner search.

Conducting a prisoner search exposes the dispatcher to significant dangers. Plaintiffs describe instances in which dispatchers were required to

conduct searches without officer backup, searched a subject with a knife, struggled with prisoners who are intoxicated and verbally and physically aggressive, searched arrestees with open wounds and sores, or who were high on drugs. Some dispatchers have come into contact with an arrestee's blood or urine, and some have performed strip searches alone without assistance from a sworn officer.

Sworn police officers undergo extensive training on how to conduct a custodial search, disarm a prisoner, manage a chain of evidence and remove dangerous articles. Plaintiffs contend the City of Warren does not provide training to the civilian female dispatchers that is comparable to the training police officers receive with regard to conducting prisoner searches. For example, dispatchers do not receive training in self-defense or in the use of force to subdue a prisoner.  Nor have they had training to search, disarm, or remove contraband from a prisoner. Ms. DeVooght described a video, shown approximately once a year, demonstrating how to pat down a female prisoner (DeVooght Decl. ¶ 10, ECF No. 26-3, Page.ID 729).  Ms. Piper and Ms. McLean's only training in their 15 years and 23 years of employment was a demonstration provided by a female dispatcher and a male officer along with paper documents and an occasional video (Piper

Decl. ¶ 8, ECF No. 26-2, Page.ID 724; McLean Decl. ¶ 9, ECF No. 26-5, Page.ID 737).

In arguing discrimination under the policy that requires them to perform searches based on their gender, plaintiffs point out that they are not paid more than male dispatchers for doing prisoner searches. There is a history of complaints by female dispatchers to the union regarding the requirement to conduct searches. In 1993, the dispatchers, all of whom were female at the time, received a pay increase after a grievance prompted the union to negotiate on their behalf. Defendant does not dispute that today there is no pay differential based on gender despite the difference in duties as it relates to conducting prisoner searches.

Plaintiffs have suffered other consequences because of the requirement that they conduct prisoner searches. For example, Ms. Piper underwent knee surgery and took a medical leave of absence in the summer and fall of 2019. She attempted to return to work once she was cleared to perform sedentary duty. However, defendant refused to allow Ms. Piper to return to work until she could perform the physical demands of completing a prisoner search. Ms. Piper was not paid, under the terms of defendant's General Order, until she was medically cleared to perform prisoner searches. By contrast, a male dispatcher who underwent hernia

surgery around the same time, was able to resume work as a dispatcher having only been cleared for sedentary work.

Plaintiffs also maintain that although the General Order requires that a female officer on duty and in the station be called upon to conduct a prisoner search, in practice this policy is not always followed.  Plaintiffs document 22 occasions from June 2019 through June 2020 where a female dispatcher was required to conduct a prisoner search even though a female officer was allegedly available.

WPD states that it has considered alternatives and has revised its policies to make it easier to locate female officers to determine their availability to conduct prisoner searches. However, WPD has ultimately concluded that there are no feasible alternatives to its current policy. Instead, WPD has worked with the union to change recruitment standards and goals to attract more minorities, including more female officers.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56© empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St.*

*Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Tolan v.* Cotton, 572 U.S. 650, 660 (2014); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56© that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

However, when defendant's motion for summary judgment is based on an affirmative defense for which defendant bears the burdens of production and persuasion, defendant must satisfy a "substantially higher hurdle". *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) (citation omitted). "Summary judgment in favor of the party with the burden of persuasion ... is inappropriate when the evidence is susceptible

of different interpretations or inferences by the trier of fact." *Id*. (quoting

*Hunt v. Cromartie,* 526 U.S. 541, 553 (1999)).

## ANALYSIS

### I.    Equal Protection Clause and Title VII

This Court previously determined that the policy at issue in this case

presents direct evidence of discrimination: "By treating female dispatchers

differently based on their gender, the policy at issue is indeed facially

discriminatory." (ECF No. 37, PageID.1569). Generally, the burden then

shifts to defendant to establish a justification for the policy that satisfies the

heightened standard for gender-based classifications. *United States v.

