UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA DeVOOGHT, JENNIFER
PIPER, and DAWN McLEAN,

       Plaintiffs,

vs.

CITY OF WARREN,
      Defendant.

Case No. 20-cv-10812
Hon. George Caram Steeh
Mag. Judge David R. Grand

_____/

| | |
|---|---|
| PITT McGEHEE PALMER & RIVERS | KIRK, HUTH, LANGE & BADALAMENTI, PLC |
| By: MICHAEL L. PITT (P24429) | By: ROBERT S. HUTH, JR. (P42531) |
| ROBIN B. WAGNER (79408) | RAECHEL M. BADALAMENTI (P64361) |
| KEVIN M. CARLSON (P67704) | ELIZABETH P. ROBERTS (P76017) |
| Attorneys for Plaintiffs | Attorneys for Defendant |
| 117 W. Fourth St., Ste. 200 | 19500 Hall Road, Suite 100 |
| Royal Oak, MI 48067 | Clinton Township, MI 48038 |
| (248) 398-9800    Fax: (248) 268-7996 | (586) 412-4900    Fax: (586) 412-4949 |
| mpitt@pittlawpc.com | rbadalamenti@KirkHuthLaw.com |
| rwagner@pittlawpc.com | eroberts@KirkHuthLaw.com |
| kcarlson@pittlawpc.com | |

_____/

**DEFENDANT CITY OF WARREN'S POST-BENCH TRIAL BRIEF
WITH PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Now Comes Defendant City of Warren ("Warren"), by and through its attorneys, Kirk, Huth, Lange & Badalamenti, PLC, and respectfully submits this Post-Bench Trial Brief, with Proposed Findings of Fact and Conclusions of Law:

# I.   <u>**TABLE OF CONTENTS**</u>

II.   INTRODUCTION……………………………………………………………6

III.   PROCEDURAL HISTORY AND GENERAL LEGAL STANDARDS…...11

IV.   PROPOSED FINDINGS OF FACT……………………………………...16

   1.   WPD's dispatcher-search policy is the result of reasoned decision-making by WPD, who has considered the policy and proposed alternatives, but ultimately concluded time and time again that no reasonable alternatives to the dispatcher-search policy exist…………………………………………………16

   2.   General Order 20-63 at Exhibit J01, Pg "GenOrder 242-243" governs WPD prisoner intake searches currently……………………………………….18

   3.   General Order 20-63 and the historical prisoner intake search policies of WPD are reasonable and consistent with industry standards……………………..19

   4.   Plaintiff's Proposed Alternative #1, a demand that female dispatchers get "hazard" or "bonus" pay for performing a prisoner search, is not a "reasonable" alternative to WPD's gender-based prisoner intake search policy………………………………………………………………………21

      A.   Proposed Alternative #1 is not actually an "alternative" at all, but a demand for increased compensation that the Warren Police Officer's Association already acceded to in 1980…………………………..21

      B.   Female and Male Dispatchers both have added responsibilities arising from the intake search duty to justify equal pay for their different-but-equal job duties…………………………………………………22

      C.   Plaintiffs' Demand for Increased Pay or Benefits Is Not Properly Considered an "Alternative" to a Gender-Based Search Policy given changes in pay or benefits must be bargained for by the WPOA, though the WPOA is not a party to this action……………………………..23

      D.   Prior to this Action, the WPOA Was Vetting The Dispatchers Demand for Added Pay or Benefits and this process only stopped because the WPOA did not want to get involved in active litigation……………………………………………………..25

   5.   Plaintiffs' Proposed Alternative #2, That WPD Call In its Sworn Female Officers from the Road to perform female prisoner intake searches is not a

"Reasonable" Alternative to a gender-based intake search policy requiring assistance by dispatchers……………………………………………...29

6.  Plaintiffs' Proposed Alternative #3, to Require Mutual-Aide from Neighboring Jurisdictions with enough female sworn police officers, if any, to Allow for an Intake Search to Occur at WPD is Not a "reasonable" alternative to a gender-based policy requiring assistance by dispatchers….36

7.  Plaintiffs' Proposed Alternative #4, a Utopian Goal or "Process" for Getting to a Point  Where Enough Female Officers are Employed at WPD Cannot Be Considered an "Alternative," Let Alone a "Reasonable Alternative," to a gender-based policy requiring assistance by dispatchers for Searches that need to be done today……………………………………………………………40

8.  WPD Has Been Proactive in Incentivizing and Scheduling to Ensure Female Officers are "Available" On As Many Shifts as Possible, but the Very Limited Total of Female Officers means that this will reduce frequency of dispatcher searches but a backup plan utilizing dispatchers as a last resort for female prisoner intake searches is still essential……………………………………44

9.  The Warren Police Department utilizes female dispatchers to conduct female prisoner searches as a matter of last resort…………………………………45

10. Although the dispatcher-search policy of WPD is not required to be without its flaws, it is undisputed that WPD Dispatchers are Properly and Adequately Trained in Search Technique and Monitored for Safety by an Officer At All Times……………………………………………………………………46

11. Plaintiffs' Expressed "Safety" or "Health" concerns inherent in conducting female prisoner intake searches Does Not Relate at all to Whether There is Reasonable Alternative…………………………………………………..47

V.   PROPOSED CONCLUSIONS OF LAW…………………………………48
A.  Defendant Warren conclusively established that no reasonable alternative exists to a gender-based prisoner intake search policy at WPD such that, incident to the prior rulings in ECF 37 and 74, the BFOQ justification is a complete defense to this case……………………………………………48

B.  Added benefits or increased compensation to female dispatchers in the form of "hazard" or "bonus" pay when a prisoner search is performed is not

properly considered in the analysis of possible "alternatives" to a gender-based prisoner intake search policy given "compensation" "bonus pay" and other benefits must be negotiated with the Warren Police Officer's Association and Warren Police Command Officer's Association, such that it is not within the control of the employer, Defendant Warren, to enact such changes.  This is especially so given the Union's history of negotiating other compensation or benefits available to all Union Members, in lieu of the dispatcher-search issue, and because the Warren Police Officer's Association and Warren Police Command Officer's Association are not even parties to this case……………………………………………………………………..48

C.  The process of seeking out, recruiting and/or hiring more female police officers is not properly considered in the analysis of possible "alternatives" to a gender-based prisoner intake search policy given there is no way to know *when* or even *if* such process could *ever* produce a volume of female sworn police personnel so that WPD could ensure prompt, same-gender female prisoner intake searches absent as-needed assistance from WPD dispatchers. Supporting this conclusion was every single law and expert witness, including Plaintiffs' expert Dr. Del Pozo who had no idea if or when such a "threshold" might be met when a reasonable alternative to a gender-based policy might exist…………………………………………………………………...51

D.  The Plaintiffs err in presenting evidence or argument about how much consideration Warren has or has not given to reasonable alternatives to a gender-based prisoner intake search policy, as this has no place in the constitutional standard which requires Warren to establish whether an *actual* reasonable alternative exists as of this moment and given this Court already dispositively held that the BFOQ defense applies, generally, to the decision of Warren to issue the dispatcher-search policy it has, ECF No. 37 and 74, and, finally, given the consideration WPD has given to this policy and its consideration of alternatives throughout the years………………………51

E.  The Plaintiffs err in presenting testimony or argument regarding "safety" or "health" concerns inherent in conducting female prisoner intake searches given the reality that these safety and health concerns exist for all female personnel employed at WPD whose job duties includes the requirement to participate in or conduct female prisoner intake searches.  This simply does not present any issue of disparate treatment based on gender and, thus, is not properly raised as part of a constitutional challenge or relevant to the BFOQ analysis……………………………………….…………………………52

F.  The Plaintiffs err in contesting application of the BFOQ defense on the basis that the prisoner intake search policy does not relate to the hiring and employment of employees, but rather the assignment of job duties for a certain gender of employee in plain error.  ECF 105, PGID 4507-4508. This Court already recognized that the BFOQ defense is generally applicable to this case. See ECF Nos. 37 and 74, PG ID 3515.  The reality is that the BFOQ defense is "applied to protect an employer when it institutes a sex-based policy as the result of a "reasoned decision making process" including in the context of job duties and shift assignments. ………………………………………………52

VI.   CONCLUSION AND RELIEF REQUESTED………………………….52

## II.   INTRODUCTION

In this case, two (2) retired dispatchers and one (1) still-employed dispatcher from the Warren Police Department ("WPD") assert a constitutional challenge against the prisoner intake search policies in place in Warren since the 1970s under which female dispatchers have been required to assist with female prisoner intake searches when and if a female police officer is not available.[1] More specifically, Plaintiffs' Second Amended Complaint asserts that the WPD policy violates the Fourteenth Amendment's Equal Protection Clause, 42 U.S.C. § 1983 (Count I), Title VII (Count II), and the Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 et seq. (Count III). **ECF No. 36**. In response, Defendant Warren identified the gender-specific justifications for its intake search policies over the last 50+ years such that gender is a bona fide occupational qualification ("BFOQ") under which disparate treatment is permissible. **ECF No. 38**.

Importantly, this Court held on cross-Motions for Summary Judgment that Defendant Warren is entitled to application of the BFOQ defense in this case. **See ECF Nos. 37 and 74**.   This Court further held dispositively that the first two

---

[1] During this lengthy timeframe, the express language of the WPD General Orders regarding intake searches has ranged from gender-neutral to gender-specific. That being so, it is undisputed by the parties that the relevant policy provisions exist for the purpose of ensuring the prompt search of *female* prisoners at intake into the Warren Jail and, thus, the policy language has only been interpreted to apply to *female* dispatchers. **ECF 105, PgID 4499-4500, ¶17-20; See e.g. Gen. Orders 20-03 and 20-63 at Exhibit J01, GenOrd. 209-210, 229-244; and 9/21 Tr., p. 17-21**.).

elements of a BFOQ analysis from *Everson*[2] were satisfied in this case, being that the gender-specific policy is "reasonably necessary" to the operation of the WPD and that gender relates to the "essence, or to the central mission" of WPD given the WPD Jail must be operated. **ECF No. 37, PgID 1572-1574; ECF No. 74, PgID 3517-3520.** The basis for these two rulings flowed from the constitutional right prisoners have to be searched by same-gender police/jail personnel against the fact that nationally female police officers comprise only an average of 12.8%[3] of sworn police personnel.[4] **See ECF No. 37, PageID.1573-1574**[5]**; See also ECF No. 74, PageID.3516**. Also pertinent was that sworn female personnel employed at WPD has ranged from only 5-15% over the last 20+ years which means that there is not always an on-duty and available female police officer to complete a female intake search. **ECF No. 74, PageID.3520**.[6]

---

[2] *Everson v. Michigan Department of Corrections*, 391 F.3d 737 (6th Cir. 2004).
[3] The current average is 12.6%. **See ECF 105, PgID 4498** (See Stipulation of Fact, ¶9); See also: https://www.statista.com/statistics/195324/gender-distribution-of-full-time-law-enforcement-employees-in-the-us/#statisticContainer; https://nij.ojp.gov/topics/articles/recruiting-and-retaining-women-police-officers-message-your-organization-sends; and https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-74.
[4] **See ECF 105, PgID 4506-4512**.
[5] The Court recognized that prisoners maintain certain privacy rights that mandate same-sex prisoner intake searches and that the historically low percentage of female police officers at WPD and nationally reasonably led defendant to strike "a balance by imposing the female prisoner intake search duty upon female dispatchers only when a female police officer is not available."
[6] This Court held that "the challenged policy ensures prompt same-sex prisoner intake searches in a department which employs female police officers in numbers

The Court concluded these rulings by finding that a question of fact existed on whether Warren could satisfy the third element of a BFOQ analysis. A Bench Trial was scheduled on this limited question.

In particular, the City of Warren was required to establish applicability of the BFOQ standard with evidence that "no reasonable alternatives exist to discriminating based on sex." **ECF 37 and 74**. The finding of a genuine issue of material fact was based on Plaintiffs' presentation of the following as alternatives to a gender-based policy:

A. Providing added benefits or increased compensation to female dispatchers int the form of "hazard" or "bonus" pay when a prisoner search is performed;
B. Calling female sworn officers on duty in from the road to perform prisoner searches at the Warren Jail;
C. Having a female prisoner wait, unsearched, until a female sworn officer is available to perform the search;
D. Hiring more female police officers at WPD;
E. Obtaining mutual-aide from a neighboring jurisdiction with enough female sworn police officers to allow one to be called off the road to come to WPD for a search.

On September 21-22, 2022, the Bench Trial was held on the narrow question of whether this third-element of the BFOQ standard is satisfied. Testimony[7] was received from:

---

well below the state and national average. Therefore, the policy of requiring female dispatchers to conduct prisoner intake searches when a female officer is not available relates to the essence of WPD's business."

[7] The Transcripts from the Bench Trial are attached at **Exhibit A** (9/21/22 Transcript) and **Exhibit B** (9/22/22 Transcript) to this Brief. These are also located at **ECF No. 113-114**.

- Linda Devooght, a named-Plaintiff in this case and WPD Dispatcher (formerly a Dispatch Supervisor);
- Jennifer Piper, a named-Plaintiff and, per her testimony, a "retired" WPD Dispatcher;
- Officer Michael Sauger, the Warren Police Officers Association Union President, who is a former dispatcher and current police officer of WPD;
- Plaintiff's Expert Brandon Del Pozo, who is employed at Rhode Island Hospital and conducts research relative to drug addiction and substance abuse;
- Dispatch Supervisor Ryan Fessenden, who served as WPOA Union Liaison and, formerly, Union Steward for the Dispatchers;
- WPD Captain Christian Bonnet, who is the second highest level in Command (only beneath Commissioner William Dwyer) and has years of experience supervising dispatch;
- WPD Commissioner Dwyer, who has more than 50 years of policing experience, served as Commander in Charge of the Chief's division at Detroit Police Department and Police Chief in Farmington Hills, before serving WPD as its Police Commissioner from 2008-2010 and 2017 to present;
- Defense Expert Brian Shock, who the parties agreed on the record is qualified to render expert testimony utilizing his vast experience in law enforcement, as set forth in his Curricula Vitae and his Report at Exhibit J26; and
- WPD Captain Reichling, who is, currently, the training Captain and, formerly, served as Watch Commander of WPD, a position with supervisory duties over all of WPD.

