UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA DeVOOGHT, JENNIFER
PIPER and DAWN McLEAN,

              Plaintiffs,

vs.

                                Case No. 20-CV-10812

                                HON. GEORGE CARAM STEEH

CITY OF WARREN,

              Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a sexual discrimination case in which plaintiffs assert constitutional and statutory challenges to an employment policy and practice that requires female dispatchers to perform intake searches of female arrestees, while male dispatchers are never required to perform searches. Plaintiffs are two retired dispatchers and one still-employed dispatcher from the Warren Police Department ("WPD"). Plaintiffs' Second Amended Complaint asserts that the WPD policy and practice violates the Fourteenth Amendment's Equal Protection Clause, 42 U.S.C. § 1983 (Count I), Title VII (Count II), and the Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 et seq. (Count III).

The Court issued a prior ruling on cross-motions for summary judgment, concluding that the policy at issue in this case presents direct evidence of discrimination. (ECF Nos. 37 and 74). However, the Court recognized that the bona fide occupational qualification ("BFOQ") defense, which presents a narrow exception to the general rule prohibiting gender discrimination, may protect defendant, City of Warren ("Warren"), from plaintiffs' claims. In analyzing the elements of the BFOQ defense, the Court determined that the gender-specific policy of requiring female dispatchers to conduct searches on female arrestees when a female officer is not available, while not requiring male dispatchers to ever conduct searches, is "reasonably necessary" to the operation of the WPD and that the policy relates to the "essence, or to the central mission" of WPD's business. *Id*. The basis for these conclusions stems from the constitutional right that prisoners have to be searched by same-gender personnel and the fact that nationally, female police officers comprise an average of only 12.6% of sworn police personnel. Also pertinent is that sworn female personnel employed at WPD has ranged from 5-15% of all sworn personnel over the last 20 years, meaning that there is not always an on-duty and available female police officer to complete a timely female intake search. However, the Court concluded there is a question of fact whether defendant can

show that no reasonable alternatives exist to the current policy and practice that discriminates based on sex.

A two-day bench trial was held, beginning on September 21, 2022, to determine whether defendant could show that no reasonable alternatives exist to WPD's discriminatory policy and practice. The Court commends counsel for their exceptional advocacy in this difficult case. Both sides have submitted proposed findings of facts and conclusions of law, which the Court has thoroughly considered.  Now therefore, for the reasons stated below, judgment in this case shall enter for defendant.

<u>FINDINGS OF FACT</u>

I.   <u>Background Facts</u>

At the time they filed their Complaint, plaintiffs were employed as dispatchers for WPD. Plaintiff Linda DeVooght was hired on April 5, 1999 and was promoted to the position of Dispatch Supervisor on or about February 20, 2015. DeVooght was terminated from her employment on August 7, 2020 and was rehired as a dispatcher on October 9, 2020. Plaintiff Jennifer Piper was hired as a dispatcher on January 24, 2005 and is now retired. Plaintiff Dawn McLean was employed as a dispatcher from May 19, 1997 until her retirement on May 19, 2022.

The WPD police station houses the jail and the dispatch center. The dispatch center is staffed predominately by female dispatchers. On June 5, 2020, around the time this case was filed, WPD employed 23 dispatchers, dispatch supervisors, and dispatchers in training, of whom 5 were men. As of August 30, 2022, there were 18 dispatchers, dispatcher supervisors, and dispatchers in training, of whom 3 are men.

On the other hand, sworn law enforcement officers employed by WPD are predominantly male. According to the 2018 FBI report on full-time law enforcement employees, 12.6 percent of all sworn law enforcement officers in the United States are female. As of March 31, 2021, WPD employed 13 women as sworn police officers out of a total of 144 sworn officers, which is 9% of the force. As of August 1, 2022, WPD employed 11 women out of a total of 159 sworn officers, which is 6.9% of the force.