Virginia*, 518 U.S. 515, 532-33 (1996). However, as the Court recognized, a

narrow exception to the general rule prohibiting gender discrimination

exists when the disparate treatment is based on a bona fide occupation

qualification. This narrow exception is only applied to protect an employer

when it institutes a sex-based policy as the result of a "reasoned decision-

making process." *See e.g., Everson v. Michigan Department of

Corrections*, 391 F.3d 737 (6th Cir. 2004); *Reed v. Cty. of Casey*, 184 F.3d

597, 599 (6th Cir. 1999).

Under the bona fide occupation qualification "BFOQ" exception, the

employer bears the burden of showing that it: (1) had a "basis in fact" for its

belief that gender discrimination is "reasonably necessary" to the normal operation of its business; (2) the job qualification relates to the essence, or to the central mission, of the employer; and (3) that no reasonable alternatives exist to discriminating based on sex. *Everson*, 391 F.3d at 748-49. Regarding gender-based prison policies, the Sixth Circuit emphasizes they are due more deference than other policies, and courts should "defer to the judgments of prison administrators." *Id*. at 752.

Regarding the first element of the BFOQ exception or defense, the Court previously held that defendant has a "basis in fact" for the belief that gender-based policies are "reasonably necessary" to WPD's operation. The Court recognized that prisoners maintain certain privacy rights that mandate same-sex prisoner intake searches. *See, Id*. at 750; *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992). In addition, the historically low percentage of female police officers at WPD and nationally reasonably led defendant to strike "a balance by imposing the female prisoner intake search duty upon female dispatchers only when a female police officer is not available." (ECF No. 37, PageID.1573-1574).

The other two elements of the BFOQ defense were not decided because the Court determined there was an issue of material fact whether there are any reasonable alternatives to the facially discriminatory policy

adopted by defendant. The parties have now completed discovery and the issues are back before the Court.

### A.   The Requirement that Female Dispatchers Search Female Prisoners Relates to the Essence of WPD's Business

The Supreme Court has stressed that "in order to qualify as a BFOQ, a job qualification must relate to the essence, or to the central mission of the employer's business." *International Union v. Johnson Controls,* 499 U.S. 187, 203 (1991) (internal citations and punctuation omitted). A policy that discriminates on the basis of gender will be found valid "when the essence of the business operation would be undermined if the business eliminated its discriminatory policy." *Dothard v. Rawlinson*, 433 U.S. 321, 332 (1977).

Defendant contends that the policy at issue, that female dispatchers conduct prisoner searches when a female police officer is not available, exists to safeguard the privacy of female prisoners as well as to ensure the safety of everyone at the jail, employees and prisoners alike. On the issue of prisoner privacy, the Sixth Circuit has held that every individual incarcerated "maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners." *Cornwell*, 963 F.2d at 916. To

that point, the State of Michigan requires that prisoner strip searches be conducted by a person of the same sex as the person being searched. MCL 764.25a(3). On the issue of safety, there is also no dispute that prisoners must be searched during the booking process. Although plaintiffs' expert, Dr. del Pozo, disagrees with defendant about who should perform arrestee searches, he does agree that "[s]earching arrestees prior to lodging and processing them is indispensable for safe and effective police operations, furthering the interests of justice, and the safety of other persons in the facility and its cells." (ECF No. 26-8, PageID.945). It can safely be said that safety and privacy relate to the essence of a jail facility. *Everson*, 391 F.3d at 759; *Reed*, 184 F.3d at 599.

The Court previously considered, but left open, whether the focus of the BFOQ analysis should be on the essential job functions of a dispatcher, or on the essence of defendant's business as a whole. Caselaw instructs that for the essence element of the BFOQ defense, courts are to look at the "normal operation" of the employer's "particular business or enterprise." *Dothard*, 433 U.S. at 333. In *Dothard*, the Supreme Court considered an Alabama policy that discriminated against female correctional counselors applying for contact positions in male maximum-security institutions. The Court discussed the dangers posed by a male, maximum-security

-13-

penitentiary, and that those dangers exist as to all correctional counselors regardless of gender. The Court also focused on "[t]he essence of a correctional counselor's job" which "is to maintain prison security." *Id*. at 334-35. The Court found that female guards presented a unique risk to prison security:

> In a prison system where violence is the order of the day, where inmate access to guards is facilitated by dormitory living arrangements, where every institution is understaffed, and where a substantial portion of the inmate population is composed of sex offenders mixed at random with other prisoners, there are few visible deterrents to inmate assaults on women custodians.