The following exhibits were also received into evidence during the Bench Trial:

Exhibits D1 (hiring/recruiting materials), D4-6 (hiring/recruiting materials), D9-20 (hiring/recruiting materials and WPD Brochures), D21 (4/8/2020 email between Lt. Wolfe and Dispatch regarding dispatcher searches), Exhibit D22 (Union Materials - 03/06/1980 Inter Department Communication), D23 (11/30/1979 Inter Department Communication), D26 (tentative agreement between WPOA/Warren), Exhibit P22 (09/26/19 E-mail between Fessenden and DeVooght), Exhibit P25 (03/18/19 Commissioners Staff Meeting Notes),Exhibit P31 (03/11/2014 Letter from Sauger),

Exhibit P32 (Search Log), Exhibit P34 (2015 E-mail between Piper and Sauger),

Exhibits J01 (Relevant WPD General Orders), J02 (WPOA Union materials),

Exhibit J04 (3/19/2019 Email Correspondence), J05 (WPCOA Collective

Bargaining Agreement), Exhibit J13 (DeVooght Deposition), J19-22 (WPD

Dispatch Supervisor Job Descriptions), J23-25 (WPD Dispatcher Job Descriptions),

Exhibit J26 (Brian Shock's Curriculum Vitae and Report),Exhibit J28 (Dr. del Pozo's

Curriculum Vitae), J49 (Cptn. Bonnet Notes), J51 (WPOA Collective Bargaining

Agreement), J52 (Stipulations of Parties).[8]

During Trial, Defendant Warren met its burden to conclusively establish

application of the third-prong of the BFOQ standard because no reasonable

alternatives exist to a gender-based police for female prisoner intake searches at

WPD.  In fact, even the Plaintiffs' expert witness conceded on the record that no

reasonable alternatives exist to WPD's gender-based prisoner intake search policy.

**9/21/22 Tr. (Del Pozo), p. 302-303, 316, 318-319**. As such, as set forth in more

detail herein, a Verdict of No Cause for Action and Judgment of Dismissal with

Prejudice are properly entered in this matter.

---

[8] All Exhibits received into Evidence are attached at **Exhibit C (Defense Exhibits), D (Plaintiffs' Exhibits) and E (Joint Exhibits)** to this Brief.

### III.   PROCEDURAL HISTORY AND GENERAL LEGAL STANDARDS

This Court concluded the WPD intake search policies over the last 50+ years present direct evidence of discrimination "[b]y treating female dispatchers differently based on their gender…" **ECF No. 37, PageID.1569**. As to those policies over the last 50+ years that utilized facially discriminatory language, Defendant does not challenge this conclusion. However, there were also many General Orders in place during this time period, including WPD General Order 2020-03 that was in effect during pendency of this case, that were facially non-discriminatory in that they required dispatchers, male or female, to assist in prisoner searches. **See ECF 105, PgID 4499, ¶19.**  As to these facially-neutral policies,[9]  *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) requires only that they are supported by a business justification and Plaintiffs carry the burden of persuasion to establish otherwise.

---

[9] Although Title VII's proscription of sex discrimination conceivably could have been limited to overt gender-based distinctions, the Supreme Court's 1971 decision in *Griggs v. Duke Power Co.,* 401 U.S. 424, 431 (1971), determined "that a plaintiff need not necessarily prove intentional discrimination in order to establish that an employer has violated [Title VII]." *Id,* 401 U.S. at 431. The Supreme Court tempered this "disparate impact" theory by authorizing adoption of facially neutral policies with discriminatory impact based upon a showing of "business necessity." *Id*. As the Court recently explained, "the employer carries the burden of producing evidence of a business justification for his employment practices. The burden of persuasion, however, remains with the disparate-impact plaintiff." See *Grant v. Gen. Motors Corp.*, 908 F.2d 1303, 1306-1309 (6th Cir. 1990).

In any event, the Court's finding shifted the burden to Defendant Warren to establish a justification for the policy that satisfies the heightened standard for gender-based classifications. *See United States v. Virginia*, 518 U.S. 515, 532-33 (1996). One such justification is the BFOQ defense, which is a narrow exception to the general rule prohibiting gender discrimination when the disparate treatment is based on a bona fide occupation qualification like gender.  Under the bona fide occupation qualification "BFOQ" exception, the employer bears the burden of showing that it: (1) had a "basis in fact" for its belief that gender discrimination is "reasonably necessary" to the normal operation of its business; (2) the job qualification relates to the essence, or to the central mission, of the employer; and (3) that no reasonable alternatives exist to discriminating based on sex. *Everson*, 391 F.3d at 748- 49. But, in every prison or jail setting "the BFOQ showing …is less demanding than it would be for other employers that adopt policies that expressly rely on gender in making employment decisions." *Strozier v. Warren Cty., Ohio*, No. 1:17-CV-817, 2020 WL 3867316, at *5 (S.D. Ohio July 9, 2020)7, citing *Million v. Warren Cty., Ohio*, 440 F. Supp 3d 859, 871 (S.D. Ohio 2020). Specifically, a gender-based prison or jail policy "should be viewed through the lens of deference such that gender-based policies meet the standard so long as they are reasonable." *Id.*  Incident to **ECF 37 and 74** rulings referenced above, a Bench Trial was held in this case to narrowly determine whether the third-element of *Everson* is established

in this case. This was necessary given this Court found a question of fact on this element given "the evidence [on the issue of whether reasonable alternatives to a discriminatory policy exist] is susceptible of different interpretations or inferences by the trier of fact."

When considering the question of "whether any reasonable alternatives exist" to Warren's gender-based prisoner intake search policy,  well-settled law directs a court to "defer to the judgments of prison administrators."[10] *Everson*, 391 F.3d at 752.  The reality is that "...the Constitution does not allow the federal courts to act as a best-practices board." *Cooey v. Strickland*, 589 F.3d 210, 220-21 (6th Cir. 2009), citing *Baze v. Rees*, 553 U.S. 35 (2008). In fact, prison administrators must be allowed "to adopt innovative solutions to the intractable problems of prison administration" *Turner v. Safley*, 482 U.S. 78, 107 (1987).  Also to be considered is that a proposed alternative is never a *reasonable* one if it "would necessarily result in the possibility that there may be only one, or even no, female [] present [to undertake a search] during a given shift." *Million v. Warren Cty., Ohio*, 440 F.Supp 3d 859, 873 (S.D. Ohio 2020). In fact, given uncertainty implicit in the concept of

---

[10] "A bald claim that a defendant has failed to explore reasonable alternatives fails where there is evidence of changes in the policy over time and the defendant's consideration of alternatives including discussions with the union --- even if the answer turned out to be that none were feasible" --- does not avoid judgment in favor of the defense. *Jennings v. New York State Off. of Mental Health*, 786 F. Supp. 376, 385 (S.D.N.Y. 1992), *aff'd*, 977 F.2d 731 (2d Cir. 1992).

managing safety risks in a police or jail setting, it is "reasonably necessary" for administrators to err on the side of caution in a close case. *W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 419-420 and FN 29 (1985).

Both sides acknowledge that prisoners maintain certain privacy rights that mandate same-sex prisoner intake searches. See *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992) (Every incarcerated individual "maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners.") It is therefore the case that a female must perform a search on a female prisoner. **ECF No. 37, PgID 1572-1573; See also Fessenden Transcript, at Exhibit F hereto, p. 23 (Video Dep., Time: 6:25:15-6:25:38); 9/21/22 Tr. (Devooght), p. 32-33, 77-79; 9/22/22 Tr (Expert Shock), p. 89-91.** This is, in part, because the procedure for intake searches is more invasive than an initial roadside search and may include the removal of undergarments and body piercings and due to both personal boundary, safety and security and liability issues. **9/22/22 Tr (Expert Shock), p. 89-92; 9/21/22 Tr. (Del Pozo), p. 218-219.** In fact, prisoners have a Constitutional right to be searched by a person of the same sex. **9/22/22 Tr (Expert Shock), p. 89-91.**

Nevertheless, Plaintiffs were able to avoid summary judgment by arguing the following *might be* reasonable alternatives to WPD's prisoner intake search policy:

14

A. Providing added benefits or increased compensation to female dispatchers int the form of "hazard" or "bonus" pay when a prisoner search is performed;
B. Calling female sworn officers on duty in from the road to perform prisoner searches at the Warren Jail;
C. Having a female prisoner wait, unsearched, until a female sworn officer is available to perform the search;
D. Hiring more female police officers at WPD;
E. Obtaining mutual-aide from a neighboring jurisdiction with enough female sworn police officers to allow one to be called off the road to come to WPD for a search.

The word "alternative" is defined by Black's Law Dictionary as meaning: "one or the other of two things; giving an option or choice; allowing a choice between two or more things or acts to be done." Black's Law Dictionary.[11]   Likewise, the Merriam-Webster Online Dictionary defines "alternative" as "a proposition of situation of offering a choice between two or more thing only one of which may be chosen; an opportunity for deciding between two or more courses or propositions; one of two or more things, courses, or propositions to be chosen; something which can be chosen instead."[12] It implies the rejection of one choice for another.  And, the law is clear that a "less discriminatory alternative" is only reasonable if it accords with the employer's customary practices so amenably that the failure to use the alternative indicates that the legitimate concerns supporting the challenged standard are pretextual. *Levin v. Delta Air Lines, Inc.,* 730 F.2d 994, 1001 (5th Cir. 1984).

---

[11] https://thelawdictionary.org/alternative/
[12] https://www.merriam-webster.com/dictionary/alternative

Using these standards, the following Proposed Findings of Fact and Proposed

Conclusions of Law flowed from the Bench Trial in this matter.

## IV.  <u>PROPOSED FINDINGS OF FACT.</u>

The following are Defendant Warren's Proposed Findings of Fact:

**1.  WPD's dispatcher-search policy is the result of reasoned decision-making by WPD, who has considered the policy and proposed alternatives, but ultimately concluded time and time again that no reasonable alternatives to the dispatcher-search policy exist.**

WPD has considered alternatives to the dispatcher search duty including an extensive command meeting on the topic in 2019.  In fact, Captain Bonett has discussed complaints from Plaintiff DeVooght since 2009. **9/21/22 Tr. (Devooght), p. 57.** Cptn Bonett testified that even when Devooght vented her frustrations, she acknowledged that dispatchers were needed for female prisoner searches to be accomplished timely. **9/22/22 Tr. (Cptn. Bonett), p. 19.**  Most recently, the conversation arose in 2019 and Captain Bonett followed-up to DeVooght's complaints by raising the issue of possible alternatives to the intake search policy for female prisoners during a Staff & Command Meeting with Commissioner Dwyer. **9/22/22 Tr. (Cptn. Bonett), p. 16-18, 23-26; Exhibit P25 (Commissioner's Staff Meeting Minutes, 3/18/2019).**  In this discussion, Cptn. Bonett relied on what had been reported to him from officers, sergeants and the lieutenants who have boots on the ground every day on patrol to determine what might be feasible for WPD. **9/22/22 Tr. (Cptn. Bonett), p. 50-51.**

Cptn. Reichling recalled this 2019 discussion too and many others about possible alternatives to the dispatcher-search policy.  **9/22/22 Tr. (Cptn. Reichling), p. 196-197.** He also recalls speaking to other jurisdictions about how they have handled female prisoner searches, learning that many jurisdictions have done away with their dispatch centers and jails too --- in preference for use of County dispatch and facilities. **9/22/22 Tr. (Cptn. Reichling), p. 247-248; See also, 9/22/22 Tr. (Commr. Dwyer), p. 70.**

WPOA Union President Officer Sauger has pondered whether a reasonable alternative to the dispatcher search policy exists too in response to complaints from dispatchers who do not like doing searches.  **9/21/22 Tr. (Sauger), p. 196; 9/22/22 Tr. (Cptn. Bonett), p. 15-16, 22**.