WPD's current official Procedure governing searches, which was published on October 5, 2020, states: "A female dispatcher will conduct the search of a female prisoner in the detention facility when a female is arrested by a male officer and there are no available female officers on duty and in the station at the time of booking." General Order 20-63. The plaintiffs contend that, in contravention of the Procedure, female

dispatchers are regularly ordered to perform intake searches even when female sworn officers are on duty and available.

Searching prisoners is a core policing function and not an essential qualification for the position of dispatcher. Captain Christian Bonett, ECF No.114, PageID.4940; Dr. Christian del Pozo, ECF No.113, PageID.4790. Searching prisoners is inherently dangerous and can result in assaults, injuries and even death of the person conducting the search. In May 2019, the dispatchers created a search log to track the searches they conducted. The log describes incidents of uncovering weapons and drug paraphernalia, exposure to bodily fluids, physical resistance, and being left to conduct searches without supervision by a sworn officer.

Dispatchers are trained how to search prisoners, but they are not provided training in defensive tactics at the level received by police officers. Captain William Reichling, ECF No. 114, PageID.5155. There is no dispute that police officers are better trained and better equipped to search prisoners than civilian dispatchers. In recognition of this fact, it is WPD's policy that the arresting officer be present during prisoner searches so they can intervene if the prisoner becomes unruly or violent. Captain Bonett, ECF No. 114, PageID.4940. Searches take place in the open area of the jail where the prisoners are secured after being arrested. However, if the

search involves removing a female prisoner's clothing, the search takes place in a private room and the male arresting officer stands outside the door while the dispatcher conducts the search. Piper, ECF No. 113, PageID.4690.

When a dispatcher is told to perform a search, she necessarily must leave her dispatch post. When this happens, the dispatcher is temporarily replaced by a sworn officer. Officers receive little to no training on dispatcher duties and they are not permitted to dispatch Fire or EMT services. The dispatcher job is technical and requires specialized training that sworn officers do not have, so this practice creates a potential danger to public safety.

There is no dispute that all dispatchers are paid on the same wage scale, even though female dispatchers, but not male dispatchers, are required to conduct prisoner intake searches in addition to their dispatch duties.

II.   <u>Consideration Given to Policy and Proposed Alternatives</u>

The female dispatchers have brought many complaints to WPD regarding the search policy. Captain Christian Bonett supervised Dispatch for many years and testified that the issue arose most recently in 2019. Bonett explained at that time he followed-up on Ms. DeVooght's complaints

by raising the issue of possible alternatives to the intake search policy
during a Staff & Command Meeting with Commissioner William Dwyer,
Captain William Reichling, Union representatives and others on March 18,
2019. ECF No. 114, PageID.4921-4923.

Bonett testified that in determining what would be feasible for the
WPD, he relied on conversations with officers, sergeants and the
lieutenants, as well as conversations with DeVooght on behalf of the
dispatchers. ECF No. 114, PageID.4955-4956. Bonett could not recall the
specifics of what was discussed at the Staff & Command Meeting. The
minutes from the meeting state, "Captain Bonett said he also had a
meeting with the WPOA and Training regarding female prisoner searches.
A discussion followed." Exhibit P25.

Captain Reichling recalled the discussion at the Staff & Command
Meeting in 2019, as well as other discussions. He testified that he spoke to
other jurisdictions about how they have handled female prisoner searches,
learning that many jurisdictions have done away with their dispatch centers
and jails and now use County dispatch and facilities. ECF No. 114,
PageID.5101, 5153.

WPD concluded there were no feasible alternatives to the policy
requiring female dispatchers to conduct intake searches on female

prisoners. However, WPD modified the language of its intake search policy to provide that dispatchers are utilized only as a matter of "last resort," including use of language clarifying how to locate "available" female officers and modifying the definition of "available." *See. e.g.* Gen. Orders. 18-03, 19-04, 20-03 and 20-63.

While the changes to the policy were intended to lead to a decrease in searches being conducted by dispatchers, that has not played out. Since 2020, the number of female dispatcher searches has remained constant or slightly increased. WPD believes this is because the overall number of arrests in Warren have increased, and for a period of time both female officers assigned to the jail cell block were out on medical leave.