*Id*. at 335-56.  The Court ultimately concluded that being a male was a bona fide occupational qualification for correctional counselors in contact positions in male maximum-security institutions. Most important to the Court was that gender was related to the guard's ability to fulfill the central mission of his employer. *See also, Everson*, 391 F.3d 737 (concluding that, under the circumstances presented, being a woman was an essential qualification for the occupation of correctional officer in a female only housing unit).

The Court must first and foremost focus on the central mission of the employer. As discussed above, the essence of WPD's business encompasses all aspects of law enforcement, including safety, prisoner care and prisoner privacy. Many things have been said about the way the

WPD implements the policy: female dispatchers are paid the same as male dispatchers, though males are not required to conduct searches; there is insufficient training of the civilians being called upon to undertake the searches; female dispatchers are exposed to danger during searches; and female dispatchers are held to a higher physical fitness standard than their male counterparts and have been forced to take unpaid leave until they are cleared to perform prisoner searches. While these criticisms are concerning, they are not relevant to evaluating the essence element of the BFOQ defense.

The Court finds that the challenged policy ensures prompt same-sex prisoner intake searches in a department which employs female police officers in numbers well below the state and national average. Therefore, the policy of requiring female dispatchers to conduct prisoner intake searches when a female officer is not available relates to the essence of WPD's business.

## B. There is a Question of Fact Whether a Reasonable Alternative Exists

Employers asserting a BFOQ defense must establish that no reasonable alternatives exist to discrimination based on sex. *Everson*, 391 F.3d at 749 (citing *Reed,* 184 F.3d at 600). Like all the BFOQ factors, the burden is on the employer, who must satisfy a "substantially higher hurdle"

than the typical summary judgment standard. *Cockrel*, 270 F.3d at 1056.

Plaintiffs suggest several alternatives to WPD's policy of requiring female

dispatchers to conduct an intake search of a female prisoner when a

female police officer is not available.

### 1. Holding Prisoners Until Female Officer is Available

One proposed alternative is that female prisoners should be held in a

secure location at WPD until a female police officer becomes available.

Defendant has explained that it offers a shift premium for female officers

willing to work full-time in the jail. The result is that at least one female

officer is assigned to the jail on every 12-hour shift. The parties appear to

agree that leaving a prisoner unsearched for approximately 20 minutes in a

jail processing area is generally reasonable. However, there is no clear

evidence presented by defendant why the female officer on duty in the

building may not be available within 20 minutes to perform a search. The

fact that female dispatchers have been called upon to do searches at an

increasing rate even though there is a female officer at the jail on every

shift raises even more questions.

Defendant states the WPD Jail is comprised of one prisoner holding

cell and two smaller detox cells, so there is not always going to be an

available place to hold a female arrestee who has not yet been searched.

However, it is not clear how often these cells are occupied or whether there is another safe alternative for temporarily holding arrestees until they can be searched by a female officer.

The Court finds there are issues of material fact whether holding prisoners until a female officer becomes available is a reasonable alternative to the discriminatory policy.

### 2.  Call Female Officer in from Field

Another proposed alternative is that WPD should seek out female police officers from the field before utilizing a female dispatcher to perform an intake search. Defendants reject this option because they argue it takes too much time for an officer to return from to the station from their patrol. If the officer is on duty, she may be engaged in an intense time-sensitive situation. Depending on her location and traffic conditions, defendant contends it would often take the officer an hour or more to drive to WPD. Then, upon arriving at WPD, the officer would have to check her weapons, clear security, and change clothes or obtain PPE before she is able to respond to the jail to conduct the search.

Plaintiffs point out that the longest distance between the jail and where the officer may be during patrol is seven to eight miles and estimates the average drive time for an officer to return to the station to be

five to seven minutes. Furthermore, Dr. del Pozo opined that officers are routinely called in from the road for various reasons and being called in to conduct a search would not be any different (ECF No. 61-7, PageID.3182). In addressing defendant's argument that this option would leave a gap in coverage of the officer's assigned quadrant, Dr. Del Pozo responded that proper public safety administration must demonstrate flexibility in order to respond to emergencies. That being the case, providing coverage when an officer returns to the station could be a reasonable possibility.