At all times since 2009, WPD has concluded that there are no feasible alternatives to the current policy. **See e.g. 9/21/22 Tr. (Sauger), p. 196; 9/22/22 Tr. (Cptn. Bonett), p. 15-16, 22; 9/22/22 Tr. (Cptn. Reichling), p. 196-197, 212-214.** Incidentally, as these complaints were raised by dispatch, WPD has modified language of its intake search policy so that dispatchers are utilized only as a matter of "last resort," including use of language clarifying how to locate "available" female officers and modifying, multiple times, the definition of "available." **See. e.g. Exhibits J01, GenOrd 171-196, 209-210, 229-244 (e.g. Gen. Orders. 18-03, 19-04, 20-03 and 20-63) and J04; 9/22/22 Tr. (Cptn. Bonett), p. 50-51**. Indeed, in **Exhibit J04** (dated 3/19/2019), Cptn. Bonett sent an email to WPD Personnel noting:

> *"The administration as well as the WPOA have taken the time to review the matter and have agreed that the following shall be the process for searching female prisoners that are in the station" and then implemented a procedure whereby dispatch verified whether or not a female was working in the Jail, the Watch Commander then determined whether or not there were female personnel on duty, in station and available to search a prisoner and contacted the immediate supervisors of sworn female personnel assigned to the station to determine their availability before calling upon a female dispatcher to conduct the female prisoner search.*

Other examples include the Stipulation at **ECF No. 25-13 and ECF 24**, **WPD General Order 20-03 at Exhibit J01, GenOrd 209-210** which was issued to "reaffirm the procedure for searches of prisoners by Dispatchers" and provides in relevant part:

> *It is the policy of the Warren Police Department that Dispatchers shall be called upon to conduct search of prisoners only after the Watch Commander or his/her designee has exhausted all efforts to locate an available on-duty Police Officer on patrol or other assignment.*
>
> *... Dispatchers may be directed to perform a search when a same-sex[3] patrol officer is not available within a reasonable time after a prisoner is brought into the jail. An "available" patrol officer is one who is: (a) on duty; (b) in the Warren Police Department building; and (c) not attending to another matter or*

17

> *prisoner at the time. A "reasonable time" is determined at the discretion of the Watch Commander or his/her designee based on the particular exigent circumstances presented in the building at the time and/or with the particular prisoner, but in no event may this time exceed one (1) hour.* **See ECF 105, PgID 4505, Stipulation of Fact ¶27.**

As of the date of Trial, WPD General Order 20-63 governs intake prisoner searches and addresses these same goals by expressing that dispatchers are only to be called upon for intake searches after reasonable attempts to utilize "available" sworn female officers are exhausted. **General Order 20-63 at Exhibit J01, GenOrd 242-243.** This should have led to a decrease in searches being conducted by dispatchers, but since 2020 the numbers have remained constant or slightly increased because (1) the number of arrests and, thus, prisoner searches overall have increased and (2) there was a time when the female officers assigned to the jail cell block were both out on medical leave. **9/22/22 Tr. (Cptn. Reichling), p. 249-254.**

This all being so, when the limited number of female sworn officers employed by WPD are unavailable, WPD must have a search policy that ensures female prisoners are searched by female personnel in a reasonable time to ensure the safety of all concerned and avoid cruel mistreatment of those prisoners. **9/22/22 Tr. (Cptn. Reichling), p. 212-214.**

2. **General Order 20-63 at Exhibit J01, Pg "GenOrder 242-243" governs WPD prisoner intake searches currently and provides at ¶14:**

> Searches performed by dispatchers:
> a. A female dispatcher will conduct the search of a female prisoner in the detention facility when:
> (1) A female is arrested by a male officer and
> (2) There are no available female officers on duty and in the station at the time of booking.
> b. The arresting/booking officer will notify Dispatch of the need for a search, at which time Dispatch will review the daily schedule to determine if a female officer is currently working the jail.
> c. If no female officer is assigned to the jail, Dispatch shall notify the Watch Commander that a female officer is needed for a search.

18

    d. It will be the responsibility of the Watch Commander to determine if an on-duty female officer from the shift is in the station and available to conduct the search.

    e. If there are no on-duty available female personnel from the Watch Commander's shift, the Watch Commander shall contact the immediate supervisor or any sworn female personnel assigned to the station.   This immediate supervisor will determine the officer's availability….

### 3.  General Order 20-63 and the historical prisoner intake search policies of WPD are reasonable and consistent with industry standards.

Relevant here is that the parties agreed on the record that Defendants' Expert Brian Shock is qualified to render expert testimony utilizing the experience set forth in his Curricula Vitae and his Report at **Exhibit J26**. See also, **9/22/22 Tr., p. 84-85.** Expert Shock testified that based on his extensive experience in law enforcement, review of materials specified and interviews with key personnel from WPD, Expert Shock concluded WPD's policy including those at **Exhibit J01** is within "industry standards," or consistent with how police departments with similar demographics to WPD operate. **9/22/22 Tr (Expert Shock), p. 87-89.**   In fact, Expert Shock confirmed that the use of civil personnel like dispatchers to conduct prisoner searches (and provide a whole host of other jail-services) is hardly unusual in Michigan or nationally. **9/22/22 Tr (Expert Shock), p. 88-89.**

    o The materials reviewed by Expert Shock included 50+ years of WPD General Orders regarding prisoner searches, WPD Dispatcher and Dispatch Supervisor job descriptions, WPD job specifications and job postings, WPD staffing and recruitment materials and information related thereto, the deposition transcripts of Plaintiffs, the deposition transcripts of nearly all of WPD's Staff & Command Officers, the deposition transcript and responses to written questions by Commissioner Dwyer, the policies and information provided from neighboring jurisdictions of Sterling Heights, Roseville, Hazel Park, Madison Heights and Eastpointe, 2009 FBI Uniform Crime Reporting Tables, demographic data from the City of Warren  and its surrounding municipalities (including that information related to the industries, businesses traffic, etc.), Dr. Del

Pozo's expert Reports and deposition transcript.    **9/22/22 Tr (Expert Shock), p. 84-88.**

o   Expert Shock noted specifically that Sterling Heights (prior to privatizing its dispatch center), Hazel Park, Eastpointe and Madison Heights Police Departments utilize civilian employees to conduct prisoner searches, with Hazel Park Police Department being just like WPD in utilizing female dispatchers to conduct female prisoner intake searches. **9/22/22 Tr. (Expert Shock), p. 113-117.**

o   Expert Shock's experience confirms this industry standard too where two police departments in which he worked utilized civilian personnel for prisoner searches, being the Black Hawk County Jail which used female booking clerks for intake and monitoring female prisoners and the Cedar Falls Police Department where civilian female employees conduct female prisoner intake searches. **9/22/22 Tr (Expert Shock), p. 110-111.**

Opposite this, Plaintiff's expert Dr. Del Pozo testified that he has never encountered a police department that had dispatchers searching female prisoners in an agency of Warren's size**. 9/21/22 Tr. (Del Pozo), p. 228-229, 254-255.** Dr. Del Pozo did acknowledge though that smaller police departments do utilize dispatchers to conduct prisoner searches when female officers are unavailable. **9/21/22 Tr. (Del Pozo), p. 254-255.** Del Pozo's conclusions were predicated on mere Google searches for dispatcher job posting. **9/21/22 Tr. (Del Pozo), p. 226-227, 281-282.** He acknowledged such "research" would not account for police departments with the same practice that do not have job openings right now. **Ibid.** Dr. Del Pozo's conclusions were further troubling given that he refused to compare WPD's 159 sworn officer total to police departments with approximately 100 sworn officers. **9/21/22 Tr. (Del Pozo), p. 281-6, 324.** Del Pozo insists instead that WPD must be exclusively compared to agencies like the Detroit Police Department with over 3,000 sworn officers employed (24% of which are female) and the New York City Police Department with over 36,000 sworn officers employed (18-20% of which are female). **9/21/22 Tr. (Del Pozo), p. 214-5, 281-286.** Finally, Del Pozo's reasoning was admittedly flawed where his experience was primarily as Chief of the Burlington Police Department which did not have a jail at all such that a policy for prisoner intake searches was never even an issue he needed to consider. **9/21/22 Tr. (Del Pozo), p. 260-3, 265-9, 279.**

Aside from the obvious flaws in Dr Del Pozo's conclusions, this Court heard that Del Pozo no longer enjoys a career in public service as a result of false statements made while holding public office. **9/21/22 Tr (Del Pozo), p. 260-263, 265-270**. This accounts for how out-of-touch Del Pozo is with current police culture, needs and policy. **See 9/21/22 Tr (Del Pozo), p. 272-5; Exhibit J28.** Even so, Del Pozo admitted that even if his "best practices" standard were employed by WPD starting immediately, there may still be times where WPD would have to utilize a female dispatcher for a female prisoner intake search to ensure same-sex rights of the prisoner and timeliness of search needs. **9/21/22 Tr (Del Pozo), p. 316-9.** In fact, Del Pozo admitted that his desire to see a more utopian approach to policing nationally really has nothing to do with WPD's prisoner intake search policy at all. Indeed, Del Pozo admitted there are actually no reasonable alternatives to this policy. **9/21/22 Tr (Del Pozo), p. 318-319.** Indeed, he admitted under oath that his opinions in this case are merely academic ideas on "best practices" that WPD should "strive" for in a perfect world, not feasible or tested alternatives that could actually ensure safe, timely same-sex prisoner intake searches. **9/21/22 Tr (Del Pozo), p. 302-303.** Such an unreasonable, impractical and unsafe approach to policing should clearly not guide this Court in any part of its analysis of this case, except of course the admission by Del Pozo that there are no reasonable alternatives to the WPD gender-based prisoner intake search policy.

4. **Plaintiff's Proposed Alternative #1, a demand that female dispatchers get "hazard" or "bonus" pay for performing a prisoner search, is not a "reasonable" alternative to WPD's gender-based prisoner intake search policy.**

A. Proposed Alternative #1 is not actually an "alternative" at all, but a demand for increased compensation that the Warren Police Officer's Association already acceded to in 1980.

In 1980 when the 'communication' position was officially re-titled to 'dispatcher,' a new dispatch system was installed at WPD and the WPOA reaffirmed the intake search duty for dispatchers and dispatch supervisors in exchange for a negotiated hazard pay salary increase. To be sure, WPOA President Officer Sauger testified that the correspondence dated 3/11/2014 at **Ex. P31** was to explain the history of benefits and compensation for dispatchers. The first change in classification was in 1980, when communication was comprised of all female employees, and the next pay increase to dispatchers was in 1990 to reflect the use of computer aided dispatch, and another was in 1996 and 2012 which applied equally to male and female dispatchers. **9/21/22 Tr. (Sauger), p. 180-182, 188, 205**. However, the 1980 pay

21

increase for dispatchers was provided to separate the dispatchers from administrative clerks because the work task of assisting jail personnel in processing prisoners was to remain within the communication aid 2 (dispatcher) classification and job description. **9/21/22 Tr. (Sauger), p. 186-187; Ex. D22 (WPOA 3).** Devooght agreed with this. **9/21/22 Tr. (Devooght), p. 84-89; DeVooght's dep. at Exhibit J13, p. 89.**[13] Cptn. Bonett, also, agreed that searches were a task that dispatchers agreed to do through collective bargaining and received renumeration for doing so. **9/22/22 Tr. (Cptn. Bonett), p. 28-29.**

Currently, male and female dispatchers receive the same pay and benefits. For Plaintiff Devooght this is appx. $65,000/year, 6 weeks of vacation with paid leave and holidays, health/dental/vision insurance, a 401k-401A Match Plan and a 457 (deferred compensation) Plan. **9/21/22 Tr., (Devooght), p. 39-40**. She also receives premiums for working afternoon and midnight shifts, for training new dispatchers, and for standing in as an Acting Supervisor as necessary. **9/21/22 Tr. (Devooght), p. 43.** These are all benefits negotiated by WPOA. **Ibid**.

Plaintiffs take issue with their pay being equal to their male counterparts because they are required to assist with intake searches due to low numbers of sworn female officers while male dispatchers are not, given there is clearly always going to be an "available" male sworn officer for a male intake search. **9/21/22 Tr. (Devooght), p. 16; 9/21/22 Tr. (Piper), p. 125**. A more appropriate remedy for such a complaint is to decrease what male dispatchers are paid, i.e. remove the 1980 benefit for those not having to conduct intake prisoner searches (though even this must be negotiated).

> ### B. <u>Female and Male Dispatchers both have added responsibilities arising from the intake search duty to justify equal pay for their different-but-equal job duties.</u>

Both male and female dispatchers have the same new-hire checklist and receive the same in-house training regarding searches. **9/21/22 Tr (Piper), p. 149-150.** At Trial, former male dispatcher (now Officer) Sauger and male dispatcher Fessenden testified to the search training each received as part of the Communications Training Officer program that continues today. **9/21/22 Tr. (Sauger), p. 183-184; See also, Ex. P34; Fessenden Transcript, at Exhibit F, p. 7, 23-24 (Video Dep, Time: 6:03:31-6:04:45, 6:25:38-6:27:05).** Aside from training, the search duty results in added job responsibilities for male dispatchers even though they are not being called

---

[13] The Union was never asked to decrease male dispatchers' compensation. **9/21/22 Tr. (Piper), p. 154.**

out to do the physical intake searches.  Specifically, male dispatchers have to work harder in dispatch to cover for their missing female co-workers while a female intake search is conducted. **9/21/22 Tr. (Devooght), p. 16; 9/21/22 Tr. (Piper), p. 125; Fessenden Transcript, at Exhibit F, p. 6, 20-22 (Video Dep., Time:6:21:30-6:24:05).**  The work is equal, albeit in differing respects, and the pay is, therefore, equal too.

Notably here, there is no hazard or bonus paid to female officers who have to stop their regular duties, which are typically detective positions or desk jobs, to conduct prisoner intake (or roadside) female searches --- though there is obviously no corresponding need for male officers assigned to a desk to have to go conduct searches. **9/21/22 Tr. (Devooght), p. 92; 9/21/22 Tr (Del Pozo) p. 93-4.**  Also notable is that male sworn officers who are required to provide "coverage" in the dispatch center while a female prisoner intake search is done by a female dispatcher are not given any hazard or bonus pay either.  **9/21/22 Tr (Devooght), p. 94; 9/21/22 Tr (Del Pozo) p. 92-3.** Stepping outside of ordinary job titles is, after all, often necessary for employees of emergency service departments like WPD to ensure "functionality" and "efficiency."  **9/21/22 Tr (Del Pozo) p. 255-7**.