Plaintiff's expert witness, Dr. Brian del Pozo testified that in his experience and research, he has "never encountered [another department] that had dispatchers searching female prisoners in an agency of Warren's size." ECF No. 113, PageID.4798-4799. Commissioner Dwyer testified: "I would prefer that just like male officers search male prisoners. I would—I would hope someday here in Warren, we can have female officers searching female prisoners." ECF No. 114, PageID.4971.

Plaintiffs have presented five alternatives to defendant's policy of having female dispatchers search prisoners. To gain protection under the

BFOQ affirmative defense, it is defendant's burden to establish by a preponderance of the evidence that the alternatives presented by plaintiffs are not reasonable.

III.   Alternative # 1 – Call a Female Police Officer in from the Field

Plaintiffs maintain that calling a patrol officer off the road is routine at WPD. DeVooght testified that in addition to calling officers off their patrol for various policing tasks, WPD calls officers to the station for non-policing activities such as vehicle maintenance, a bathroom break, or to bring in a meal for the Watch Commander. DeVooght, ECF No. 113, PageID.4599. Plaintiff therefore proposes calling a female officer off the road to return to the station to conduct female arrestee searches as a reasonable and feasible alternative to using female dispatchers.

When a prisoner is brought to the jail they are made to sit on a bench and their hands are cuffed to a bar. They remain there until they can be searched. The law enforcement witnesses and experts agree that it is unsafe and unreasonable to have a prisoner remain unsearched at the jail for more than 20 minutes, and that optimally a search should take place within 15 to 20 minutes. The passage of time is dangerous given that an unsearched prisoner can access contraband, or dispose of evidence on their person. In addition, keeping an unsearched prisoner handcuffed to the

intake bench awaiting a search for more than 20 minutes is "not comfortable" and leads to aggression. On this subject, Captain Reichling testified:

> [A]nything over that 15-, 20-minute mark, it just starts to go south for us in every way… [T]he longer you leave someone handcuffed, it just goes -- and I've seen it in my 26 years, the more uncomfortable they get, or if they're intoxicated or if they're on something, you start hearing the demands. Get these cuffs off me. Get these cuffs off me. Now, you have someone who maybe wasn't in an agitated state, but in a sense, you're escalating it by leaving them in the cuffs as opposed to getting it deescalated, where you get them out of the cuffs, get them searched, throw them in their own holding cell, and they crawl down and go to sleep, something like that. That's what we strive for. But, yeah, I mean it's just human nature. The more locked up or locked down a person is, the more they become opposed and act against that.

ECF No. 114, PageID.5108-5109. The Court finds that as a general proposition, an intake search should be conducted within 20 minutes of an arrestee being brought to the jail.

The City of Warren occupies 34.4 square miles. The dispatchers, who regularly follow patrol movement from their communication consoles, testified that in heavy traffic it would take an officer no more than twenty minutes to drive from her position on road patrol to the jail. While there was other testimony that the drive time to the jail could be as long as thirty minutes, the Court generally credits the testimony of the dispatchers.

In addition to drive time, the female officer on road patrol may be actively involved in a traffic stop or an investigation, or they may be covering a quadrant for a male officer who is on a call. The time it takes to clear a run before driving back to the jail adds to the response time. Captain Reichling testified that the timing required to clear a run before returning to the station is "such a gray area… it could be five minutes. It could be five hours… It all depends on the nature [of the run they are engaged in]. Nothing's black and white in this." ECF No. 114, PageID.5104.