At the very least, there is a material issue of fact regarding the time required for an officer to return from patrol to the station such that the reasonableness of this alternative can be evaluated.

### 3. Call Female Officer from a Neighboring Jurisdiction

A third proposed alternative is that WPD could request female officer aid from an adjoining jurisdiction before utilizing a female dispatcher to perform an intake search. According to plaintiffs, WPD allows its female officers to travel to other departments to search female arrestees (DeVooght dep. 55, 69; Piper dep 140-41; McLean dep. 117-18).

WPD responds that neighboring jurisdictions are also short on personnel, and even if they could accommodate a request for a female officer it would take at least an hour for one to arrive at WPD. The Court

finds defendant's response to be conclusory. Neither Captain Bonett's deposition nor Mr. Shock's report or deposition provides factual support to support their opinions on why this proposed alternative is not reasonable.

### 4.  Pay Dispatchers More for Conducting Searches

Plaintiffs maintain that paying the female dispatchers more if they must occasionally be called upon to perform an intake search is another reasonable alternative to the current policy. Defendant responds that this case was not pled as an unfair wage dispute. While defendant is correct that plaintiffs have not asserted a cause of action based on unfair compensation, their compensation argument is made in the context of the BFOQ defense raised by defendant. Plaintiffs' suggestion is that a reasonable alternative to discriminating against them based on gender would be to provide hazard pay when they are required to perform a search.

Defendant has not met its burden of demonstrating why providing hazard pay to dispatchers who perform intake searches is not a reasonable alternative to the challenged policy.

### 5.  Female Dispatchers Will Still be Needed for Searches

Defendant contends that a proposed alternative is de facto unreasonable if it results in the possibility that a female officer will still be

unavailable to conduct a search. *Million v. Warren Cty., Ohio*, 440 F.Supp 3d 859, 873 (S.D. Ohio 2020) (court rejected the alternative proposed by plaintiff as unreasonable because it made the situation worse than it stood under the challenged policy instead of better). To support its argument that each of the proposed alternatives are de facto unreasonable in this case, defendant cites to Dr. del Poso's deposition testimony. Dr. del Poso opined that even if all reasonable alternatives are utilized by defendant, there will still be times when utilizing a female dispatcher to do a female intake search will be required. (del Poso dep., pp. 212-23). Dr. del Pozo explained there still has to be a backup plan, in large part because WPD employs an insufficient number of female police officers, well below the national and state average.

Dr. del Poso's opinion is that each of the proposed alternatives, individually and together, are reasonable because they will greatly decrease, though not eliminate, the occasions in which a female dispatcher will be called upon to do a search. Defendant has not satisfied the "substantially higher hurdle" required on this element of its affirmative defense, on which it bears the burdens of production and persuasion. *Cockrel*, 270 F.3d at 1056. The Court concludes that on the issue of whether reasonable alternatives to the discriminatory policy exist, "the

evidence is susceptible of different interpretations or inferences by the trier of fact." *Id*. (quoting *Hunt v. Cromartie,* 526 U.S. 541, 553 (1999)). Defendant's motion for summary judgment is denied.

## II. ELCRA Claim

Claims brought under Michigan's ELCRA "involve the same analysis as Title VII claims." *McDaniels v. Plymouth-Canton Comm. Sch.*, 755 Fed. App'x 461, 469 n.3 (6th Cir. 2018) (citing *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 n.4 (6th Cir. 2003)); *see also Everson*, 391 F.3d 748 n.14 (discussing M.C.L. § 37.2208); *Reed*, 184 F.3d at 599. Pursuant to the Court's analysis above, defendant's motion for summary judgment is denied.

## <u>CONCLUSION</u>

For the reasons stated above, defendant's motion for summary judgment is DENIED.

Dated:  February 8, 2022

s/George Caram Steeh
HON. GEORGE CARAM STEEH
United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on February 8, 2022, by electronic and/or ordinary mail.

s/Brianna Sauve
Deputy Clerk