> C. <u>Plaintiffs' Demand for Increased Pay or Benefits Is Not Properly Considered an "Alternative" to a Gender-Based Search Policy given changes in pay or benefits must be bargained for by the WPOA, though the WPOA is not a party to this action.</u>

The issue of Plaintiffs' compensation and benefits is governed exclusively by the WPOA Collective Bargaining Agreement. **Exhibits J05, J51 J54; 9/21/22 Tr. (Sauger), p.194-195.**  Article 1 of the CBA at **Exhibit J05** recognizes that the Warren Police Command Officers Association is the exclusive representative for collective bargaining regarding pay, wages, hours and other terms of employment for employees in the classification/rank of dispatch supervisor, sergeant, lieutenant and captain.  **Ibid., see also 9/21/22 Tr., (Devooght) p. 46.**  The same exclusive representative language is in **Exhibit J51** which is the 2016-2019 Collective Bargaining Agreement between the WPOA and Warren which has been extended to continue through current day.  **9/21/22 (Sauger) Tr., p. 165-166, 193-194; See also Exhibit J54**.

Union President Sauger confirms that Article 1 of **Exhibit J51** makes WPOA the exclusive collective bargaining representative for employees in the classification/rank of dispatcher, police officer, candidate, police officers and corporal – which means that the POA is the only entity that has the ability to

23

represent the members with the City and that wages, shift premiums, comp time, holidays, and all benefits for these employees must be negotiated by the Union. **9/21/22 Tr. (Sauger), p.163-4, 194-195.** Plaintiff Piper agrees that the Union is the exclusive representative for the POA members and must bargain for any change to compensation, wage and/or benefits.   **9/21/22 Tr. (Piper), p. 156**.  Commissioner Dwyer and Captain Reichling likewise testified that dispatcher pay and benefits is established through collective bargaining with the Union. **9/22/22 Tr. (Commr. Dwyer), p. 72-73**;  **9/22/22 Tr. (Cptn. Reichling), p. 209-210, 214-217**.

There is, in fact, no dispute that any process of enacting change to dispatcher compensation or benefits requires the WPOA and/or WPCOA Union to begin negotiations and only then is Warren in a position to accept or reject a proposed change in dispatcher compensation or benefits.   **9/21/22 Tr. (Devooght), p. 47; 9/21/22 Tr. (Piper), p. 156, 159; Fessenden Transcript, at Exhibit F, p. 27-28 (Video Dep., Time: 6:28:52-6:30:06).**  In fact, Commissioner Dwyer testified:

> *"It's up to the POA to bring that request forward. I don't have the ability to just give them a raise. It has to be -- it's got to be their union that negotiates any type of an increase."* **9/22/22 Tr. (Commr. Dwyer), p. 72-73**

Similarly, Dispatcher Fessenden who was formerly a Union Steward and the Dispatcher-Union Liaison, testified that it is solely within the Unions' purview to propose, then negotiate compensation and benefits for the Union Members; this is a negotiated process in which a change is proposed by the Union Board, the City comes to an initial agreement with the Union Board, then the agreement is voted upon by all union members and that all have to agree that this is the best use of "their pot of compensation and benefits" before change in pay or benefits is enacted. **Fessenden Transcript, at Exhibit F, p. 27-28 (Video Dep., Time: 6:28:52-6:31:35); See also 9/21/22 Tr. (Sauger), p.163-4.**  This always takes place during open contract negotiations and there is no other way to change compensation or benefits for union members. **Fessenden Transcript, at Exhibit F, p. 28-29 (Video Dep., Time 6:31:35-6:31:59).**  Even Plaintiff's Expert Del Pozo acknowledged that once a collective bargaining agreement is signed between the union and municipality, the municipality or police department does not have the option of changing union member benefits, that this is negotiated during collective bargaining, and that the union would have to agree.  **9/21/22 Tr. (Del Pozo), p. 296.**  Del Pozo agreed that it is up to the Union, not the City or WPD, to bargain for the dispatchers in this regard and there is no evidence that the Union has done so.  **9/21/22 Tr. (Del Pozo), p. 298, 323.**

In fact, Michigan law (PERA) prohibits WPD or Commissioner Dwyer from proposing or attempting to negotiate compensation or benefits directly with the union or union employees. **9/21/22 Tr (Sauger), p. 203.** This law similarly prevents Warren from directing the unions on what or whom they should focus on in collective bargaining processes. **9/21/22 Tr (Sauger), p. 203.** Further, any change in pay or benefits would result in a change in the adopted annual City of Warren Budget which must be approved by Warren's City Council. **9/22/22 Tr. (Commr. Dwyer), p. 56, 72-74; 9/22/22 Tr. (Cptn. Reichling), p. 209-210, 213-217; 9/21/22 Tr (Del Pozo), p. 296.**

        D. <u>Prior to this Action, the WPOA Was Vetting The Dispatchers Demand for Added Pay or Benefits and this process only stopped because the WPOA did not want to get involved in active litigation.</u>

Prior to this lawsuit, Union Steward and Dispatcher Fessenden had been engaged in a process for vetting benefits given to dispatchers or other civilian personnel who have similar job duties as the female dispatchers at WPD. **Fessenden Transcript, at Exhibit F, p. 16-17, 25-26 (Video Dep., Time: 6:16:25-6:18:05, 6:28:00-6:28:52); 9/21/22 Tr (Sauger), p. 168-169; Sauger Dep at Ex. J17, p. 103**. As Plaintiffs knew in 2019-2020, Dispatcher Fessenden hoped to effect change in favor of female dispatchers who did not like having to do prisoner intake searches and, correspondingly, *all* dispatchers who had to work harder when a female is pulled out of dispatch to undertake a search. **9/21/22 Tr (Devooght), p. 68-78, 100, 103; See also, Exhibit P22: 9/26/2019 Correspondence between Dispatcher Fessenden (the Union liaison for dispatch at the time and Devooght, indicating that changing search policy would be a priority if there were multiple requests on the wish list); 9/21/22 Tr., (Devooght), p. 36; 9/21/22 Tr (Piper), p. 155; Fessenden Transcript, at Exhibit F, p. 6, 19-22, 26-28 (Video Dep., Time: 6:09:40-6:10:30, 6:28:52-6:30:06)**. Rather than wait for the WPOA to take action, Plaintiffs retained counsel and filed this lawsuit. **Ibid**.

        o  Indeed, Devooght testified that she has had dozens of discussions over the years with different union presidents and representatives beginning in about 2009 when she first raised the issue of comp. time for searches to the Union. **9/21/22 Tr., (Devooght) p. 57-60.** She testified that she first raised the search issue with the union. President of the Union at that time was Mr. Figurski. **Ibid**. She testified that then-Union President Figurski was not receptive to her discussion. **Ibid.** DeVooght testified that she gave Figurski a wishlist requesting to no longer have to do searches and

he called dispatchers greedy. **Ibid.**  Devooght testified that Figurski did not include the issue in the following labor negotiation, explaining that he did not ask whether the duty could be removed or if additional compensation could be paid. **Ibid.**  He was not receptive to her request for comp time for searches either. **Ibid.**

o  At the next labor negotiations, Figurski was replaced by Union President Sauger.  Devooght raised the same issue to Union President Sauger, but the issue was never brought to the Union Board to be discussed – as she learned from Ryan Fessenden (who was a steward for dispatch on the board for about 5 years). **9/21/22 Tr., (Devooght) p 62-63**.  President of the WPOA since 2011, Officer Sauger confirmed that for many years, female dispatchers have been opposed to being required to search female prisoners. He testified that dispatchers have specifically stated that their first choice would be to remove searches from the job duties, and that their second choice would be to be used only as a last resort and be compensated for performing female prisoner searches**. 9/21/22 Tr (Sauger), p. 168-169.**

o  In about 2016, Devooght said she raised the issue to Sauger who told her that the Union would not negotiate it because there were 3 full-time female officers assigned to the jail (so 3 of the 4 shifts had one female officer stationed in the jail). **9/21/22 Tr., (Devooght) p. 65-66**.  Devooght admits that the Union essentially told her that it was not a significant enough issue for the Union to negotiate. **Ibid., p. 68-69.**   Indeed, in 2016, the dispatchers raised the dispatcher-search policy issue to him and indicated that they were not happy about having to conduct prisoner searches. **9/21/22 Tr. (Sauger), p. 188**.  Sauger initially testified that he was not sure that the idea of compensating dispatchers for prisoner searches was on the Union's list for negotiation in 2016, but then recalled that "the idea of compensating dispatchers for searches was in the 2016 negotiations. Then, when it came into budget constraints, that was one of the issues that was -- didn't make it through. And I think that's when [the Dispatcher's Union Steward] Ryan [Fessenden] was trying to get the updated comparables for the next negotiations." **9/21/22 Tr (Sauger), p. 168-169; Saager Dep at Ex. J17, p. 103**.  In fact, in 2016, the Union did not negotiate for anything related to the search duty. **9/21/22 Tr. (Sauger), p. 189.**  Instead, during the 2016 round of negotiations, Sauger secured pay raises for all union members, including the dispatchers. **9/21/22 Tr (Sauger), p. 170-171, 189.**  To be sure, the dispatchers have received

every contractual pay increase that the entire Union has received**. 9/21/22 Tr. (Sauger), p. 188**.  The reason that Sauger gave to Devooght in 2016 for not negotiating the dispatcher search issue was that, at that time, there were 3 out of 4 shifts where a female was staffed in the jail full time so it was such a rare occurrence that dispatch needed to be involved in a search at that point that the Union did not want to go out to bat for them then. **9/21/22 Tr. (Sauger), p. 189.**

o   Plaintiff Piper also described the creation of a union wish list in which anything desired to be added or removed from the union contract during union negotiations was noted.  She testified that the dispatchers included a request to change or remove the prisoners search duty "every year" or every time that the wish list was created. **9/21/22 Tr (Piper), p. 128, 152-153**.  The issue of additional compensation for female dispatchers performing searches was also discussed between dispatch and Sauger. **Ibid., p. 154**.

o   In 2019, Sauger went to dispatch and other departments and asked them to put together a wishlist for negotiations. **9/21/22 Tr. (Sauger), p. 190**. At this time, former Union Steward/then-Union liaison Dispatcher Fessenden[14] wanted the WPOA to start with a proposal to get rid of the dispatcher search-duty entirely, stating that this would be a starting point for the contract negotiations for this issue, though acknowledging that he was not sure if police administration could have even agreed to do so, with the aim of reaching an agreement about compensation. **Fessenden Transcript, at Exhibit F, p. 19-20, 26-28 (Video Dep., Time: 6:19:45-6:21:30)**.  Fessenden asked the dispatchers to log their searches in order to show how many searches they were performing and gain leverage going into the 2019-2020 labor contract negotiations. **9/21/22 Tr., (Devooght), p. 36; Fessenden Transcript, at Exhibit F, p. 11, 13 (Video Dep., Time: 6:12:10-6:13:00); Exhibit P22.**

o   The Union Board planned to consider whether or not to include in labor negotiations requests for more pay, comp time, etc. for female dispatchers

---

[14] Prior to Fessenden acting as steward, there was no dispatcher representative on the union board; Currently, no dispatcher has come forward to be part of the union board and no dispatcher attends the POA meetings to be eligible to sit on the board. **9/21/22 Tr. (Devooght), p. 63-64.**

because where a handful expressed dislike of the intake search duty. **9/21/22 Tr. (Sauger), p. 191.**

o   Sauger and Fessenden learned that all other departments in Macomb County that had a dispatch center that were doing searches had been centralized or privatized and no longer were hiring for police department dispatch centers. **9/21/22 Tr. (Sauger), p. 191; Fessenden Transcript, at Exhibit F, p. 16-17, 25-26 (Video Dep., Time: 6:16:25-6:18:05, 6:28:00-6:28:52).** For example, Sterling Heights has a similar sized police department to WPD and they do not have a dispatch in operation anymore. **9/21/22 Tr. (Sauger), p. 183**.

o   WPD has not privatized its dispatch center despite that, in previous negotiations, the City had brought up the cost savings of getting rid of the dispatch center all together. **9/21/22 Tr. (Sauger), p. 191**; **See also, 9/22/22 Tr. (Commr. Dwyer), p. 70; 9/22/22 Tr. (Cptn. Reichling), p. 247-248**. Even Union President Sauger admits that the savings of cutting Warren's dispatch would be "substantial"; but, he simultaneously noted that one of the reasons Warren has not gotten rid of dispatch is because of the need for dispatch to be housed in the WPD so that female dispatchers can assist in female prisoner searches. **9/21/22 Tr. (Sauger), p. 192.**

o   <u>In other words, Union President Sauger understood what the Plaintiffs do not: that all compensation and benefits received through labor negotiations come at a cost; a cost to the City, a cost to all union members (including the dispatchers who received union-member pay increases through these negotiations) for a traded benefit that would only be provided to the dispatchers, or a cost to dispatchers when WPD is pushed toward privatizing the dispatch center and leaving Plaintiffs unemployed.</u> **9/21/22 Tr. (Sauger), p. 191-192.**

Upon seeing the lawsuit, as reported in the news, WPOA President Sauger felt the union should take no further action regarding the issue of intake searches until the court case was fully decided. **9/21/22 Tr. (Sauger), p. 197-198.** This decision to stop vetting the issue regarding dispatchers and intake searches flowed from the WPOA Board and its separate counsel, exclusively. **9/21/22 Tr. (Sauger), p. 197-198; Fessenden Transcript, at Exhibit F, p. 31 (Video Dep., Time: 6:34:20-6:35:27); See also 9/21/22 Tr. Devooght, p, 65-66.**

Although Sauger is certain that WPOA's duty of fair representation to all its Union Members has been met, he confirmed that the dispatchers remedy if they are not satisfied because the issue of added pay or benefits has not been negotiated in their favor is to file an unfair labor or breach of fair representation complaint against the union or petition the State of Michigan to form their own 'dispatcher union.' **9/21/22 Tr. (Sauger), p. 197-198.** Plaintiffs pursued none of these options, and never even contacted The Michigan Employment Relations Commission ("MERC"), but filed this lawsuit against Warren, only, despite knowing the union and City are separate. **See 9/21/22 Tr (Devooght) p. 99, 100-2; 9/21/22 Tr (Piper), p. 152-153.**

In fact, even if WPOA proposed and Warren agreed to an increase in female dispatcher compensation or benefits given the search duty, the entire WPOA Membership must vote on whether this change is effected from "their pot of compensation and benefits." **Fessenden Transcript, at Exhibit F, p. 19-20, 26-28 (Video Dep., Time: 6:28:52-6:31:35); 9/21/22 Tr (Del Pozo), p. 296.** The union and union membership are not parties to this action; this "alternative" is not properly even is issue given this failure to establish any legal basis for relief against Warren.