WPD patrols are organized by a quadrant or sector system. If an officer is called off their assigned quadrant or sector, the rest of the patrol is adjusted to cover that slot. Dwyer, ECF No. 113, PageID.4963; Brian Shock, ECF No. 114, PageID.5058. Bringing a female officer in from the road to conduct an intake search necessarily creates a patrol gap for other officers on patrol and may pose a danger to officers as well as to the community. The gap will last as long as it takes the female officer to travel to the jail, conduct the search, and travel back to her assigned quadrant. The gap is compounded by the fact that a second patrol gap is created because the male officer who arrested the female prisoner must remain at the jail until the female officer arrives and completes the search. These patrol gaps will be further compounded if they involve an officer assigned to

a two-officer patrol car. Two-officer cars are assigned to higher-crime areas and are called upon to respond to priority runs. Taking these cars out of their quadrants for extended periods of time, adds to the unreasonableness of this proposed alternative.

Even if the drive time from road patrol to the jail is under 20 minutes, a female officer is not available to begin that journey until she finishes whatever task she is involved in and coverage has been secured for her quadrant. Given the issues attendant to calling a female officer in from the road, it is unlikely she will arrive at the jail within the 15 to 20 minute window that is considered safe for conducting intake searches. As for plaintiffs' argument that officers are called in from the road for non-search reasons, even then the Watch Commander makes the decision to call officers in, based on what else is going on in the City and in each quadrant.

The Court finds that defendant has established that calling a female officer in from the road is not feasible in most instances and is therefore not a reasonable alternative to the present policy.

IV.   Alternative # 2 – Hold an Arrestee Until a Female Officer is Available

Plaintiffs argue that it is reasonable to hold the arrestee until a female officer is available to conduct an intake search. This alternative is covered by the current policy that provides for a search by a female dispatcher only

when there is no female officer on duty or when a female officer is on duty but is not available. The Court has already found that calling a female officer in from the road is not generally a reasonable alternative because it would result in dangerously long delays. In addition, since police officers at WPD work 12-hour shifts, if no female officer is on duty when a prisoner is brought in, the wait could be up to 12 hours for a female officer to come on duty. This extreme example would be an unreasonable alternative because a delay of that length of time is per se unconstitutional.

As discussed above, holding an arrestee for over 20 minutes until a female officer is available can present a danger to jail staff, the personnel ultimately conducting the search, and to the prisoner. This alternative can also result in coverage issues that must be considered by the Watch Commander. Therefore, defendant has shown that holding an arrestee until a female officer becomes available is not a reasonable alternative.

V.    <u>Alternative # 3 – Hire More Female Police Officers</u>

Plaintiffs propose that if WPD hired more female police officers in sufficient numbers, it would not be necessary to use female dispatchers to conduct intake searches of female prisoners. According to plaintiffs, if 10% of WPD's sworn officers were female, which would be 16 of the current 159 officers, all prisoners could be searched by officers of the appropriate

gender. While having more female officers employed and on duty would inevitably lessen the necessity of using female dispatchers for searches, there was no evidence as to what the magic number would need to be to never have to resort to using female dispatchers.

Rather, most of the evidence presented focused on whether defendant has undertaken reasonable efforts to hire more female police officers. Plaintiffs point to WPD's success in hiring officers and building its force to fully staffed over the last two years, even as policing across the country has suffered from low application numbers and officers leaving the profession. WPD achieved these results by offering higher pay and more generous benefits to attract lateral hires from other departments, along with its 3-year suspension of civil service requirements governing the hiring of police officers.

However, even with its success in hiring new officers, WPD remains an outlier in the percentage of female officers it employs – 6.9% compared to the national average of 12.6%. Plaintiffs compare WPD to neighboring Detroit Police Department ("DPD"), which employs approximately 1900 officers, of which 24% are female. Plaintiffs point out that in its recent hiring spree, WPD hired 35 new male officers away from DPD, but no female

officers. Plaintiffs argue that hiring more female officers is feasible, but for defendant's lack of effort.

WPD has made some modest efforts to attract female applicants for officer positions. Those efforts include setting aside the civil service system of Michigan's Act 78 for the last several years to attract more minority and female applicants. In addition, they engaged in community outreach to reach female candidates through social media and open houses. WPD attempted to create a Women in Law Enforcement group, but it apparently failed to survive due to a lack of volunteers. Ultimately, WPD's efforts to recruit female officers failed to achieve its goal.