5. **Plaintiffs' Proposed Alternative #2, That WPD Call In its Sworn Female Officers from the Road to perform female prisoner intake searches is not a "Reasonable" Alternative to a gender-based intake search policy requiring assistance by dispatchers.**

It was conclusively established at Trial that there is no way to ensure sworn female police officer response from the road to a female prisoner intake search at the Warren Jail in a timely, predicable or consistent manner so as to consider "calling female officers in from the road" to be a reasonable alternative to a gender-based policy that utilizes dispatcher assistance. This occurs because (A) traffic is prohibitive; (B) female officers are on police calls. Moreover, the resulting patrol gap and fact that there is not always a female officer on road patrol further mandate against consideration of this as an alternative.

More specifically, traffic around WPD means that travel time when called in from the road "sometimes it could be, ... 10 minutes ...to an hour depending on traffic" to commute from within the City of Warren's jurisdiction to the station. **9/22/22 Tr. (Expert Shock), p. 97-98; 9/22/22 Tr. (Reichling) at ECF No.114, PageID.5106**. In fact, Captain Reichling testified:

29

Q.      The -- what about traffic out there? And this kind of relates to two of the alternatives that the plaintiffs are talking about, calling in somebody from a neighboring jurisdiction, and calling in somebody from your -- the road. What is the traffic around the PD?

A.      Well, during the day, it's pretty rough. I mean, if anyone there has ever driven down Van Dyke or Schoenherr or Hoover or any of those major roads, you know, we have construction and we have traffic. That's pretty much what we offer here during the day. So if you're calling in someone from the south end, you know, yeah, maybe only seven, eight, nine miles away from the station, but those -- that's not freeway miles. I mean, that's bumper to bumper sometimes. Sometimes it's opened up on the weekends, sure, but we have a lot -- I mean, we have a city with over a million daytime population. That's a lot of cars out there.

Q.      You have a couple manufacturing shifts, too, right in that area, don't you?
A.      Manufacturing plants? Well, sure, yeah.

Q.      And --
A.      There's Dodge. I mean, there's a few of them in the city, yes.
Q.      One right, a mile from the station on Mound. One right across from the station, right?
A.      That's correct.

        [and]… there's a lot in the south end of the City that aren't necessarily major hubs, but there's a lot of smaller factories that bring in a lot of traffic. There's a -- I believe it's Green for Life Waste Management down there. That's quite a big outfit. Lipari. There's a lot of things that slow things down on you.  **9/22/22 Tr. (Cptn. Reichling), p. 199-201; See also 9/22/22 Tr. (Expert Shock), p. 97-98.**

Aside from traffic, the female officer response time is impacted by what is going police situations and runs are in process in the City of Warren at the time a female prisoner intake search might be needed.  Of consideration is whether the female

30

officer is "on a call, if they're backing up someone, staffing, if their lack of staffing at the time, if there's something going on with the male officers at another quadrant and they're floating around as a female patrol officer, which, doing their patrol duties, so time wise, it could vary." **9/22/22 Tr. (Expert Shock), p. 96. This makes the female officer response time completely unpredictable. 9/22/22 Tr. (Expert Shock), p. 103-4.** On this issue, Captain Reichling testified that the timing "such a gray area… it could be five minutes. It could be five hours… It all depends on the nature [of the run they are engaged in]. Nothing's black and white in [policing]." **9/22/22 Tr. (Cptn. Reichling), p.199.**

Additionally, you have shifts at WPD now that have only one (1) female assigned to the road. If that female is on vacation or out sick, a policy that begins and ends with calling a female officer in from the road leaves this entire 12-hour shift unable to search a female prisoner at intake. **9/22/22 Tr (Expert Shock), p. 91-92; 9/21/22 Tr (Devooght), p. 96**. Even Plaintiffs agree that this policy would mean there are shifts where a female prisoner intake search simply could not be done if this were the policy utilized. **9/21/22 Tr (Devooght), p. 98**.

While Plaintiff's Expert Del Pozo opined that WPD could call a female patrol officer in from the road to conduct female prisoner searches, he acknowledged that his opinion was based off of his experience in NYPD and Burlington PD, both being departments that could do so. **9/21/22 Tr (Del Pozo), p. 235-239**. But, Burlington was not geographically similar to Warren and was not as populated as Warren**. 9/21/22 Tr (Del Pozo), p. 237.** And, both had a police force consisting of 15-20% female officers – meaning neither dealt with the situation that presents in Warren when a *female officer* is simply unavailable to respond to the station to search prisoners. **9/21/22 Tr. (Del Pozo), p. 214-215.** And, Del Pozo admitted that in Warren, because of the low number of female officers, it would not be feasible to call a female officer in from the road to conduct a female prisoner search on all WPD shifts. **9/21/22 Tr (Del Pozo), p. 312-313.**

Del Pozo, also, admitted that whether it was feasible to call a female officer in from the road to conduct a female prisoner search was very dependent upon traffic and whether the female officer is located and what she is engaged in on patrol when you call for her. **9/21/22 Tr (Del Pozo), p. 313.** For instance, Del Pozo acknowledged that it would take a long time to travel from the southeast corner of Warren to WPD's Jail at 4:00p.m. and, in this event, WPD would still need a dispatcher to conduct any female prisoner search. **9/21/22 Tr (Del Pozo), p. 307.**

**This timing matters**.

In fact, every witness that testified including Plaintiffs' Expert Dr. Del Pozo agrees that it is unsafe and untenable to have a prisoner at the Warren Jail sit unsearched for more than 20 minutes, at maximum. **9/21/22 Tr (Del Pozo), p. 253-254, 319-320.** Expert Shock and Captain Reichling agreed too that it unreasonable to maintain a policy that does not guarantee prisoner intake searches within 15-20 minutes. **9/22/22 Tr. (Cptn. Reichling), p. 201-203; 9/22/22 Tr. (Expert Shock), p. 98-99.**

First and foremost, police shifts at WPD are 12-hours so the unsearched prisoner when no female is on a shift would be handcuffed to the intake bench for up to 12 hours unable to eat, drink water or use the restroom. **9/22/22 Tr. (Expert Shock), p. 99-101.** This would be a per se unconstitutional treatment of the prisoner. **Ibid.** On this, too, Del Pozo agrees. **9/21/22 Tr (Del Pozo), p. 253-254, 319-320.**

Secondarily, when there is a female on the shift who is called upon for an intake search from the road, but cannot get there within the safe 15-20 minute window, there are a whole host of problems creates as Captain Reichling testified:

> "They haven't been searched, so they're not free to go anywhere. And it's not safe to let them go anywhere, even after a pat down. You don't know what that person has. I mean, we had an officer killed in the jail by someone who smuggled in a gun, who was un-handcuffed, and left un-handcuffed, who wasn't searched. And it was horrific, and I don't ever want to see that happen again." **9/22/22 Tr. (Cptn. Reichling), p. 203**.

This passage of time is dangerous given the unsearched prisoner can still access contraband, a weapon, drugs or dispose of evidence on their person. **9/22/22 Tr. (Cptn. Reichling), p. 203-205; 9/22/22 Tr. (Expert Shock), p. 98-100.** This access combines with the fact that keeping an unsearched prisoner handcuffed to the intake bench awaiting a search for more than 20 minutes is "not comfortable" and leads to aggression too. The prisoner sitting in handcuff beyond 15-20 minutes will begin to experience numbness and pain, and can even sustain permanent nerve damage. **9/22/22 Tr. (Cptn. Reichling), p. 201-203.** Consequently, Captain Reichling testified: "[A]nything over that 15-, 20-minute mark, it just starts to go south for us in every way… [T]he longer you leave someone handcuffed, it just goes -- and I've seen it in my 26 years, the more uncomfortable they get, or if they're intoxicated or if they're on something, you start hearing the demands. Get these cuffs off me. Get these cuffs off me. Now, you have someone who maybe wasn't in an

32

agitated state, but in a sense, you're escalating it by leaving them in the cuffs as opposed to getting it deescalated, where you get them out of the cuffs, get them searched, throw them in their own holding cell, and they crawl down and go to sleep, something like that. That's what we strive for. But, yeah, I mean it's just human nature. The more locked up or locked down a person is, the more they become opposed and act against that." **Ibid**.

Additionally, the prisoner could have ingested drugs which is not realized if an intake search is not accomplished promptly. **9/22/22 Tr. (Cptn. Reichling),p. 203-205.** Captain Reichling confirmed that prisoner death from drug intake and overdose is a "real risk" that has resulted in death at the Warren Jail. **Ibid**. To wit, even Del Pozo acknowledged that having an unsearched prisoner waiting more than 20 minutes is a "terrible disadvantage" unless the police department is designed to have enough holding cells to allow the unsearched prisoners to be held and constantly observed. **9/21/22 Tr (Del Pozo), p. 253-254.** Here, this means that all parties agree that the limited staffing in the Warren Jail,[15] and corresponding limited space, creates serious safety concerns for jail officers when a prisoner is left unsearched for more than 20 minutes. **9/22/22 Tr. (Cptn. Bonett), p. 23.**

To this, Captain Reichling testified: "when a person comes into the jail, they have a bench they sit on. There's a bar there they can handcuff -- handcuff to the bar, which will hopefully keep them from getting up. But as I've already testified to, that prisoner still has to be watched because you don't know what they have on them. And the jail personnel, if the arresting officer is gone, would then have to watch that person. You can't leave them unattended, he or she unattended, which now takes them away from their other responsibilities that may come up." **9/22/22 Tr (Cptn. Reichling), p.217-220.** There is, also, no staffing or budget allowance under which the jail staff could hire another employee to be designated to watch unsearched female prisoners to offset this risk. **9/22/22 Tr. (Cptn. Reichling), p.217-220.** Clearly a policy that has the effect of making intake searches inherently more

---

[15] Two or three officers are assigned to the Warren Jail on each shift to monitor the entire area of the jail, tend to needs of the prisoners, feed them, handle any request for or signs of a need for medical care, dispense medications, etc. **9/22/22 Tr (Cptn. Reichling), p.217-220.** WPD Jail staff must also handle paperwork attendant to intake, bail/bailbonds, prisoner release and transfers, court appearances and any processing (fingerprinting/mugshots) that could not be accomplished by the arresting officer at the time of intake. **9/22/22 Tr (Cptn. Reichling), p.217-220.**

dangerous cannot be considered a "reasonable" alternative to the current gender-based policy.

Thirdly, a policy mandating female officers to be called in from road patrol is not a "reasonable" alternative for WPD because it results in unnecessary and unsafe patrol gaps for other officers on patrol and Warren's citizens.  To properly consider this issue, the Court must account for travel time to the Warren Jail, the time it takes to search the prisoner and travel time back to the female officer's assigned quadrant, as set forth here.  Also properly considered is how the problem is compounded if that female officer is in a priority-run, two-man patrol car, also as set forth here.