It is clearly in defendant's best interest to employ more female officers, not just to address the issues associated with female intake searches, but to achieve more efficiency in the department and better policing in the community. It is easy to pick apart what WPD could have done better and criticize the strategies utilized, but given the realities that exist, defendant has shown that hiring more female officers is an unfeasible alternative to the present search policy. Of course, WPD should continue to strive to employ more female officers to achieve what Commissioner Dwyer expressed to be the ideal goal of having enough female officers to never have to use female dispatchers for searches. However, based on evidence

of the situation as it exists today, the Court finds that defendant has

established that hiring more female officers is not a reasonable alternative.

VI.    <u>Alternative # 4 – Request Female Officer from Neighboring Jurisdiction</u>

Plaintiff's next proposed alternative to the search policy is to request

female officer assistance from a neighboring jurisdiction. Plaintiffs identify

fifteen police departments within a ten-mile radius of the WPD jail, including

precincts in the City of Detroit which has hundreds of female police officers.

However, given the shortage of sworn officers in almost all police

departments, this is not a reasonable alternative.

Commissioner Dwyer testified that DPD is so understaffed that they do

not even respond to their own accidents that occur on the border between

Detroit and Warren. Based on his knowledge and experience with DPD,

while he would like to see them assist WPD by sending female officers to do

searches, he knows that is not a possibility. ECF No. 114, PageID.4980.

Dwyer clarified that the two departments work together on investigations, but

because DPD does not have the manpower to service their own residents,

they are not able to assist with intake searches.

Even considering that Dwyer gave contradictory testimony about

whether he personally, or someone from his administration, discussed this

issue with Assistant Chief David LeValley, the Court finds that the proposed

alternative was given due consideration and was found not to be a reasonable alternative. Captain Reichling provided another problem with seeking assistance from another jurisdiction, which is that it causes a patrol gap for the other department. Not only does the other jurisdiction lose officer time due to travel, entering the jail, and conducting the search, it also loses time due to chain of custody issues and potentially appearing in court. ECF No. 114, PageID.5112-5113.

Plaintiffs point out that WPD sends its female officers to neighboring jurisdictions to do searches, but at trial it was clarified that those are limited to roadside searches. Captain Reichling testified that Warren and other cities assist each other with roadside searches which are of a different character than intake searches. Roadside searches are necessitated when a male officer pats down a female and feels something suspicious, or witnesses a female hide something in her bra. These searches are quick and targeted, they take place next to the patrol car, and the officers are not taken out of service like they would be if they reported to the WPD jail. ECF No. 114, PageID.5113-5114.

WPD has demonstrated by a preponderance of the evidence that relying on mutual aid from neighboring jurisdictions to perform intake

searches on female prisoners is not a reasonable alternative to the current policy.

VII.   <u>Alternative # 5 – Provide Hazard or Bonus Pay</u>

The final alternative offered by plaintiffs, paying female dispatchers to search prisoners, is one that was initially of most interest to the Court. Conducting prisoner searches is a function outside traditional dispatcher duties and it exposes the individual to danger, so offering bonus or hazard pay presents like a natural solution. Dr. del Pozo explained that compensation incentives are used to staff less desirable shifts. Similarly, extra pay may be provided to employees who perform duties outside of their standard role. ECF No. 113, PageID.4801-4802. Both Commissioner Dwyer and Captain Reichling expressed their support for paying women dispatchers to do searches. ECF No. 114, PageID.4977, ECF No. 114, PageID.5115.

However, decisions regarding wages and shift premiums must originate with the union and must be collectively bargained under the Warren Police Officers Association ("WPOA") Collective Bargaining Agreement, Ex. J51; ECF No. 113, PageID.4764-4765. The WPOA is the exclusive representative for collective bargaining regarding pay, wages, hours and other terms of employment for employees in the classification/

rank of dispatcher, police officer, candidate, and corporal. Ex. J51. Union President Sauger confirmed this is the case, as did Commissioner Dwyer, Captain Reichling, and several dispatchers.