- o  First, when a female officer comes in to conduct the search, they must check their weapon on arrival and get up to the jail, then conduct the search.  **9/21/22 Tr (Devooght), p. 91.**   A prisoner search can take up to 20 minutes to complete, due to layers of clothing, health or biohazard issues that present during the search, and whether the prisoner is being combative.  **9/22/22 Tr. (Cpnt. Bonett), p. 11-12; 9/22/22 Tr. (Expert Shock), p. 106-107**.  While there is no need for a dispatcher to prepare a report to document evidence retrieved during a search because an arresting officer stands-by during these searches, that is not true for a female officer who comes to the station to conduct a search.  **9/21/22 Tr. (Devooght), p. 90-91; 9/22/22 Tr. (Expert Shock), p. 106-108**.  Expert Shock opined that writing such a report could take 5-20 minutes depending on the circumstances.  **Ibid.**  The female officer may also need to appear in court on the issue to testify about the search, including about contraband or evidence found during the search – making them unavailable for future searches.  **9/21/22 Tr. (Devooght), p. 91; 9/22/22 Tr. (Expert Shock), p. 108-109.**

- o  The travel time, search time and report writing time takes a road patrol officer, female or not, away from patrol duties in her assigned quadrant of Warren.  **9/22/22 Tr. (Comr. Dwyer), p. 57-58**. [16]  To this, Cptn. Reichling

---

[16] Commissioner Dwyer has vast experience in policing.  He served as WPD Commissioner from 2008 to 2010 and since 2017. Commissioner Dwyer has been in law enforcement, public service for 50 years. He started his employment with the Detroit Police Department in 1962 and was employed there for 23 years. He left DPD as a commander in charge of the Chief's division. He was a police chief in Farmington Hills from 1985 to 2008. Then, he came to Warren in 2008 to the end of

testified that the female officers assigned to patrol need to remain on patrol duties: "the female officers who are on the road, to me, aren't really male or female, they're police officers who are out there for a reason. And their mission is to be out there and patrolling their area and taking whatever law enforcement action needs to be taken. When you start bringing people in off the road, that's kind of something that we stay on our sergeants about is, we say, hey, we don't want people around the station, get them out on the road. Because, unfortunately, as we discussed earlier, you never know when a shooting is going to go down in the middle of Eleven Mile and Van Dyke. Like last night, we had a fatal or near fatal, a guy on a mini bike got hit by a car. You don't want your people tied up in the station when that happens and, you know, seconds can make life or death changes…" **9/22/22 Tr. (Cptn. Reichling), p.197-198.**

o   Second, this reality must be considered in light of the fact that WPD is already understaffed with 240 sworn officers. **9/22/22 Tr. (Commr. Dwyer), p. 61-64; See also 9/22/22 (Lt. Reichling), p. 181); 9/22/22 Tr (Expert Shock), p. 93-95.** This, along with sick leave and injuries, means that one patrol car is not always assigned to one of the 8 quadrants recognized for WPD assignments. **9/22/22 Tr. (Cptn. Reichling), p. 182-185; 9/22/22 Tr (Expert Shock), p. 95-96.**

o   Especially in light of staffing issues, pulling patrol officers off the road presents a patrol gap that is a genuine safety concern. **9/22/22 Tr (Expert Shock), p. 93-95.**

o   Third, this is compounded by the fact that a second patrol gap is automatically created because the male-officer who effectuated the arrest of the female prisoner in need of a search must stand-by for up to an hour or more until a female officer can make it into the Warren Jail from the road from road patrol. **9/22/22 Tr. (Expert Shock), p. 102-103; See also General Order 20-63 at Exhibit J01, GenOrd 241-243.**

o   Finally, the patrol gap is compounded further if either the female officer or the arresting officer waiting with the female prisoner was assigned to a two-man car. Aside from having a two officer patrol gap from either side of this equation, it is proper to recognize that two-officer cars are assigned

2010. He has a bachelor's degree in criminal justice and went to the FBI National Academy. **9/22/22 Tr. (Commr. Dwyer), p. 58.**

to higher-crime areas in the City and are called upon respond to priority runs that are usually more urgent and more dangerous.  **9/22/22 Tr. (Cptn. Reichling), p. 184-185; 9/22/22 Tr. (Expert Shock), p. 118.**  A policy which makes road patrol response more dangerous by pulling these two-officer cars out of their quadrant and keeping them unavailable for extended periods is obviously not "reasonable."

**6. Plaintiffs' Proposed Alternative #3, to Require Mutual-Aide from Neighboring Jurisdictions with enough female sworn police officers, if any, to Allow for an Intake Search to Occur at WPD is Not a "reasonable" alternative to a gender-based policy requiring assistance by dispatchers.**

WPD has no written agreements requiring other departments to provide mutual aid to it with respect to searches and any such agreements would have to be negotiated with those jurisdictions – not simply demanded by Warren. **9/22/22 Tr. (Cptn. Reichling), p. 261.**  Without such an agreement, neighboring jurisdictions have no duty to respond to a mutual-aide request such that the result of such a policy would often, if not exclusively be, that unsearched prisoners sit in the Warren Jail handcuffed to the intake bench for up to 12 hours.  As set forth in the preceding section, this would create more dangerous situations for jail staff, officers or civilian personnel ultimately involved in the search, and for the prisoner too.  **See preceding section and citations.**

Of significance to considering "mutual-aide" as an "alternative," Commissioner Dwyer testified that a Chief from the Detroit Police Department advised such an arrangement is "totally impossible." **9/22/22 Tr. (Commr. Dwyer), p. 71-77.** Commissioner Dwyer testified that the Detroit Police Department cannot even service its own City  and, simply, "they don't have the ability to send female officers from one district or one precinct to another because of their manpower constraints." **Ibid**.  Commissioner Dwyer further testified that "[t]o try to get a female officer from Detroit… it would probably take at least an hour, two hours to get that female officer here in Warren because of the distance, because of the availability. It's something we've looked at. It was just impossible for Detroit to provide that service." **9/22/22 Tr. (Commr. Dwyer), p. 71-77.**   Captain Reichling agreed, testifying "They are a very big, very busy, very understaffed agency" and unavailable to assist with searches. **9/22/22 Tr. (Cptn. Reichling), p. 205-206.**

Regarding other neighboring jurisdictions, Captain Reichling testified: "…I belong to the Michigan Association of Chiefs of Police, so I have a lot to do with command officers from other jurisdictions. We get together and work on things together, sometimes. The biggest complaint they all have is that they're understaffed. Now, specifically to tell you Sterling Heights is this short or they're fully staffed, I can't do it. But I can tell you the consensus and the general opinion is, and you've probably seen it on papers and on the news, is that police departments all across the country are short staffed and trying to figure out how to do … more with less…"**9/22/22 Tr. (Cptn. Reichling),p. 206-209.**

Captain Reichling testified that, even if a neighboring jurisdiction was technically able to send a female officer to Warren to urgently search a female prisoner, the neighboring jurisdiction would suffer from their own patrol gaps and jurisdictional issues by doing so.  He testified, "I wouldn't do that. And, you know, I'm a team player and I believe in working together, but you do that, not only are you shorting yourself an officer that your citizens pay for to protect their city or county or whatever it may be, so you're shorting an officer that way, so now you're down on your officers who can respond to anything. And then you have jurisdictional issues involved in that, too". **9/22/22 Tr. (Cptn. Reichling),p. 206-209.**  This must further be considered given Plaintiffs agree that the lack of female police officers is a national problem, not something unique to WPD.  **9/21/22 Tr., p. 97.**

Indeed, based on his own findings regarding understaffing and lack of female officers in WPD's neighboring jurisdictions, Expert Shock opined that a policy of pulling female officers from neighboring departments is not a feasible alternative to WPD's dispatcher search policy. **9/22/22 Tr. (Expert Shock), p. 111-112.**  For example,

- o Sterling Heights Police Department was understaffed, being budgeted for 172 officers, with only 152 officers employed (down 12% of its police force) and only had 14 female officers employed (accounting for about 9.2% of its police force). **9/22/22 Tr. (Expert Shock), p. 111-113.**
- o Roseville Police Department was budgeted for 82 officers, and they had 72 officers employed, 8 of which were female (meaning 11% of its police force was female). **9/22/22 Tr. (Expert Shock), p. 114-115.**
- o Hazel Park Police Department was budgeted for 40 officers, and they were staffed at 35 (down about 12% of the police force) with 4 female officers employed. **9/22/22 Tr. (Expert Shock), p. 115.**
- o Eastpointe Police Department was budgeted for 53 officers, employed 44 officers (down 17% of their force) and only employed 1 female police officer (just 2% of its police force). **9/22/22 Tr. (Expert Shock), p. 116.**

- o Madison Heights Police Department was budgeted for 61 officers, employed 51 officers (down about 16% of its police force) and employed 4 female officers (about 7% of its police force). **9/22/22 Tr. (Expert Shock), p. 117.**

Also, even in the case where a neighboring jurisdiction could assist, there is an inherent safety concern *created* with the time it takes for response from outside the City of Warren. **9/22/22 Tr. (Expert Shock), p. 111-112.** To this, Commissioner Dwyer testified that "[t]o try to get a female officer from Detroit… it would probably take at least an hour, two hours to get that female officer here in Warren because of the distance, because of the availability. It's something we've looked at. It was just impossible for Detroit to provide that service." **9/22/22 Tr. (Commr. Dwyer), p. 71-77.** From Hazel Park and other neighboring jurisdictions similar in size to WPD, the response is up to 45 minutes simply due to traffic. **9/22/22 Tr. (Cptn. Reichling), p.199-201; 9/22/22 Tr. (Reichling) at ECF No.114, PageID.5106**.

As stated in great detail in the preceding section, and agreed upon by Expert Shock and Expert Del Pozo, a policy that results in an unsearched prisoner in the Warren Jail in excess of 15-20 minutes is not a "reasonable" alternative. **See eg 9/22/22 Tr. (Expert Shock), p. 98-99 (**a prisoner should not be left unsearched for more than 20 minutes given the harm to one's self and others increases with the passage of time for a handcuffed arrestee sitting in a jail "[d]ue to the fact that they have more opportunity to – to get, if they have a substance on them, or a weapon that was not found in their initial search, or even their own safety concerns with ingesting that, or getting hurt by being handcuffed.")

Also relevant to this proposed alternative is that the WPD Watch Commander, who is tasked with finding an "available" female to conduct a female prisoner intake search, would be removed from his essential duties while making countless calls to neighboring jurisdictions until an available female was found. **9/22/22 Tr. (Expert Shock), p. 122-123.** This simply is not feasible where the Watch Commander's job duties including monitoring all the cars and officers on the road, all calls coming into dispatch, the run log to ensure prompt dispatching and response, the prisoners in the jail, what's going on in the front lobby, officers in the back including those testing drugs in the basement. **9/22/22 Tr. (Cptn. Reichling), p. 210-212.** On afternoon, midnight and weekend shifts "…the Watch Commander is the de facto Chief of Police while he or she is on duty. They have to be monitoring the radio. They have to be monitoring their board. They have a big TV where they can see everybody as far as what's going on. They're responsible for everything that's happening in the city. They need to be kept up to speed. Because if myself or my

lieutenant or the chief calls down and they say, hey, what's going on with this, we expect them to know what's going on in the City, not hang on, let me find out. In addition to that, you have to remember that they still have their own duties to do. They -- they have to read and approve reports. They have to make schedules out. They have to approve time off. They may have to be doing investigations into pursuits or personnel complaints against their officers, any use of force they're responsible for. There may be injured prisoners that they're responsible for being sure that they get the proper treatment. There's a lot more that goes into that job. So to task them with that entire responsibility, I don't -- I don't believe you can actually do that. And now, you make that a policy, now you're going to be, you know, making the unions upset because you're writing people up for trying to fulfill a mission that they can't. You know, it's not -- you're not setting people up for success there, you're setting them up for -- for failure." **9/22/22 Tr. (Cptn. Reichling), p. 210-212. A policy that distracts the Watch Commander from these essential functions to make calls until mutual aide can be obtained is unrealistic, dangerous and a waste of critical resources.  9/22/22 Tr. (Expert Shock), p.  121-123.**

And, finally, Expert Shock confirms that a policy of pulling female officers from neighboring departments was not a feasible alternative to WPD's dispatcher search policy given the safety issue this presents. **9/22/22 Tr. (Expert Shock), p. 111-112.** Captain Reichling agreed given these outside-WPD officers "are taught to conduct searches according to their own policies, not WPD's policies.  Steps can be missed; contraband could be missed.  Having an officer out-of-jurisdiction conducting searches can present legal problems for the City." **9/22/22 Tr. (Cptn. Reichling),p. 206-209.**

Against all this, Plaintiffs offer mere speculation.  In fact, in even suggesting this alternative Plaintiffs best argument was that Center Line was a possibility for mutual aide though they admitted that Center Line often needs assistance *from WPD* to conduct road-side female searches and they actually do not even know how many female officers are employed in Center Line on *any* shift.  **9/21/22 Tr. (Devooght), p. 96-97; See also 9/21/22 Tr (Piper), p. 157-158.** Likewise, in arguing that WPD has at various times provided assistance to other jurisdictions, Plaintiffs acknowledge they are aware of only a "couple" times this occurred and that they do not know if any involved mere roadside-searches or a female WPD officer going into another department's jail for a search.  **9/21/22 Tr., (Devooght), p. 31-32; 9/21/22 Tr (Piper), p. 129, 143, 157-8**. Captain Reichling though was sure that WPD has only provided mutual aide in "exceptional" situations and when the request is for a "roadside search" so that the WPD officer can remain "in-service" during the run.  **9/22/22 Tr. (Cptn. Reichling),p. 206-209.**  Finally, Del Pozo testified that

calling upon a neighboring jurisdiction to provide a female officer to report to WPD to perform a female prisoner intake search is an alternative to having a female dispatcher conduct these searches. **9/21/22 Tr (Del Pozo), p. 233-234.** His opinion that this was an alternative available to Warren was based solely on his experience that both NYPD and Burlington PD called for mutual aide, though he acknowledged that NYPD did not actually utilize mutual aide for prisoner searches. **9/21/22 Tr (Del Pozo), p. 233-234, 299.** He testified that he simply looked at a map to determine that "there are several jurisdictions that Warren could rely on to have sworn officers come and conduct a prisoner search. One of them being Detroit". **9/21/22 Tr (Del Pozo), p. 233-234.** But, he acknowledged that this was an assumption based only on his consideration that these jurisdictions were within a reasonable drive time and, in the case of Detroit, that it employed a higher than average percentage of female officers. **9/21/22 Tr (Del Pozo), p. 286-290.** Del Pozo did not do any research into whether DPD or other neighboring jurisdictions were fully staffed and could lend an officer to WPD. **Ibid.** He did admit that most police departments, including DPD, are understaffed. **Ibid.** In this regard, Del Pozo mistakenly claimed that he does not need to be informed on what neighboring jurisdictions have the capability of doing before opining that mutual aide is a reasonable alternative to WPD's dispatcher search policy! He admits that, in the event a neighboring jurisdiction lacks the capability of providing mutual aide for prisoner searches, this simply means that the best practice is not feasible at this time. **9/21/22 Tr (Del Pozo), p. 302-303.** <u>But, what is not feasible at this time is certainly not a reasonable alternative, at this time, either!</u>

### 7. Plaintiffs' Proposed Alternative #4, a Utopian Goal or "Process" for Getting to a Point Where Enough Female Officers are Employed at WPD Cannot Be Considered an "Alternative," Let Alone a "Reasonable Alternative," to a gender-based policy requiring assistance by dispatchers for Searches that need to be done today.