Dispatcher Fessenden who was formerly a Union Steward and the Dispatcher-Union Liaison, testified that it is solely within the Unions' purview to propose, then negotiate compensation and benefits for the Union Members. Under this negotiated process, a change is proposed by the Union Board, the City comes to an initial agreement with the Union Board, then the agreement is voted upon by all union members who have to agree that this is the best use of "their pot of compensation and benefits" before a change in pay or benefits is enacted. This always takes place during open contract negotiations and there is no other way to change compensation or benefits for union members. ECF No. 120-7, PageID.6740-6741. Finally, any change in pay or benefits that would result in a change in the adopted annual City of Warren budget must be approved by Warren's City Council.

Although appealing, this is not a viable alternative given that the defendant cannot provide the extra pay that plaintiffs propose without it first being negotiated by the Union.

<u>CONCLUSIONS OF LAW</u>

A discriminatory policy may be excused as a BFOQ only if it is "the result of a 'reasoned decision-making process'" and defendant can prove that there are no reasonable alternatives to this discriminatory policy. Opinion and Order Denying Defendant's Motion for Summary Judgment (citing *Everson v. Michigan Dep't of Corrections*, 391 F.3d 737, 750 (6th Cir. 2004); *Reed v. Cty of Casey*, 184 F.3d 597, 599 (6th Cir. 1999)), ECF No. 74, PageID.3515-3516. "An employer must have a basis in fact for its belief that gender discrimination is reasonably necessary—not merely reasonable or convenient—to the normal operation of its business." *Roman v. Cnty. of Monroe*, 426 F. Supp. 3d 439, 445 (E.D. Mich. 2019) (quoting *Everson*, 391 F.3d at 748). If the decisions made by prison administrators are the product of a reasoned decision-making process, and based on available information and experience, the Court defers to that judgment and gives them substantial weight. *Emerson*, 391 F.3d at 750 (citing *Torres v. Wisc. Dep't of Health & Soc. Svcs*, 859 F.3d 1523, 1529, 1532 (7th Cir. 1988) (en banc)).

Plaintiffs argue that the City of Warren did not commission an independent report to aid in its determination whether there were any feasible alternatives to the discriminatory policy it employed. Nevertheless,

the Court finds that defendant did consider available information and the collective experience of its police department in making the decision to stand by its policy. In fact, changes were made to the policy to address plaintiffs' concerns, including the definition of what it means for a female officer to be unavailable. *See, Jennings v. New York State Off. of Mental Health*, 786 F. Supp. 376, 385 (S.D.N.Y. 1992), *aff'd*, 977 F.2d 731 (2d Cir. 1992).

The Court therefore defers to the judgments of the administrators charged with making the decisions. For the reasons discussed above, in relation to the five alternatives proposed by plaintiffs, the Court finds that defendant has established that no reasonable alternative exists to the gender-based prisoner intake search policy at WPD. Therefore, the BFOQ justification is a complete defense in this case.[1]

## CONCLUSION

Having determined that the BFOQ defense protects defendant for instituting a sex-based policy as a result of a reasoned decision-making process, judgment shall enter on behalf of defendant.

---

[1] Plaintiffs failed to preserve their theory that the BFOQ defense is inapplicable because it only applies to the hiring and employment of employees and not the assignment of job duties. Plaintiffs failed to raise or develop this argument in response to either motion for summary judgment. Plaintiffs raised the theory for the first time when they unilaterally identified it as an issue of law in the Joint Final Pretrial Order.

The Court encourages the plaintiffs to work with their union to effect the change they are seeking. The Court also encourages the City to continue its efforts to hire more female officers and take other reasonable actions in applying its intake search policy, to maximize the safety of all its employees and citizens.

Dated:  February 2, 2023

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on February 2, 2023, by electronic and/or ordinary mail.

s/Michael Lang
Deputy Clerk