While WPD Administration agrees that it would be "absolutely" fantastic for Warren to have more female officers [**9/22/22 Tr. (Cpnt. Bonett), p. 12**] and that doing so is a genuine priority **[9/22/22 Tr. (Commr. Dwyer), p. 61-64],** that desire does not mean WPD has the ability to do so or its always going to happen. **Ibid; See also, General Order 20-12 at Exhibit J01, GenORd 211.**

On this, Plaintiff's expert Del Pozo testified that it is important, for recruiting females, that job postings are on social media, that women appear on recruiting materials and that women are involved in the recruiting processes. **9/21/22 Tr (Del**

Pozo), p. 248-250. The City of Warren has extensively worked to diversify its sworn police force, including extensive efforts tailored to attract female officer interest. This includes convincing Warren City Council to set aside PA 78, creating policies and gaining police accreditation to attract more minority and female applicants. **9/22/22 Tr. (Commr. Dwyer), p. 61-64; See also, General Order 20-12 at Exhibit J01, GenORd 211.** It also includes modernizing recruitment through use of social media, recruiting events and open houses and the creation of a Women in Law Enforcement group. **9/22/22 Tr. (Commr. Dwyer), p. 185-189; 9/22/22 Tr. (Cptn. Reichling), p. 188-189, 243.** Printed materials were also updated to showcase female officers, the less dangerous job postings available which are often more attractive to women officers, and a family-friendly environment. **9/22/22 Tr. (Commr. Dwyer), p. 189-191; 9/22/22 Tr. (Cptn. Reichling), p. 254-258; See also: Exhibits D16-D18.** WPD is also marketing an officer wellness program and family-friendly benefits so as to appeal to female officers. **9/22/22 Tr. (Commr. Dwyer), p. 238.** And, WPD makes efforts to include women in recruiting, including their presence at open house recruitment booths. **9/22/22 Tr. (Cptn. Reichling), p. 188-189, 311.**

WPD has strict, clear anti-sexual harassment and discrimination policies, which ensure female applicants would not be discouraged from employment with WPD too. **9/22/22 Tr. (Commr. Dwyer), p. 239.**

WPOA Union President Sauger has, also, been involved in the WPD recruiting and hiring efforts, including sitting on the interview panels to help speed up staffing decisions. **9/21/22 Tr (Sauger), p. 174-7, 197-9.** There has been a big push by the Union to advertise open positions online too in hopes of adding to WPD's efforts of diversity. **Ibid.**

Cptn. Bonett testified that the City has enjoyed recent success in hiring entry-level and lateral hires and has done well in recent years with recruiting and retention. **9/22/22 Tr. (Cptn. Bonett), p. 12, 40.** Commr. Dwyer likewise acknowledged that, despite defunding issues nationally which leads to less police officers overall (both male and female), Warren has been able to fill their positions better than any other department in the State. **9/22/22 Tr. (Commr. Dwyer), p. 61-64.** Ofc. Sauger testified that WPD went from being significantly understaffed to fully staffed according to its Annual Budget in May 2022. **9/21/22 Tr. (Sauger), p. 176, 199.**

Plaintiffs suggest that WPD is not reaching a female audience. However, Captain Reichling completely dispelled this notion, testifying that he recently posted for dispatch openings on the exact same platforms he posted officer openings with the

response for the dispatcher openings being 90% female. **9/22/22 Tr (Cptn. Reichling), p. 191-193**. As Captain Reichling attested:

> *So it just shows you that obviously women are seeing our ads. They're seeing our recruitment materials, and they are responding.*
>
> *...Policing has always kind of been a male-dominated field just like, you know, nursing or elementary school teachers have been a female-dominated field. Why that is? I can't tell. I did not set the cultural norms, or whatever you want to call them. When the numbers go down and you already had a small amount of applicants or people with interest in that field, and then the numbers have been cut [given recent events nationally], I would say, more than half since I started, of people who even apply, of course the number of female applicants are also going to correspondingly go down. It's unfortunate. I wish I could fix it. I've tried everything I know how to do. But at the end of the day, I cannot force people to apply for a job. But I know I'm getting the word out to them as is reflected from my dispatch application list being predominantly female.* **Ibid.**

To all of this, Expert Shock testified WPD's recruiting efforts look like most other departments, with features like setting aside PA 78 which he concludes is exceptional. **9/22/22 Tr (Expert Shock), p. 93-94, 120.** Despite these efforts, from 2020 to present only 3 of the 65 applicants to police officer positions at WPD were women. **9/21/22 Tr (Sauger), p. 201; 9/22/22 Tr. (Cptn. Reichling), p. 193-5.** Each of them were offered a job with WPD but none ended up being hired (with only one back on the list now). **Ibid.**

Notably, Dr. Del Pozo on behalf of Plaintiffs had nothing credible to offer on this: he opined that there were very few police officer applicants to WPD over the past years; he could not understand why that was. **9/21/22 Tr (Del Pozo), p. 308.** He later admitted he did no research into how many applicants WPD has had over the past year, had no idea whether WPD has offered jobs to its female applicants over the past years and was clueless as to whether female officers were turning down jobs at Warren. **9/21/22 Tr (Del Pozo), p. 318.** He agreed, too, that there are less people going into law enforcement now and that it harder than ever to retain officers. **9/21/22 Tr. (Del Pozo), p. 291.** Del Pozo simply has no idea how, if or when WPD could employ the national average of 12% female sworn officers. **9/21/22 Tr (Del**

Pozo), p. 284. Indeed, Expert Shock agrees this is a "very time consuming" process of indefinite duration. *9/22/22 Tr. (Expert Shock), p. 119.*

In fact, there is nothing unique to WPD about this struggle to hire female officers. **9/22/22 Tr (Expert Shock), p. 91-92.** In general, Michigan police departments are not even close to the 18-20% female police officer goal that Dr. Del Pozo notes would be necessary for any feasible alternative to a gender-based policy to work and, instead, are actually below the national average of 12% for female officers, as follows:

- Sterling Heights Police Department was understaffed, being budgeted for 172 officers, with only 152 officers employed (down 12% of its police force) and only had 14 female officers employed (accounting for about 9.2% of its police force). **9/22/22 Tr. (Expert Shock), p. 111-113.**
- Roseville Police Department was budgeted for 82 officers, and they had 72 officers employed, 8 of which were female (meaning 11% of its police force was female). **9/22/22 Tr. (Expert Shock), p. 114-115.**
- Hazel Park Police Department was budgeted for 40 officers, and they were staffed at 35 (down about 12% of the police force) with 4 female officers employed. **9/22/22 Tr. (Expert Shock), p. 115.**
- Eastpointe Police Department was budgeted for 53 officers, employed 44 officers (down 17% of their force) and only employed 1 female police officer (just 2% of its police force). **9/22/22 Tr. (Expert Shock), p. 116.**
- Madison Heights Police Department was budgeted for 61 officers, employed 51 officers (down about 16% of its police force) and employed 4 female officers (about 7% of its police force). **9/22/22 Tr. (Expert Shock), p. 117.**

The simple reality is that WPD cannot control whether female officers in Michigan, let alone Warren, will apply for or take employment at WPD, as Captain Reichling pointed out:

> *"I think what you're -- you're not considering in that factor is that I don't control who applies…What I control is the message. I control the advertisement. I control the recruitment. I can control the focus. And I'll go back to my original point. And I guess I disagree with you. I am reaching that pool of applicants. I have a large pool of applicants who are dispatchers. We are -- I'm sorry, who are female dispatchers applying for the dispatch position. We have a huge amount of females applying for that position….We do not have a huge amount applying for the police officer position." 9/22/22 Tr (Cptn. Recihling), p. 236.*

WPD cannot hire female officers if none are willing to work at WPD despite best efforts to draw them in. **9/21/22 Tr (Sauger), p. 202; 9/22/22 Tr (Cptn. Recihling), p. 195.** The addition of more female police officers is thereby not a feasible, let alone a reasonable, alternative to a gender-based intake search policy.

> **8. WPD Has Been Proactive in Incentivizing and Scheduling to Ensure Female Officers are "Available" On As Many Shifts as Possible, but the Very Limited Total of Female Officers means that this will reduce frequency of dispatcher searches but a backup plan utilizing dispatchers as a last resort for female prisoner intake searches is still essential.**

In 2016, there were 3 full-time female officers assigned to the jail (so 3 of the 4 shifts had one female officer stationed in the jail). **9/21/22 Tr., (Devooght) p. 65-66.** This was the case for about 2 months, until one of the female officers left her employment with WPD. **9/21/22 Tr., (Devooght) p. 67.** Commissioner Dwyer testified that, now, WPD has a female corporal up in the Detective Division, a female officer in the property room, and a couple more female officers that are assigned in the cell block area of WPD's jail for a total of six female officers who are at the station –and whenever on-duty and available – the female officers are called upon to conduct female prisoner searches before a dispatcher is called upon. **9/22/22 Tr. (Commr. Dwyer), p. 71; 9/22/22 Tr. (Cptn. Bonett), p. 19-21; General Order 20-63 at Exhibit J01, GenOrd 229-244; See also 9/21/22 Tr., (Devooght), p. 21-26.**

Plaintiffs admit that female officers in a jail position get paid more; they receive a premium for working in the jail and this is designed to increase interest in taking the position. **9/21/22 Tr., (Devooght) p. 67.** But, these positions cannot simply be assigned; they are budgeted for, bid for and a premium is offered to incentivize officers to take them. **9/22/22 Tr. (Commr. Dwyer), p.71-72.**

Still, these female officers receive vacation and time off, so there is not always a female in the jail. **9/21/22 Tr., (Devooght) p. 68-69.** To wit, Officer Moore is one of the officers currently assigned to the Jail but is off on disability now, so there is only 1 shift fully covered by female jail officers; when Officer Moore returns from disability, there will be two shifts covered. **9/21/22 Tr., (Devooght) p. 67; See also, 9/22/22 Tr. (Cptn. Reichling), p. 252.**

Del Pozo also mentioned that having more women in command positions would make the logistics of having a woman available to search less challenging.  But, the lack of female officer in command positions is not something WPD necessarily controls given potential lack of interest, collective bargaining and civil service limitations, etc. **9/21/22 Tr (Del Pozo), p. 251.**  On this, Del Pozo admits that it is a process or a *a threshold WPD should strive to meet* --- not an alternative or immediate solution to ensure female prisoners are searched at intake today.  **9/21/22 Tr (Del Pozo), p. 252**. WPD Command has the same goal but acknowledges freely female interest is not there though it will continue to strive toward added diversity. **9/22/22 (Cptn. Reichling), p. 260-261.**   In fact, Plaintiff's expert Del Pozo freely admitted that until a volume of female officers in a range of 18-20% or more exists at WPD a backup policy utilizing dispatchers as a last resort to assist in female intake searches is absolutely essential.  **9/21/22 Tr. (Del Pozo), p. 302-303, 316, 318-319.**

Clearly, it is undisputed that there are no simply are no reasonable alternatives, today, to the current policy.

### 9.  The Warren Police Department utilizes female dispatchers to conduct female prisoner searches <u>as a matter of last resort</u>.

Dispatchers are not the first line for conducting searches at WD. **9/22/22 Tr. (Expert Shock), p. 104-105.**  Expert Shock testified that WPD has Watch Commanders, who hold "the supervisorial role of the actual police department. So what's going on in the patrol function, and probably what's going on in the -- in the jail function as well." **9/22/22 Tr. (Expert Shock), p. 104-105.**

Indeed, the Watch Commander is tasked with deciding whether or not to pull someone in the event an individual is being called out on a run, and a search is needed.  The policy affords the Watch Commander some level of discretion to make this call and the discretion afforded is, in Expert Shock's opinion, within industry standards and necessary to deal with the fluid situations that present in police work. In each circumstances, the Watch Commander has to consider many factors, including assessing things like how many witnesses are involved on a particular call, how long any run is going to take. **9/22/22 Tr. (Expert Shock), p. 104-105.**

Per policy, the WPD Watch Commander is supposed to look for female officers before pulling a female dispatcher to conduct a search. **Ibid.**  A female jailer, property clerk or other female officer on duty in the WPD Jail and available is conducting female prisoner searches before a dispatcher is called upon to do any search. **9/22/22 Tr. (Expert Shock), p.  120-121.**

Plaintiffs argue that there have been occasions where they believe a Watch Commander did not look hard enough for an "available" female officer to conduct a female prisoner intake search. This testimony was wholly speculative and self-serving. For example, Plaintiffs testified that female dispatchers have been ordered to do searches, even when female officers are on duty and available. **9/21/22 Tr., p. 21; 9/21/22 Tr (Piper), p. 122**. DeVooght testified she complained each time but admittedly never filed a grievance. **9/21/22 Tr., p. 22-26.** If she had done so, WPD Command attested that the complaint would be fully investigated and, if warranted, action would be taken to sanction such misconduct. **9/22/22 Tr. (Cptn. Bonett), p. 19-21.** Short of such findings though, the assertion by Plaintiffs is wholly speculative as they certainly are not in a position to know whether a female officer was actually "available" in these instances. **Ibid.**

**10. Although the dispatcher-search policy of WPD is not required to be without its flaws, it is undisputed that WPD Dispatchers are Properly and Adequately Trained in Search Technique and Monitored for Safety by an Officer At All Times.**

Plaintiffs argue it is unsafe to allow dispatchers – as opposed to female officers – to conduct female prisoner intake searches. However, at Trial it became clear that Plaintiffs were all adequately and fully trained over 4 to 5 months in search technique where each undertook some 50-100 searches. **9/21/22 Tr., (Devooght) p. 49; 9/21/22 Tr (Piper), p. 116.** Dispatchers have continued to participate in 40-hour block trainings every year or two with the officers and have received training materials and presentations on conducting searches throughout the years. **9/22/22 (Cptn. Reichling), p. 196-7; 9/21/22 Tr. (Devooght), p. 24, 41, 49.** Plaintiffs also attended defensive tactics training and received pressure point training. **9/21/22 Tr. (Devooght), p. 55; Devooght Dep at J13, p. 131; 9/21/22 Tr (Piper), p. 141, 144.** Expert Shock testified that WPD's training of its dispatchers to conduct searches was within industry standard, was adequate and allowed them to conduct searches safely. **9/22/22 Tr (Expert Shock), p. 92.**

Further, WPD's express policy requires an officer to stand-by during a dispatcher search to ensure any dangerous situation will be handled by a sworn officer instead of the dispatcher. **9/21/22 Tr., (Devooght), p. 26; 9/21/22 Tr. (Piper) p. 120; General Order 20-63 at Exhibit J01, GenOrd 242-243.** In fact, it is the duty of the officer standing-by to handle such a situation. **9/22/22 Tr. (Cptn. Reichling), p.**

**249-250.** Expert Shock concurred that WPD's policy requiring an arresting officer stand by "in close proximity to a female dispatcher" during these prisoner searches is within industry standard and ensures the safety of dispatchers. **9/22/22 Tr (Expert Shock), p. 93-94.** Even so, Plaintiffs admit that they are provided the same protective gear (masks, gloves, goggles, face shields, gowns and bullet proof vests) that officers have available to them to conduct searches. **9/21/22 Tr., (Devooght), p. 54-55; See also, General Order 20-63 at Exhibit J01, GenOrd 242-243.**

In reality, Plaintiffs Devooght and Piper are so comfortable with search training that they both act as trainers for new dispatchers, including specifically in the area of intake prisoner search training. **9/21/22 Tr. (Devooght), p. 43; 9/21/22 Tr (Piper), p. 159-160.** Neither have suggested to WPD that they feel their own training was or is inadequate. **9/21/22 Tr (Piper), p. 161.** Even so, when dispatchers in 2019 raised complaints about the search duty, **Exhibit J04** issued from Cptn. Bonett indicating:
> "If there are any female dispatchers that feel that they are not adequately trained to do searches, contact me for remedial training".

None of the Plaintiffs requested additional training, but a few dispatchers did respond and were provided with the additional training. **9/22/22 Tr. (Cptn. Bonett), p. 14; 9/21/22 Tr (Devooght), p. 101-102; 9/21/22 Tr (Piper), p. 148; 9/22/22 (Cptn. Reichling), p. 196-197.** In fact, Devooght has consistently turned any offer of added training down because she's "been searching prisoners for 22 years" and is comfortable with how she conducts searches. **9/21/22 Tr., (Devooght), p. 50-52; Devooght Dep. Tr. At J13, p. 43-45.** This issue was simply contrived for this lawsuit, though the offer for additional training stands open.

### 11. Plaintiffs' Expressed "Safety" or "Health" concerns inherent in conducting female prisoner intake searches Does Not Relate at all to Whether There is Reasonable Alternative.

Plaintiffs admit the safety complaints dispatchers have about conducting searches are inherent in the prisoner searches and present equally regardless of who conducts the search (officers or dispatchers): ie. searching heavily intoxicated prisoners, prisoners with urine/feces/bodily fluids/vomit or prisoners with sharp objects. **9/21/22 Tr. (Devooght), p. 33-35; 9/21/22 Tr. (Piper), p. 125**.

Plaintiffs attempt to rebut WPD's position that the dispatcher search policy ensures safety by countering that its unsafe to assign police officers, untrained to do so, to cover dispatch because these officers were not permitted to dispatch police, fire or

medical runs.  **9/21/22 Tr., (Devooght) p. 32-33; 9/21/22 (Piper), p. 120-121.** However, officers received additional training to conduct these dispatch duties since complaints were made and can receive further training in this regard.  **J04; 9/22/22 Tr. (Cptn. Reichling), p. 225-229**.


## V.  PROPOSED CONCLUSIONS OF LAW

Defendant Warren's proposed Conclusions of Law are as follows:

**A. Defendant Warren conclusively established that no reasonable alternative exists to a gender-based prisoner intake search policy at WPD such that, incident to the prior rulings in ECF 37 and 74, the BFOQ justification is a complete defense to this case.**

> **And on the same facts which support the BFOQ defense, the less onerous standard of *Griggs v. Duke Power Co.,* 401 U.S. 424 (1971), which merely requires that the dispatcher-search policy be supported by a business justification, has certainly been met.**  In this regard, holding a female prisoner requiring an intake search "until a shift that happens to have female officers assigned may leave incoming female inmates in the intake holding cell for an indeterminate period of time", and this constitutes the unacceptable treatment of a prisoner under settled law. *Million*, 440 F.Supp.3d at 873.


**B. Added benefits or increased compensation to female dispatchers in the form of "hazard" or "bonus" pay when a prisoner search is performed is not properly considered in the analysis of possible "alternatives" to a gender-based prisoner intake search policy given "compensation" "bonus pay" and other benefits must be negotiated with the Warren Police Officer's Association and Warren Police Command Officer's Association, such that it is not within the control of the employer, Defendant Warren, to enact such changes.  This is especially so given the Union's history of negotiating other compensation or benefits available to all Union Members, in lieu of the dispatcher-search issue, and because the Warren Police Officer's Association and Warren Police Command Officer's Association are not even parties to this case.**

In Michigan, public sector labor-management relations are governed by the Michigan Employment Relations Commissions (MERC). The principal statute administered by MERC is the Public Employment Relations Act (PERA), which grants collective bargaining rights to public employees.

Of relevance to this conclusion, PERA, specifically MCL 423.209(1), recognizes that "Public employees may do any of the following: (a) Organize together or form, join, or assist in labor organizations; engage in lawful concerted activities for the purpose of collective negotiation or bargaining or other mutual aid and protection; or negotiate or bargain collectively with their public employers through representatives of their own free choice; or (b) Refrain from any or all of the activities identified in subdivision (a)."

Likewise, MCL 423.211 of the Public Employment Relations Act makes clear that "Representatives designated or selected for purposes of collective bargaining by the majority of the public employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the public employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment, and shall be so recognized by the public employer…"

Importantly, MCL § 423.210(1) of the Public Employment Relations Act provides, in pertinent part that:

(1) A public employer or an officer or agent of a public employer shall not do any of the following:
(a) Interfere with, restrain, or coerce public employees in the exercise of their rights guaranteed in section 9 (*meaning MCL 423.209*)
(b) Initiate, create, dominate, contribute to, or interfere with the formation or administration of any labor organization. A public school employer's use of public school resources to assist a labor organization in collecting dues or service fees from wages of public school employees is a prohibited contribution to the administration of a labor organization. However, a public school employer's collection of dues or service fees pursuant to a collective bargaining agreement that is in effect on March 16, 2012 is not prohibited until the agreement expires or is terminated, extended, or renewed. A public employer may permit employees to confer with a labor organization during working hours without loss of time or pay.
(c) Discriminate in regard to hire, terms, or other conditions of employment to encourage or discourage membership in a labor organization.

(d) Discriminate against a public employee because he or she has given testimony or instituted proceedings under this act.
(e) Refuse to bargain collectively with the representatives of its public employees, subject to section 11 (*meaning MCL 423.211*)…

MCL § 423.210(2) prohibits the labor union from similar conduct. Importantly, an employer who takes unilateral action on a mandatory subject of bargaining before an impasse has committed an unfair labor practice under this act. *Jackson Community College Classified and Technical Ass'n, Michigan Educational Support Personnel Ass'n v. Jackson Community College*, 468 N.W.2d 61, 187 Mich.App. 708 (1991); *Wayne County Government Bar Ass'n v. Wayne County*, 426 N.W.2d 750, 169 Mich.App. 480 (1988).

To be clear, this issue is not within Warren's control – even if a unilateral change in compensation or benefits would be favorable to some union members (the female dispatchers), that does not mean the conduct would not constitute an unfair labor practice by Warren. Indeed, in *St. Clair Intermediate School Dist. v. Intermediate Educ. Association/Michigan Educ. Ass'n*, 555 N.W.2d 267, 218 Mich.App. 734 (1996), appeal granted 572 N.W.2d 11, 456 Mich. 901, affirmed 581 N.W.2d 707, 458 Mich. 540, a unilateral increase by a subsidiary of the teachers' union in a lifetime maximum health insurance benefit available pursuant to the collective bargaining agreement between the union and the school district was held to be in violation of bargaining obligations contained in the Public Employment Relations Act (PERA). More specifically, the Michigan Court of Appeals found that the subsidiary neglected to provide the school district with notice and an opportunity to bargain before making changes in the existing terms or conditions of employment, and the individual bargaining with regard to these specific details contained within the insurance policy was unnecessary and uncommon. The Court further notes that, before a party to an agreement governed by the Public Employment Relations Act (PERA) can be said to have waived its right to bargain over changes made to such agreement, there must first be sufficient evidence of a clear, explicit and unmistakable waiver of its right to bargain. *Id.* And, Act 312 at MCL 423.231 et. seq. provides for compulsory arbitration of unresolved contract disputes in police and fire departments operated by a city, county, village, or township, as well as emergency medical personnel and emergency telephone operators employed by a municipal police or fire department.

And, in this regard, the will or desire of the 3 named-Plaintiffs (2 of which are "Retired" from WPD) do not control how the Union negotiates and bargains for compensation, benefits and terms for all of its members; the Public Employment

Relations Act (PERA) impliedly imposes on labor organizations representing public sector employees a duty of fair representation. *Technical, Professional and Officeworkers Association of Michigan v. Renner,* Ubpub., 2021 WL 68322 (2021).

Further, the collective bargaining process entails a vote by the Union's members, prior to any change to the terms of its membership's compensation, pay or benefits. See e.g. *.Mayo v. Great Lakes Greyhound Lines*, 333 Mich. 205, 214, 52 N.W.2d 665, 670 (1952).   And, the Collective Bargaining Agreements between the WPOA/WPCOA and Warren do not allow free re-negotiation to occur at any time. **See Exhibit J51, Art. 40, 44.**

C. **The process of seeking out, recruiting and/or hiring more female police officers is not properly considered in the analysis of possible "alternatives" to a gender-based prisoner intake search policy given there is no way to know *when* or even *if* such process could *ever* produce a volume of female sworn police personnel so that WPD could ensure prompt, same-gender female prisoner intake searches absent as-needed assistance from WPD dispatchers.  Supporting this conclusion was every single law and expert witness, including Plaintiffs' expert Dr. Del Pozo who had no idea if or when such a "threshold" might be met when a reasonable alternative to a gender-based policy might exist.**

D. **The Plaintiffs err in presenting evidence or argument about how much consideration Warren has or has not given to reasonable alternatives to a gender-based prisoner intake search policy, as this has no place in the constitutional standard which requires Warren to establish whether an *actual* reasonable alternative exists as of this moment and given this Court already dispositively held that the BFOQ defense applies, generally, to the decision of Warren to issue the dispatcher-search policy it has, ECF No. 37 and 74, and, finally, given the consideration WPD has given to this policy and its consideration of alternatives throughout the years.**   "A bald claim that a defendant has failed to explore reasonable alternatives fails where there is evidence of changes in the policy over time and the defendant's consideration of alternatives including discussions with the union --- even if the answer turned out to be that none were feasible" --- does not suffice. *Jennings v. New York State Off. of Mental Health*, 786 F. Supp. 376, 385 (S.D.N.Y. 1992), *aff'd*, 977 F.2d 731 (2d Cir. 1992).

E. **The Plaintiffs err in presenting testimony or argument regarding "safety" or "health" concerns inherent in conducting female prisoner intake searches given the reality that these safety and health concerns exist for all female personnel employed at WPD whose job duties includes the requirement to participate in or conduct female prisoner intake searches.  This simply does not present any issue of disparate treatment based on gender and, thus, is not properly raised as part of a constitutional challenge or relevant to the BFOQ analysis.  See ECF No. 74, PageID.3520**.

F. **The Plaintiffs err in contesting application of the BFOQ defense on the basis that the prisoner intake search policy does not relate to the hiring and employment of employees, but rather the assignment of job duties for a certain gender of employee in plain error.  ECF 105, PGID 4507-4508. This Court already recognized that the BFOQ defense is generally applicable to this case. See ECF Nos. 37 and 74, PG ID 3515.  The reality is that the BFOQ defense is "applied to protect an employer when it institutes a sex-based policy as the result of a "reasoned decision making process" including in the context of job duties and shift assignments. *See Everson v. Michigan Department of Corrections*, 391 F.3d 737 (6th Cir. 2004) and *Reed v. Cty. of Casey*, 184 F.3d 597, 599 (6th Cir. 1999). Further, this argument was not properly preserved for Trial.**

## VI.   <u>CONCLUSION AND RELIEF REQUESTED</u>

WHEREFORE, Defendants request this Court accept the proposed Findings of Fact and proposed Conclusions of Law herein, render verdict for No Cause for Action, enter Judgment of dismissal with prejudice, award costs and sanctions in favor of Defendant Warren, and grant such other relief as may be appropriate.

Respectfully submitted,
KIRK, HUTH, LANGE & BADALAMENTI, PLC
/s/ Raechel M. Badalamenti
RAECHEL M. BADALAMENTI (P64361)
Email: rbadalamenti@kirkhuthlaw.com

Dated: 11/4/2022          Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on 11/7/22, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF participants in this case.

<u>s/Raechel M. Badalamenti</u>
RAECHEL M. BADALAMENTI (P64361)
rbadalamenti@kirkhuthlaw.com